**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

_____

|  |  |  |
|---|---|---|
| LEGACY COMMUNITY | ) | |
| HEALTH SERVICES, INC., | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     v. | ) | Case No.: 4:15-CV-00025 |
| | ) | |
| DR. KYLE L. JANEK, in his Official Capacity | ) | |
| as Executive Commissioner of the Texas | ) | |
| Health and Human Services Commission, | ) | |
| | ) | |
|     and | ) | |
| | ) | |
| TEXAS CHILDREN'S HEALTH PLAN, | ) | |
| | ) | |
|     Defendants. | ) | |

_____

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S**
**MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND**
**FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

I.   INTRODUCTION ........................................................................................................ 1

II.  FACTUAL AND LEGAL BACKGROUND ............................................................... 3

   A.   Federal Legal Framework ....................................................................................... 3

      1.   Community Health Centers .............................................................................. 3

      2.   The Medicaid Program .................................................................................... 4

      3.   Medicaid Managed Care .................................................................................. 5

   B.   Factual Background and Texas Medicaid Regime .................................................. 9

      1.   Legacy Community Health Center .................................................................. 9

      2.   The Texas Medicaid Managed Care System and TCHP .............................. 10

      3.   TCHP's Termination of Legacy .................................................................... 12

III. ARGUMENT ................................................................................................................ 14

   A.   Legacy Is Substantially Likely To Succeed On The Merits ................................. 14

      1.   HHSC's wraparound payment system is contrary to federal law ................ 14

         i.   HHSC improperly comingles FQHC wraparound payments with the
              capitation payments made to MCOs ...................................................... 15
         ii.  HHSC's requirement that MCOs reimburse FQHCs at their PPS rates is
              contrary to federal law .................................................................... 17

      2.   TCHP's contract fails to include a provision providing for payment at an FQHC's
           PPS rate for specified out-of-network medically necessary services. .................. 19

      3.   TCHP's receipt of Medicaid FQHC supplemental payment funds and disbursement of
           those funds as HHSC's agent violates federal law. ........................................ 21

      4.   TCHP's termination of its provider agreement with Legacy for the sole reason that
           TCHP does not wish to pay Legacy's PPS rate constitutes breach of its contract with HHSC.
           ...................................................................................... 22

   B.   Legacy Has A Substantial Likelihood Of Incurring Irreparable Harm Absent
        Preliminary Injunctive Relief ............................................................................... 25

      1.   Legacy lacks an adequate remedy at law to redress its financial losses caused by
           HHSC's policies, and thus its injuries are *per se* irreparable. ............................ 25

      2.   Legacy will suffer concrete and immediate harm as a result of both Defendant's
           actions ............................................................................................. 27

   C.   The Balance Of Equities Favors Granting Preliminary Relief To Legacy .................... 31

   D.   Granting Injunctive Relief To Legacy Is In The Public Interest .................................. 32

IV.  CONCLUSION ............................................................................................................. 34

# TABLE OF AUTHORITIES[1]

**Cases**

*ACLU v. Reno*, 929 F. Supp. 824 (E.D. Pa. 1996)............................................................. 32

*Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240 (3d. Cir. 2003)........................................... 31

*Barnhart v. Walton*, 535 U.S. 212 (2002)..................................................................... 19

*Bontrager v. Indiana Family & Social Serv. Admin.*, 697 F. 3d 604 (7th. Cir. 2012)................. 31

*\*Byrum v. Landreth*, 566 F.3d 442 (5th. Cir. 2009) ..................................................... 14

*California Pharm. Ass'n v. Maxwell-Jolly*, 563 F. 3d 847 (9th. Cir. 2009) ........................... 26, 32

*\*Cmty. Health Care Assn' of New York v. Shah*, 770 F.3d 129 (2d. Cir. 2014).......... 20-21, 25, 33

*\*Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132 (2d. Cir. 2002)........................................... 19

*Edelman v. Jordan*, 415 U.S. 651 (1974) ............................................................... 25-26

*Evergreen Presbyterian Ministries, Inc. v. Hood*, 116 F. Supp. 2d 745 (W.D. Lou. 2000) ......... 32

*Ex Parte Young*, 209 U.S. 123 (1908) ..................................................................... 26

*Exhibitors Poster Exchange, Inc. v. Ntn'l Screen Serv. Corp.*, 441 F.2d 560 (5th. Cir. 1971) .... 30

*Gonannies, Inc. v. Groupair.Com, Inc.*, 464 F. Supp. 2d 603 (N.D. Tex. 2006)....................27

*Harris v. McRae*, 448 U.S. 297 (1980).................................................................... 31

*Hinojosa v. City of Kingsville, Texas*, 266 F. Supp. 2d 562 (S.D. Tex. 2003) ........................... 14

*Hornbeck Offshore Services, LLC v. Salazar*, 696 F. Supp.2d 627 (E.D. La. 2010)................... 29

*Hughes Network Sys., Inc. v. InterDigital Commc'n Corp.*, 17 F.3d 691 (4th. Cir. 1994).......... 26

*Kan. Health Care Ass'n, Inc. v. Kansas Dep't of Social and Rehab. Servs.*, 31 F.3d 1536 (10th.

Cir. 1994) .................................................................................................. 27

---

[1]        Authorities chiefly relied upon are marked with an *

*K.C. ex rel. Africa H. v. Shipman*, 716 F.3d 107 (4th. Cir. 2013)……………………………… ……21

*MCI Telecomm. Corp. v. Texas Util. Elec.*, 995 S.W. 2d 647 (Tex. 1999) .............................23-24

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618 (5th. Cir. 1985)...... 29

*New Jersey Primary Care Ass'n v. New Jersey Dep't of Human Res.*, 722 F.3d 527 (3d. Cir. 2013) ................................................................................................................................ 21, 25

*Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249 (4th. Cir. 2003)........................................... 31

*Pashby v. Delia*, 709 F.3d 307 (4th. Cir. 2013) ............................................................................ 33

*Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303 (5th. Cir. 2008).............................. 26

*Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204 (4th. Cir. 2007)........................................ 15

*Petroleum Exploration v. Public Service Comm'n of Kentucky* U.S. 209, 217 (1938) ............... 27

*Pharmacy Buying Ass'n, Inc. v. Sebelius*, 906 F.2d 604 (W.D. Tex. 2012)................................. 22

*\*Rio Grande Cmty. Health Center v. Rullan*, 397 F.3d 56 (1st. Cir. 2005) ..................... 15-16, 25

*Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353 (4th. Cir. 1991) ............................... 26-27

*Savage v. Commonwealth of Pennsylvania*, 475 F.Supp. 524 (E.D. Pa. 1979) ........................... 27

*Spiegel v. City of Houston*, 636 F.2d 997 (5th Cir.1981).............................................................. 27

*\*Stine v. Stewart*, 80 S.W. 3d 586 (Tex. 2002)......................................................................23-24

*Talbot v. Lucy Corr Nursing Home*, 118 F.3d 215 (4th. Cir. 1997) ............................................ 27

*Tawes v. Barnes*, 340 S.W. 3d 419 (Tex. 2011) .......................................................................... 24

*Temple Eastex, Inc. v. Old Orchard Creek Partners, Ltd.*, 848 S.W. 2d 724 (Tex. App. 1993).. 24

*Texas First Nat. Bank v. Wu*, 347 F. Supp. 2d 389 (W.D. Tex. 2004) ........................................ 30

*Texas Medical Assn' v. Bowen*, 1988 WL 235555 (W.D. Tex 1988).......................................... 26

*\*Three Lower Cnties. Cmty. Health Servs., Inc. v. Maryland*, 498 F.3d 294 (4th. Cir. 2007) ...............................................................................................……………….4-5, 14-15, 19, 24

*U.S. v. Baylor University Medical Center*, 711 F.2d 38 (5th. Cir. 1983) ...................................... 33

*U.S. v. Mead*, 533 U.S. 218, 235 (2001) ...................................................................................... 26

*United States v. State of New York*, 708 F.2d 92 (2d. Cir. 1983)................................................. 27

*West Alabama Quality of Life Coal. v. U.S. Fed. Highway Admin.*, 302 F. Supp.2d. 672 (W.D.

Tex. 2004) ...................................................................................................................... 28

**Statutes**

42 U.S.C. § 254b.......................................................................................................................3-4, 9

42 U.S.C. 254b(k)(3)(G)(ii)(II).................................................................................................... 22

42 U.S.C. § 1315(a)(1)................................................................................................................. 11

42 U.S.C. § 1396-1(1) ................................................................................................................... 4

42 U.S.C. § 1396a(bb)(5)(A) .................................................................................................. 7, 15

42 U.S.C. § 1396b(m)(2)(A)....................................................................................... 6-7, 9, 17, 19

42 U.S.C. §§ 1396d(a)(2)(C) ........................................................................................................ 5

42 U.S.C. § 1396d(*l*)(2)(B) ........................................................................................................... 5

42 U.S.C. § 1396u-2(a)(1) ............................................................................................................ 6

Tex. Gov. Code § 533.002 ........................................................................................................... 11

**Other Authorities**

Fed. R. Civ. P. 65........................................................................................................................ 14

H. Rep. 105-217 (2007) ............................................................................................................. 6-7

**Regulations**

42 C.F.R. § 51c.104(b)................................................................................................................ 10

42 C.F.R. § 438.2 .......................................................................................................................... 6

42 C.F.R. § 438.6(c)....................................................................................................................... 6

42 C.F.R. § 447.201(b) .............................................................................................. 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

_____

|  |  |  |
|---|---|---|
| LEGACY COMMUNITY | ) | |
| HEALTH SERVICES, INC., | ) | |
|  | ) | |
|     Plaintiff, | ) | |
|  | ) | |
|     v. | ) | Case No.: 4:15-CV-00025 |
|  | ) | |
| DR. KYLE L. JANEK, in his Official Capacity | ) | |
| as Executive Commissioner of the Texas | ) | |
| Health and Human Services Commission, | ) | |
|  | ) | |
|     and | ) | |
|  | ) | |
| TEXAS CHILDREN'S HEALTH PLAN, | ) | |
|  | ) | |
|     Defendants. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND FOR A PRELIMINARY INJUNCTION

### I.    INTRODUCTION

This action seeks to enjoin Dr. Kyle L. Janek, in his Official Capacity as Executive

Commissioner of the Texas Health and Human Services Commission (hereafter referred to as

"HHSC"), and Texas Children's Health Plan ("TCHP"), a Texas Medicaid managed care

organization ("MCO"), from continuing to violate federal Medicaid payment requirements with

respect to Legacy Community Health Services, Inc. ("Legacy"), a Texas federally-qualified

health center ("FQHC").  This action further seeks to enjoin TCHP from knowingly breaching its

managed care contract with HHSC to the detriment of Legacy, an intended third party

beneficiary of that contract.  As a result of HHSC and TCHP's actions culminating in TCHP's

decision to terminate its provider agreement with Legacy effective February 1, 2015, thousands

of Legacy's FQHC patients, the majority of whom are children or expectant mothers, will be

prevented from seeing their chosen health care providers, and Legacy's overall patient population will be left without comparable access to much-needed health care services.

As explained herein, states are required by federal law to reimburse FQHCs such as Legacy for Medicaid services at a unique "prospective payment system" ("PPS") rate.  In order to ensure FQHCs such as Legacy receive their full PPS rates in states that have implemented Medicaid managed care, states must provide for payment to FQHCs of the difference between MCO payments and the FQHCs' PPS rates.  Yet since 2011, HHSC has unlawfully made such payments indirectly by incorporating the full value of FQHCs' PPS rates into the payments it makes to MCOs for Medicaid services and requiring the MCOs to then reimburse FQHCs directly at their full PPS rates.  At issue in this case, HHSC makes payments to TCHP that incorporate Legacy's PPS rate and TCHP is responsible for reimbursing Legacy at its PPS rate for FQHC services rendered to TCHP enrollees.  By requiring that TCHP reimburse Legacy at its PPS rate rather than a lower negotiated rate, HHSC increased TCHP's reimbursement costs and incentivized TCHP to terminate its provider agreement with Legacy.

Further, federal law requires that states and MCOs ensure full payment to providers for certain out-of-network services.  HHSC failed to include such a payment requirement in TCHP's MCO contract, and TCHP has independently indicated that it maintains an interpretation of the out-of-network payment requirement that is contrary to federal law.  As such, following TCHP's termination of Legacy's provider agreement Legacy risks not receiving reimbursement for providing required services to out-of-network patients, a violation of the federal PPS payment provisions.

Lastly, because TCHP contracted to provide payments at Legacy's PPS rate its termination of Legacy's provider agreement is also a breach of TCHP's obligations under its

contract with HHSC, a contract TCHP entered into with full knowledge about the payments it would be required to make to FQHCs and which TCHP itself construed as not permitting it to terminate Legacy's provider agreement on the basis of cost alone. In sum, HHSC and TCHP's actions have ignored explicit federal directions intended to minimize conflict between the payments states must make to FQHCs like Legacy and states' Medicaid payment systems so that the underserved populations served by FQHCs are not harmed or denied access to care.

HHSC's policy and TCHP's termination will result in irreparable harm to Legacy in the form of lost patients and a subsequent significant reduction in revenue. Legacy will be forced to terminate clinical staff, reduce its scope of services, and close clinical sites. HHSC and TCHP's actions will also cause substantial harm to the tens of thousands of Legacy's patients in the greater Houston area who will no longer have reasonable access to the comprehensive FQHC services that Legacy currently offers if Legacy is forced to reduce its services, as well as Legacy's patients currently enrolled with TCHP whose care will be disrupted when they are prevented from seeing their chosen Legacy health care providers after February 1, 2015.

## II.     FACTUAL AND LEGAL BACKGROUND

### A.     Federal Legal Framework

#### 1.     Community Health Centers

Community health centers are primarily § 501(c)(3) organizations that are eligible to receive grant funds under Section 330 of the Public Health Service ("PHS") Act, 42 U.S.C. § 254b, to provide care to medically underserved populations[2] in their communities. 42 U.S.C. §§

---

[2]     "Medically underserved population[]" means "the population of an urban or rural area designated by the Secretary [of the Department of Health and Human Services] as an area with a shortage of personal health services or a population group designated by the Secretary as having a shortage of such services." 42 U.S.C. §254b(b)(3).

254b(a), (e), (k).  Community health centers are required by Section 330, to, among other things: (1) serve a medically underserved population (42 U.S.C. § 254b(a)(1)); (2) provide primary health care services (42 U.S.C. §§ 254b(a)(1)(A) and 254b(k)(3)(A)); (3) provide health care services to Medicaid recipients (42 U.S.C. § 254b(k)(3)(E)); and (4) serve all residents of their communities, regardless of any patient's ability to pay.  42 U.S.C. §§ 254b(a)(1) and 254b(k)(3)(G)(iii).  Community health centers also offer enabling services, such as outreach and transportation, education services, and patient case management services.  42 U.S.C. § 254b(b)(1)(A).

As grant funds under Section 330 are to be used only to serve economically disadvantaged patients who are unable to pay for the medical services that the health center provides, 42 U.S.C. § 254b(e)(5)(A), community health centers are required to make every reasonable effort to collect appropriate reimbursement for services from all available funding sources, including Medicaid.  42 U.S.C. § 254b(k)(F).

2.    The Medicaid Program

The Medicaid program was initiated in 1965, and is jointly supported by federal and state funds.  Medicaid makes health care services available to needy individuals and families whose resources are insufficient to meet the costs of necessary medical services.  *See* 42 U.S.C. § 1396-1(1).  Participation in Medicaid by any state is voluntary; however, once a state elects to participate, the State must comply with all "detailed federally mandated standards." *Three Lower Cnties. Cmty. Health Servs., Inc. v. Maryland*, 498 F.3d 294, 297 (4th. Cir. 2007).  A state that elects to participate in Medicaid must submit and have approved a State Medicaid Plan through which the state defines, *inter alia*, groups of individuals covered, eligibility conditions, medical care and services, reimbursement, and federal-state requirements.  *See generally* 42

4

U.S.C. §§ 1396a(a)(1)-(65) and 42 C.F.R. Part 430, *et seq.* Of particular relevance here, a state

plan "must describe the policy and methods to be used in setting payment rates for each type of

service included in the State's Medicaid program." 42 C.F.R. § 447.201(b).

Under the Medicaid program, a community health center is deemed a "Federally-

qualified health center," or FQHC, if it is a recipient of funds under Section 330 and maintains

an outpatient health program. 42 U.S.C. § 1396d(*l*)(2)(B). This confers special Medicaid status

on FQHCs in two respects. First, "[f]ederally-qualified health center services . . . and any other

ambulatory services offered by a Federally qualified health center" *must* be covered under a

State's Medicaid plan. 42 U.S.C. §§ 1396d(a)(2)(C) and 1396a(a)(10)(A).

Second, the Medicaid statute provides unique payment provisions for FQHCs. Congress'

goal in passing the FQHC payment provisions was made clear in legislative history: to "ensure

that health centers receiving funds under [§330] would not have to divert Public Health Services

Act funds to cover the cost of serving Medicaid patients." *Three Lower Cnties.*, 498 F.3d at 297-

98 (citing H.R. Rep. No. 101-247, at 392-93, reprinted in 1989 U.S.C.C.A.N. 2118-19).

Currently this reimbursement obligation takes is based on a cost-related PPS methodology,

which requires states to reimburse FQHCs on a prospective, or predetermined, rate per patient

visit (also known as an "encounter"). 42 U.S.C. § 1396a(bb).[3]

3.      Medicaid Managed Care

---

[3]      The per visit reimbursement rate for each FQHC, which is uniform for patient encounters
regardless of the service performed during the visit, is computed on the basis of the average of
100 percent of the particular FQHC's reasonable costs for covered services in federal fiscal years
1999 and 2000. 42 U.S.C. § 1396a(bb)(2). The PPS rate became effective January 1, 2001. The
PPS rate is increased each year by a standard medical inflation factor, known as the Medicare
Economic Index ("MEI") and adjusted for any changes in the scope of services furnished by the
health center. 42 U.S.C. § 1396a(bb)(3).

States have the option of implementing their Medicaid programs through managed care systems. In such systems, a state contracts with managed care organizations (known generically as "health maintenance organizations" ("HMOs")) to provide and manage Medicaid services for a segment of the Medicaid population enrolled with that MCO. 42 U.S.C. § 1396u-2(a)(1). In exchange for its services, an MCO receives a per-member per-month payment, called a "capitation" payment, from the state based on its number of enrollees. 42 C.F.R. § 438.2. The MCO in turn contracts with various providers, including FQHCs, to provide services to its enrollees. An MCO contract is risk-based; to the extent an MCO can manage its enrollees' health care costs so that the amount the MCO pays in reimbursement to its providers is less than the amount it receives from the state in capitation payments, the MCO makes a profit. 42 C.F.R. § 438.6(c). If payments to providers exceed capitation payments, the MCO incurs a loss. *See* 42 C.F.R. § 438.2 (defining the risk-based MCO contract model). To protect against excessive gains or losses, this capitation payment also must be "actuarially sound." 42 U.S.C. § 1396b(m)(2)(A)(xiii)(II).

Because of the nature of risk-based MCO contracting, a number of protections were enacted to secure the FQHC payment system in the managed care context. First, to allow FQHCs to offer MCOs rates competitive with those offered by non-FQHC providers, federal law does not require MCOs to pay FQHCs at their full PPS rates. Instead, Congress requires that states make "a supplemental payment [to FQHCs] equal to the amount . . . by which" an FQHC's cost-related rate exceeds the amount of payments the FQHC received from MCOs. *See* H. Rep. No. 105-217, at 869 ("[s]tates would be required to make supplemental payments to the FQHCs" and "[s]uch payments would be equal to the difference between the contracted amount and the cost-based amount").

The statutory language currently reads as follows:  "In the case of services furnished by [an FQHC] pursuant to a contract between the center and a [MCO] . . . the State plan shall provide for payment to the center or clinic by the State of a supplemental payment equal to the amount (if any) by which the [statutorily required per-visit rate] exceeds the amount of the payments provided under the contract."  42 U.S.C. § 1396a(bb)(5)(A).  These supplemental payments "shall be made . . . in no case less frequently than every 4 months."  *Id.*  Thus, irrespective of the fact that MCOs (rather than states) contract with FQHCs to provide Medicaid services, a state is responsible for ensuring that an FQHC directly receives supplemental payments, known as "wraparound" payments, so as to ensure the FQHC received its full federally-mandated PPS payment rate.  The wraparound payment system is designed to work as follows:



Second, to avoid MCOs taking advantage of the state's supplemental payment obligation, Congress also required that MCOs pay FQHCs "not less" than they would pay non-FQHC providers for the same medical services.  42 U.S.C. § 1396b(m)(2)(A)(ix); H. Rep. 105-217, at 869 (2007) (MCO required to "pay the FQHC . . . at least as much as it would pay any other provider for similar services") (reprinted in 1997 U.S.C.C.A.N. 176, 490).

In an April 20, 1998 guidance letter to state Medicaid directors regarding a prior iteration of the cost-related FQHC payment methodology, the U.S. Department of Health and Human Services' Health Care Financing Administration ("HCFA," now known as and referred to hereafter as the Centers for Medicare and Medicaid Services, ("CMS")) interpreted that this

statute "specifically requires States to make these supplemental payments" and that because "this requirement cannot and should not be delegated to an MCO . . . each State must determine any differences in payment and make up these amounts." Exhibit ("Ex"). A, at 1. Further, CMS confirmed that "[t]he intention of this provision is to ensure that [MCOs] negotiate rates of payment with FQHCs . . . that are comparable to the rates paid to similar providers that do not have an FQHC . . . designation" so as to "protect[] the State against negotiated rates that are excessively low in comparison to the community standard." *Id.*

In addition, and particularly relevant here, in that same guidance letter CMS stated that "[w]hile the literal text . . . does not impose an upper limit on what a State may require an MCO to pay [an FQHC], we recognize that permitting States to impose such requirements could result in access problems and have the opposite impact on [FQHC] contracting arrangements than what was intended by Congress. (That is, Congress intended to encourage contracting between [FQHCs] and MCOs and to remove financial barriers to this contracting." *Id.* at 2.

Further, on October 23, 1998 CMS commented on state policies whereby MCOs would have the responsibility for reimbursing FQHCs at their full cost-related rates. Ex. B, at 1. CMS stated that "such reimbursement approaches . . . violate the April 1998 policy guidance." *Id.* CMS explained that its clarification "is intended to assure that MCOs do not perceive or incur any undue burdens when contracting with [FQHCs] versus other providers of care thus creating unintended barriers or disincentives to contract." *Id.* The agency also explained that it had "intended to not have the MCO involved in any issues regarding supplemental payments, reconciliation or any other reimbursement issue that would raise payment levels between the two parties above those of non-[FQHCs] that provide a similar set of services." *Id.*

Third, federal law requires that an MCO contract include the following protection: "in the case of medically necessary services which were provided . . . other than through the organization because the services were immediately required due to an unforeseen illness, injury, or condition, either the entity or the State provides for reimbursement with respect to those services." 42 U.S.C. §1396b(m)(2)(A)(vii). Essentially, in the case of an FQHC the state must protect the FQHC's right to receive full PPS reimbursement by guaranteeing that even in the case of certain specified out-of-network services either the state or the MCO will be responsible for full reimbursement.

**B.     Factual Background and Texas Medicaid Regime**

     1.     Legacy Community Health Center

Legacy is an Internal Revenue Code § 501(c)(3) nonprofit corporation located in Texas. Ex. C, Caldwell Decl., at ¶ 3. Legacy was formed in 2005 as the result of a merger of two leading Houston area community organizations, the Montrose Clinic and The Assistance Fund, and received its first § 330 grant funding in 2006. Legacy operates eight school-based clinics, two education/outreach locations, and 12 outpatient clinics, including one emergency room diversion clinic. *Id*. Legacy offers comprehensive primary, behavioral, and dental services, as well as other enabling services including case management, patient education, and enrollment eligibility services, pharmacy services, and referral coordination. *Id.*

Legacy is certified as an FQHC for the purposes of Medicaid provider participation and reimbursement. *Id*. As an FQHC, Legacy is reimbursed for Medicaid services under the PPS system. Its PPS rate was approximately $266 per encounter in 2012, $271 per encounter in 2013, and is approximately $270 per encounter at present. Ex. C, at ¶ 5.

Legacy provides care to almost 44% of the FQHC patients in Southwest Houston, where the greatest concentration of TCHP enrollees who use Legacy providers reside. *Id.* at ¶ 12.

From November 1, 2013 through ending October 31, 2014, TCHP reimbursed Legacy for 51,869 patient visits relating to services provided to approximately 13,902 patients enrolled in Medicaid. *Id.* at ¶ 6. Because the great majority of Legacy's patients live at or under the poverty line and transportation is a substantial barrier to care, *id.* at ¶ 12, many of Legacy's patients enrolled with TCHP will lack the ability to easily transition to non-Legacy providers at other locations.

In furtherance of its mission and consistent with the health center program priorities, Legacy has implemented several initiatives in Houston, Baytown, and Beaumont to expand its scope of services and improve accessibility to services by establishing new sites and reducing barriers to care, such as transportation challenges. *Id.* at ¶ 4. For example, since 2010 Legacy has increased the staff at its largest Southwest Houston clinic from 34 full-time equivalent ("FTE") employees to 86 FTEs with a corresponding increase in patient encounters of over 800%. Ex. C, at ¶ 4. In addition, in response to a significant unmet need for mental health and substance use services, Legacy hired approximately 40 FTE behavioral health providers, many of whom are targeted at serving the pediatric population. *Id.* Legacy has also established clinical sites on the campuses of eight KIPP public charter schools that are staffed by Legacy nurse practitioners, pediatric psychiatrists, and pediatric therapists. *Id.* Through this innovative school-based delivery model, Legacy provides access to primary care and behavioral health services to over 8,000 students. *Id.* Each of Legacy's expansion initiatives to establish new sites and/or increase its scope of services, including but not limited to the initiatives described above, were approved by the agency that oversees the health center program, the Health Resources and Services Administration ("HRSA") within the U.S. Department of Health and Human Services. *See* 42 C.F.R. § 51c.104(b).

     2.     The Texas Medicaid Managed Care System and TCHP

Texas has implemented a Medicaid managed care payment system to arrange for the delivery of health care services to individuals who are enrolled in Medicaid. Tex. Gov. Code § 533.002.[4] Pursuant to the implementation of the managed care system, the Texas State Medicaid Plan provides for payment of wraparound funds to FQHCs through State Plan amendment 10-61, effective October 2, 2010, which notes that if "the total amount paid to an FQHC by a [MCO] is less than the amount the FQHC would receive under PPS or APPS" the State will "reimburse the difference on a state quarterly basis." Ex. E, at 9.

Notwithstanding this language, since 2011 HHSC has imbedded the amount of an FQHC's full PPS rate directly into the monthly capitation payments it pays to MCOs. It has then, through MCO contracts, required MCOs to reimburse FQHCs at their PPS rates, instead of at individual negotiated rates.[5]

For example HHSC's MCO contract with TCHP, which incorporates HHSC's Uniform Managed Care Contract, states that:

---

[4] Texas submitted to CMS, and obtained approval for, a managed care Demonstration Project under 42 U.S.C. § 1315(a)(1), which authorizes the waiver of state plan requirements for experimental, pilot, or demonstration projects. Ex. D, at 1. The purpose of the waiver, known as a "§ 1115(a) Demonstration" was, among other things, to "expand the existing Medicaid managed care programs," and it also noted that HHSC "may deviate from Medicaid State plan requirements only to the extent that those requirements have been specifically waived or listed as inapplicable . . . ." *Id.* at 2. None of the Medicaid State Plan requirements waived by the Demonstration relates to the payment of FQHCs. *Id.* at 5-6. The approval of the Demonstration project was also subject to Special Terms and Conditions, one of which reiterated that FQHCs services are mandatory and must be made available to HHSC Medicaid managed care enrollees. *Id.* at 11.

[5] On June 17, 2011, as part of House Bill No. 1, the General Appropriations Bill, the Texas legislature amended the wraparound process by stating that: "[t]o the extent allowable by law, in developing the premium rates for Medicaid and CHIP Managed Care Organizations [], the Health and Human Services Commission shall include provisions for payment of the FQHC Prospective Payment System (PPS) rate and establish contractual requirements that require MCOs to reimburse FQHCs at the PPS rate." Ex. F, at 4. That provision was repeated in the 2013 appropriations bill. *Id.* at 7.

> The MCO must pay full encounter rates to FQHCs and RHCs for Medically Necessary Covered Services provided to Medicaid and CHIP Members using the prospective payment methodology described in Sections 1902(bb) and 2107(e)(1) of the Social Security Act. Because the MCO is responsible for the full payment amount in effect on the date of service, HHSC cost settlements (or "wrap payments") will not apply.

Ex. H, at 21.

This change also appears in TCHP's MCO provider agreement with Legacy. In 2009, when Legacy first signed a provider contract with TCHP, the contract provided that Legacy would be reimbursed by TCHP at a rate of $67.00 per visit, presumably a rate comparable to that paid to other providers. Ex. G, at 9. Following passage of the 2011 appropriations rider that passed on the responsibility for paying Legacy's PPS rate directly to TCHP, on July 29, 2011 Legacy's contract with TCHP was amended to provide that TCHP would reimburse Legacy at its full PPS rate, currently approximately $270 per visit. *Id.* at 13. Consequently, TCHP was and is still now responsible for reimbursing Legacy at its PPS rate for all eligible Medicaid encounters. HHSC's system works as follows:



3.     TCHP's Termination of Legacy

TCHP informed Legacy that its sole reason for terminating its provider agreement was because the requirement that TCHP reimburse Legacy at its PPS rate made Legacy too costly. In a September 19, 2013 email, TCHP President Christopher Born noted that Legacy's increased visits were not covered by the "trend increase" built into TCHP's capitation rate from HHSC, and that because "utilization at FQHCs" such as Legacy was increasing, the rates from HHSC were not sufficient to cover TCHP's costs. *See* Ex. L, at 4. Further, on October 8, Mr. Born again wrote to Legacy noting that HHSC's current wraparound payment model was "not

sustainable" and that it needed "immediate rate relief." *Id.* at 8. TCHP then requested that

Legacy accept a per-encounter rate of $133 for original Legacy sites and a rate of $59 for

acquired physician practices, rates less than Legacy's PPS rate at that time. *Id.* TCHP also

noted that, contrary to its MCO contract with HHSC, Legacy could attempt to seek additional

wraparound funds directly from the State. *Id.*

At that same time, on November 12, 2013, as part of a larger correspondence to HHSC,

TCHP indicated that its MCO contract would not allow it to terminate Legacy's provider

agreement on the basis of cost alone. *Id.* at 2. Specifically TCHP cited the provision in its MCO

contract relating to the payment of FQHC services, Ex. H, at 21, and stated that it did "not

believe [TCHP] can terminate [Legacy] from network participation on the sole basis of cost as

this would be in conflict with the 'reasonable efforts to include' since cost is pre-determined by

HHSC." Ex. L, at 2.

Finally, on November 1, 2014 TCHP informed Legacy that it was terminating its contract

effective February 1, 2015. Ex. I, at 1. TCHP stated that it was doing so because of a

"utilization trend that far exceeds the trend in the Medicaid premium." *Id.* Legacy attempted to

resolve the issue with TCHP, including clarifying the rationale referenced in the notice of

termination and meeting with TCHP on December 4, 2014, but was informed by Mr. Born that

TCHP did not intend to change its decision regarding termination of Legacy's provider

agreement, nor would TCHP consider delaying the termination until the end of Legacy's contract

period. Ex. M, at 1. Further, Mr. Born reiterated that Legacy's termination "should not have

been a surprise," due to an "unsustainable trend." In addition, after Legacy attempted to clarify

with TCHP its reimbursement policy for out-of-network services, TCHP informed Legacy that

for "services provided on an out-of-network basis, Legacy will need to obtain authorization to

ensure that services can be evaluated to determine whether they qualify for payment." Ex. K, at 7. Confusingly then, TCHP also sent Legacy a December 15, 2014 letter informing Legacy that its "application for continued participation in [TCHP] has been approved." Ex. I, at 2.

At the same time, Legacy sent HHSC two letters on December 9, 2014 and December 24, 2014, respectively, detailing Legacy's concerns with the wraparound payment process and TCHP's actions, as well as the expected harm to Legacy and its patients. Ex. K. Legacy's second letter specifically addressed the requirement that HHSC or TCHP ensure reimbursement at Legacy's PPS rate for certain out-of-network services. Ex. K, at 6. Legacy also met with HHSC on December 12, 2014 to explain its concerns. At that meeting HHSC informed Legacy that it would not be able to render a decision until after January 1, 2015.

Finally, on December 29, 2014, TCHP sent a letter to Legacy's patients informing them that they would need to "pick a new doctor" by January 31, 2015. Ex. N, at 1.

### III.    ARGUMENT

A plaintiff seeking a temporary restraining order or preliminary injunction must establish: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Byrum v. Landreth*, 566 F.3d 442, 445 (5th. Cir. 2009); *see also Hinojosa v. City of Kingsville, Texas*, 266 F. Supp. 2d 562, 564 (S.D. Tex. 2003); Fed. R. Civ. P. 65(b).

### A.    Legacy Is Substantially Likely To Succeed On The Merits

1.    HHSC's wraparound payment system is contrary to federal law.

HHSC's wraparound payment scheme is contrary to two federal FQHC payment requirements put in place to protect the detailed Medicaid PPS payment scheme applicable to

FQHCs.[6]  First, a state must ensure that payment of wraparound funds to FQHCs is independent

of any payments made to MCOs.  Second, a state cannot require that MCOs pay FQHCs at their

PPS rates rather than negotiated rates.

> i.     HHSC improperly comingles FQHC wraparound payments with the
> capitation payments made to MCOs.

As to the first requirement, HHSC has implemented a payment scheme that improperly

places the responsibility for making PPS payments on TCHP and improperly mixes supplemental

FQHC wraparound funds with MCO capitation payment funds.  The plain language of the statute

notes that "[i]n the case of services furnished by [an FQHC] . . . pursuant to a contract between

the center and a managed care entity . . . the State plan shall provide for payment to the center or

clinic *by the State* of a supplemental payment equal to the amount (if any) by which the

[statutorily required per-visit rate] exceeds the amount of the payments under the contract."  42

U.S.C. § 1396a(bb)(5)(A) (emphasis added).  The State must make these wraparound payments

---

[6]     It is well-settled that an FQHC such as Legacy must be reimbursed at its cost-based PPS per-visit rate for Medicaid FQHC services provided to Medicaid beneficiaries.  Federal law plainly states that "the State plan *shall* provide for payment for [FQHC services] furnished by a Federally-qualified health center . . . in accordance with the provisions of this subsection."  42 U.S.C. § 1396a(bb)(1) (emphasis added); *see also Rio Grande Cmty. Health Ctr. v. Rullan*, 397 F.3d 56, 61-62 (1st. Cir. 2005) (noting that "Federal law regulates in great detail the ways in which FQHCs receive payment for the services that they provide to Medicaid patients" reflecting "the important public health role that these centers play"); *Three Lower Cnties.*, 494 F.3d at 303 (Congress requires states to ensure "that FQHCs be fully and promptly compensated for the services they render to Medicaid enrollees so that the FQHCs could perform their vital function in delivering healthcare to underserved populations in accordance with their § 330 grants under the Public Health Service Act.") .  The Texas Medicaid State Plan indeed reaffirms this obligation, noting that "FQHCs may choose between two prospective payment methodologies for reimbursement purposes" and that "[b]oth methods are in accordance with" 42 U.S.C. § 1396a(bb).  Ex. E, at 3.  Because of these clear requirements, numerous courts have "conclude[d] that § 1396a(bb) gives rise to a right enforceable under § 1983" as the language "unambiguously binds the states" and "contains rights-creating language."  *See, e.g. Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 212 (4th. Cir. 2007).  This holding specifically extends to the wraparound payment requirement found in 42 U.S.C. § 1396a(bb)(5).  *See Rio Grande*, 397 F.3d at 74-75.

"pursuant to a payment schedule agreed to by the State and the [FQHC] . . . , but in no case less frequently than every 4 months." 42 U.S.C. § 1396a(bb)(5)(B). "Thus even when a State relies upon a managed care system to administer its Medicaid program, FQHCs are protected and must receive the full per-visit rate calculated pursuant to the methodology outlined in [42 U.S.C. § 1396a(bb)]." *Three Lower Cnties*, 498 F.3d at 299. Moreover, "[t]he language here is extremely clear and narrow: it tells a state exactly how to calculate the wraparound and it gives a maximum duration (4 months) between wraparound payments." *Rio Grande*, 397 F.3d at 75.

In its April 20, 1998 guidance letter CMS confirmed that states are required to make "wraparound" payments *directly* to FQHCs, and not via MCOs. CMS found the above language "specifically requires States to make these supplemental payments" and that "[i]t is our conclusion that this requirement cannot and should not be delegated to an MCO, and that each State must determine any differences in payment and make up these amounts." Ex. A, at 1. This policy interpretation is entitled to deference due to its persuasive value and because CMS's guidance relates to a "highly detailed" regulatory scheme. *U.S. v. Mead*, 533 U.S. 218, 235 (2001). Indeed, consistent with this guidance, Texas's State Medicaid Plan specifically provides for direct quarterly supplemental payments, noting that, "in the event that the total amount paid to an FQHC by a managed care organization is less than the amount the FQHC would receive under PPS or APPS, whichever is applicable, the state will reimburse the difference on a state quarterly basis." Ex. E, at 9.

Despite this plain statutory language and guidance, however, Texas's 2011 and 2013 General Appropriations Act riders provided that "in developing the premium rates for Medicaid and CHIP Managed Care Organizations (MCOs), [HHSC] shall include provisions for payment

of the FQHC Prospective Payment System (PPS) rate." Ex. F, at 4, 7.[7]  Further, HHSC's contract with TCHP notes that the "MCO must pay full encounter rates to FQHCs . . . using the prospective payment methodology described in Sections 1902(bb) and 2107(e)(1) of the Social Security Act" and that because the MCO is responsible for the full payment amount in effect on the date of service, HHSC cost settlements (or "wrap payments") will not apply." Ex. H, at 21. HHSC's inclusion of Legacy's PPS rates in its capitation payments to TCHP is inconsistent with federal law as it places the responsibility of making Legacy whole on TCHP and thus eliminates the need for the separate payment of wraparound funds by HHSC.  HHSC's responsibility for making Legacy whole through the payment of its full PPS rates should not have been delegated, nor should wraparound funds have been comingled with TCHP's capitation payments.

   ii. HHSC's requirement that MCOs reimburse FQHCs at their PPS rates is contrary to federal law.

As an initial matter, 42 U.S.C. § 1396b(m)(2)(A)(ix) plainly states that MCOs must "provide payment that is not less than the level and amount of payment which the [MCO] would make for the services if the services were furnished by a provider which is not [an FQHC]." This language clearly "imposes a floor" on the rates to be paid FQHCs.  *Three Lower Cnties*, 498 F.3d at 305.  In its April 1998 guidance letter CMS confirmed that "[t]he intention of this provision is to ensure that [MCOs] negotiate rates of payment with FQHCs . . . that are comparable to the rates paid to similar providers that do not have an FQHC . . . designation" so as to "protect[] the State against negotiated rates that are excessively low in comparison to the community standard."  Ex. A, at 1.

_____

[7] To the extent, however, that the Appropriations Act riders included the caveat "to the extent allowable by law," Ex. F, at 4, it is in fact HHSC's implementation of the policy, rather than Texas's legislative change itself, that violates federal law.

In addition, and particularly relevant here, in that same guidance letter CMS stated that "[w]hile the literal text . . . does not impose an upper limit on what a State may require an MCO to pay [an FQHC], we recognize that permitting States to impose such requirements could result in access problems and have the opposite impact on [FQHC] contracting arrangements than what was intended by Congress. (That is, Congress intended to encourage contracting between [FQHCs] and MCOs and to remove financial barriers to this contracting." *Id.* at 2.

On October 23, 1998 CMS reiterated its earlier position by considering state arrangements almost identical to what HHSC has done here. CMS commented on state policies whereby MCOs would have the responsibility for reimbursing FQHCs at their full cost-related rates. Ex. B, at 1. CMS stated that "such reimbursement approaches . . . violate the April 1998 policy guidance." *Id.* CMS explained that its clarification "is intended to assure that MCOs do not perceive or incur any undue burdens when contracting with [FQHCs] versus other providers of care thus creating unintended barriers or disincentives to contract." *Id.* The agency also explained that it had "intended to not have the MCO involved in any issues regarding supplemental payments, reconciliation or any other reimbursement issue that would raise payment levels between the two parties above those of non-[FQHCs] that provide a similar set of services." *Id.* CMS plainly stated the statutory requirement is for states to pay wraparound funds directly because to pay it indirectly via MCOs causes harmful financial incentives, including specifically that MCOs will be incentivized to not contract with FQHCs.

CMS's interpretation of the federal statutory requirements is entitled to deference from this Court. "As the Supreme Court recently noted, even relatively informal HCFA (now CMS) interpretations, such as letters from regional administrators, 'warrant[ ] respectful consideration' due to the complexity of the statute and the considerable expertise of the administering agency."

*Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 138 (2d. Cir. 2002) (citing *Wis. Dep't of Health and Family Servs. v. Blumer*, 534 U.S. 473, 479 (2002)).[8]

HHSC's system, which is in direct conflict with the statutory language, CMS's guidance, and the language of its own State Medicaid Plan, indeed incentivized TCHP to terminate its provider agreement with Legacy. TCHP's correspondence with Legacy indicates that Legacy's PPS rate costs were the sole reason for TCHP's termination of Legacy's contract; at one point TCHP even requested that Legacy accept less than its federally-mandated PPS rate and seek supplemental payments from HHSC. Ex. L, at 8. HHSC's policy is therefore plainly contrary to federal law.

> 2.      TCHP's contract fails to include a provision providing for payment at an FQHC's PPS rate for specified out-of-network medically necessary services.

A state's MCO payment methodology must provide for payment to FQHCs at their PPS rates for out-of-network visits required due to unforeseen illness or injury so as to ensure that FQHCs receive full PPS reimbursement. Federal law therefore requires an MCO contract include that "in the case of medically necessary services which were provided . . . other than through the organization because the services were immediately required due to an unforeseen

---

[8]      CMS's interpretation that the statutory scheme imposes both a floor and a ceiling on the payments MCOs must make to FQHCs is also persuasive because courts "accord particular deference to an agency interpretation of 'longstanding' duration." *Barnhart v. Walton*, 535 U.S. 212, 220 (2002). For example, in an August 20, 2001 letter to the California Medicaid program CMS referenced its April 21, 1998 guidance letter. Ex. J, at 1-2. Further, in 2006, HRSA, in a "Comparison of the Rural Health Clinic and Federally Qualified Health Center Programs" guidance document, noted that "Medicaid managed care plans are required to pay . . . FQHCs at *rates comparable to the rates paid to other providers* of similar services." Ex. J, at 3. "This protection in the managed care environment may prove to be one of the strongest incentives for obtaining . . . FQHC status." *Id.*

illness, injury, or condition, either the entity or the State provides for reimbursement with respect to those services." 42 U.S.C. §1396b(m)(2)(A)(vii).

"In plain language, this section requires States to include in their contracts with managed care organizations a provision that requires either the managed care organization or the State to reimburse out-of-network health centers for services provided to the managed care organization's Medicaid enrollees when such services are 'immediately required due to an unforeseen illness, injury or condition.'" *Three Lower Cnties*., 498 F.3d at 304. Specifically, a state that chooses to use MCOs must still provide that FQHCs are paid at their PPS rates for "unforeseen" patient visits regardless of the MCO with which the patient receiving care is enrolled. "To the extent that out-of-network services constitute a part of the services provided by FQHCs, there must be some arrangement by which FQHCs may be reimbursed for them." *Cmty. Health Care Assn' of New York v. Shah*, 770 F.3d 129, 157 (2d. Cir. 2014). "If that contractual arrangement is between the state and the MCO in the first instance, under Section 1396b(m)(vii), that is permissible," "[b]ut if this arrangement stops short of ensuring full repayment for these services . . . then it does not comport with the statute." *Id.*

TCHP's MCO contract does not explicitly provide as such, and instead only notes that TCHP is not responsible for payment of unauthorized out-of-network non-emergency services, Ex. H, at 17, nor does a state statute, regulation, or the State Medicaid Plan alternatively place the burden on HHSC to reimburse FQHCs directly. Further, TCHP explicitly indicated that its interpretation of the out-of-network reimbursement requirement is contrary to federal law when it informed Legacy that for "services provided on an out-of-network basis, Legacy will need to obtain authorization to ensure that services can be evaluated to determine whether they qualify for payment." Ex. K, at 7. At present, therefore, after February 1 Legacy risks not receiving

reimbursement at its PPS rate if it provides immediately required services to TCHP enrollees, who will be treated as out-of-network patients following termination of Legacy's provider agreement. Indeed, because many of Legacy's patients who are enrolled with TCHP are children, likely a substantial percentage of their health care needs fall into the category of "unforeseen" but "immediately required" care. HHSC's failure to provide such protection and TCHP's interpretation leave Legacy at risk of being put in precisely the situation that the Third Circuit found improper: "where MCOs do not pay out valid Medicaid claims, the FQHC should not be left holding the bag." *New Jersey Primary Care Ass'n v. New Jersey Dep't of Human Resources*, 722 F.3d 527, 541(3d. Cir. 2013). TCHP's MCO contract is contrary to federal law to the extent that it does not provide payment at an FQHCs' PPS rate for out-of-network "unforeseen" visits and thus improperly leaves FQHCs such as Legacy at risk of "absorb[ing] the costs." *Community Health Care Ass'n*, 770 F.3d at 157.

> 3. TCHP's receipt of Medicaid FQHC supplemental payment funds and disbursement of those funds as HHSC's agent violates federal law.

Congress requires that each state "provide for the establishment or designation of a single State agency to administer or to supervise the administration" of its Medicaid program. 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.101(e). HHSC is Texas's single state agency for management of the Medicaid program. *See* Texas Medicaid State Plan, § 1.1(a). In carrying out its duties, it may delegate responsibility for certain aspects of its Medicaid processes to other entities, including MCOs. *K.C. ex rel. Africa H. v. Shipman*, 716 F.3d 107, 113 (4th. Cir. 2013). Such entities may "manage the provision of Medicaid on the state's behalf." *Id.*

HHSC's MCO contract with TCHP delegates broad responsibility to TCHP. For example, it requires TCHP to provide medical services to Medicaid beneficiaries, Ex. H, at 15, make payments to providers, *id.* at 21, establish and manage systems for beneficiary and

provider complaints, *id.* at 20, 23, and coordinate with other state programs. *Id*. at 22. In fact,

the degree of delegated responsibility for Medicaid management functions is so broad as to

necessitate a clause in the contract that limits TCHP's delegated authority only to that expressly

conferred by the contract. Ex. H, at 6; *see, e.g. Pharmacy Buying Ass'n, Inc. v. Sebelius*, 906

F.2d 604, 609 (W.D. Tex. 2012) (describing HHSC's delegation of Medicaid requirements to

MCOs under the Texas managed care system).

As HHSC's agent in an unlawful Medicaid payment scheme, TCHP is also clearly

violating federal law.

> 4. TCHP's termination of its provider agreement with Legacy for the sole reason that TCHP does not wish to pay Legacy's PPS rate constitutes breach of its contract with HHSC.

As noted in part above, TCHP's contract with HHSC provides:

> The MCO must make reasonable efforts to include FQHCs . . . in its Provider Network. If a Member visits an FQHC . . . at a time that is outside of regular business hours (as defined by HHSC in rules, including weekend days or holidays), the MCO is obligated to reimburse the FQHC . . . for Medically Necessary Covered Services. The MCO must do so at a rate that is equal to the allowable rate for those services . . . .

> The MCO must pay full encounter rates to FQHCs . . . using the prospective payment methodology described in Sections 1902(bb) and 2107(e)(1) of the Social Security Act. Because the MCO is responsible for the full payment amount in effect on the date of service, HHSC cost settlements (or "wrap payments") will not apply.

Ex. H, at 21. As explained, TCHP has terminated Legacy's provider agreement solely to avoid

its obligation to pay Legacy's PPS rate. TCHP President Christopher M. Born specifically stated

that increased utilization of Legacy by TCHP-enrolled Medicaid beneficiaries is causing TCHP

to incur undesired costs because TCHP is required to pay Legacy at its PPS rate. Ex. L, at 4.

Indeed TCHP at one point requested that Legacy accept less than its federally-mandated PPS rate

in order to lower TCHP's costs, *id.* at 8, a request Legacy could not legally accept. 42 U.S.C.

254b(k)(3)(G)(ii)(II). This request, as well as TCHP's overarching termination, was made, of course, despite TCHP's certification in its MCO contract with HHSC that it was an expert in Medicaid reimbursement laws and regulations, an expertise that presumably would have allowed it to anticipate the cost of paying Legacy's PPS rate before it entered into its contract with HHSC. Ex. H, at 8. By terminating Legacy's provider agreement for the sole reason that TCHP must pay Legacy at its PPS rate TCHP is therefore breaching its duty to "pay full encounter rates" as noted above. *Id.* at 21. Most egregiously, as noted earlier TCHP itself acknowledged that termination of Legacy's provider agreement for the sole reason that HHSC mandated that it reimburse Legacy at its PPS rate would breach TCHP's MCO contract with HHSC. Ex. L, at 2.

Further, TCHP's MCO contract notes that TCHP agrees to comply with all Medicaid statutes and regulations. Ex. H, at 7. Federal law plainly provides that "in the case of medically necessary services which were provided . . . other than through the organization because the services were immediately required due to an unforeseen illness, injury, or condition, either the entity or the State provides for reimbursement with respect to those services." 42 U.S.C. §1396b(m)(2)(A)(vii). Contrary to that plain language, however, TCHP has indicated it plans to reimburse Legacy at its full PPS rate for those out-of-network services only if Legacy obtains prior authorization. Ex. K, at 7. In regard to those services TCHP has also indicated intent to breach its MCO contract.

TCHP's MCO contract states that it is to be construed in accordance with Texas law. Ex. H, at 7. Under Texas law, where a contract clearly expresses the parties' intent to confer a direct benefit upon a third party, that party may enforce the contract as an intended third party beneficiary. *Stine v. Stewart*, 80 S.W. 3d 586, 589 (Tex. 2002). A third party need only show that certain provisions of a contract were intended to benefit it, not that the entire contract was

executed for its benefit. *Id.* at 590. The third party must show that it is either a creditor or donee beneficiary. *MCI Telecomm. Corp. v. Texas Util. Elec.*, 995 S.W. 2d 647, 651 (Tex. 1999). If performance by a promisor comes to the third party in satisfaction of a promisee's legal obligation to the third party, the third party is a creditor beneficiary. *Id.* at 651; *Stine*, 80 S.W. 3d at 589.

Whether the contracting parties intended to confer a benefit upon a third party must be determined from the unambiguous language of the contract document when read as a whole. *Tawes v. Barnes*, 340 S.W. 3d 419, 425 (Tex. 2011); *MCI,* 995 S.W. 2d at 651. Such contract language displays intent to benefit a third party when it provides for the payment of a specific amount of money from a specific source to a specific recipient. *See Stine* at 590; *see also Tawes*, 340 S.W. 3d at 428 (explaining, "[i]n *Stine* . . . [w]e determined that the agreement contained the requisite clear and unequivocal language of intent to directly benefit a thirds party, because it provided for the repayment of a specific amount of money to the mother from a specific source of income . . . .).

Moreover, an entity need not be specifically named in the contract document to be an intended third party beneficiary. Clear intent to benefit a specific limited class of third parties is sufficient to convey third party beneficiary status on all members of that limited class. *See, e.g.*, *Temple Eastex, Inc. v. Old Orchard Creek Partners, Ltd.*, 848 S.W. 2d 724, 730 (Tex. App. 1993) (holding a specific subcontractor was a third party beneficiary of a waiver explicitly conferring a benefit on the class "subcontractors"); *see also Tawes*, 340 S.W. 3d at 428 (reasoning a stated obligation to a specific limited group is sufficiently clear to demonstrate the contracting parties' intent to confer a benefit).

Here, 42 U.S.C. § 1396a(bb) requires that states reimburse FQHCs at their respective PPS rates.  It is well-established that FQHCs are the intended beneficiaries of this federal statutory requirement, and may directly enforce it.  *See Cmty. Health Care Ass'n of New York*, 770 F.3d at 153; *New Jersey Primary Care Ass'n*, 722 F.3d at 541; *Three Lower Cnties*, 498 F.3d at 298; *Rio Grande*, 397 F.3d at 74-75.  HHSC attempted to satisfy this obligation by requiring, specifically through binding language in its MCO contracts, that its MCO contractors reimburse FQHCs directly at their PPS rates.  See Ex. H, at 21.

FQHCs are plainly intended third party creditor beneficiaries of this provision.  This language appears in TCHP's contract solely as an attempt to meet HHSC's federal legal obligation to FQHCs.  As with the payment obligation in *Stine*, this provision calls for payment of specific amounts from specific sources to specific entities.  In fact, it refers to a state's federal legal obligation and specifically names "FQHCs" as the beneficiaries.  Thus, as an FQHC, Legacy is an intended beneficiary of this contract provision.  *C.f. Temple Eastex, Inc.*, 848 S.W. 2d at 730.

As TCHP is clearly in breach of its obligations under its MCO contract, and Legacy is a creditor intended third party beneficiary entitled to enforce the contract, Legacy's likelihood of success on the merits is high.

**B.     Legacy Has A Substantial Likelihood Of Incurring Irreparable Harm Absent Preliminary Injunctive Relief**

1.     Legacy lacks an adequate remedy at law to redress its financial losses caused by HHSC's policies, and thus its injuries are *per se* irreparable.

First and foremost, upon succeeding in the merits of this action, Legacy would be barred from receiving retroactive monetary damages from HHSC with respect to the above-referenced violations of federal law.  This is because the Supreme Court has held that "a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is

barred by the Eleventh Amendment." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974).  Although this action against HHSC fits squarely within the exception to sovereign immunity articulated in *Ex Parte Young*, 209 U.S. 123, 28 (1908),[9] a federal court's remedial power, consistent with the Eleventh Amendment . . . may not include a retroactive award which requires the payment of funds from the State treasury." *Edelman*, 415 U.S. at 677.  Indeed, without an injunction against HHSC's policy Legacy has no federal remedy and cannot recoup lost funds through this action. *See Texas Medical Assn' v. Bowen*, 1988 WL 235555, at *5 (W.D. Tex 1988) (discussing how the doctrine of sovereign immunity barring future recovery impacts a finding of irreparable harm).

  To that end, the Fifth Circuit has found that "[t]he absence of an available remedy by which the movant can later recover monetary damages . . . may . . . be sufficient to show irreparable injury." *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 312 (5th. Cir. 2008).  In fact, courts have found that a state's Eleventh Amendment sovereign immunity resulting in a plaintiff's inability to obtain retroactive monetary damages for ongoing violations of law in of itself constitutes irreparable harm.  *See California Pharm. Ass'n v. Maxwell-Jolly*, 563 F. 3d 847, 854 (9th. Cir. 2009) ("Because the economic injury doctrine rests only on ordinary equity principles precluding injunctive relief where a remedy at law is adequate, it does not apply where, as here, the [plaintiffs] can obtain no remedy in damages against the state because of the Eleventh Amendment"); *see also Rum Creek Coal Sales, Inc. v. Caperton*, 926

---

[9] The *Ex Parte Young* exception allows federal courts to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution or a federal statute.  *See Ex Parte Young*, 209 U.S. at 159.  This exception is based on the concept that a State official who acts in violation of the Constitution "is stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct."  *Id.* at 160.

F.2d 353, 362 (4th. Cir. 1991) ("[B]ecause current Supreme Court cases suggest that the only remedy available to a plaintiff who alleges that a State or State official has violated rights under § 1983 is an injunction and declaration against the State, the showing necessary to meet the irreparable harm requirement for a preliminary injunction should be less strict than in other instances where future monetary remedies are available"); *Kan. Health Care Ass'n, Inc. v. Kansas Dep't of Social and Rehab.Servs.*, 31 F.3d 1536, 1543 (10th. Cir. 1994); *Savage v. Commonwealth of Pennsylvania*, 475 F.Supp. 524, 533 (E.D. Pa. 1979), *aff'd*, 620 F.2d 289 (3d. Cir. 1980) ("The reasoning . . . that a claimant seeking reinstatement is not entitled to preliminary relief because an award of back pay will fully compensate him for his injury breaks down in this instance where the Eleventh Amendment bars such an award").

Finally, "in deciding whether a federal plaintiff has an available remedy at law that would make injunctive relief unavailable, federal courts may consider only the available *federal* legal remedies." *United States v. State of New York*, 708 F.2d 92, 93 (2d. Cir. 1983)*; see also Petroleum Exploration v. Public Serv. Comm'n of Kentucky*, 304 U.S. 209, 217 (1938) (adequate remedy at law must exist in federal courts).[10]

2. Legacy will suffer concrete and immediate harm as a result of both Defendant's actions

In order to satisfy the requirements for a temporary restraining order or a preliminary injunction, a plaintiff must demonstrate a present threat of substantial, non-compensable harm.

---

[10] Further, in keeping with the Supreme Court's holding that state remedies should not be considered for the purposes of evaluating the availability of remedies in federal court, there is also no requirement to exhaust state administrative remedies when bringing a suit under § 1983 unless Congress has explicitly carved out such an exception. Specifically in regards to Medicaid, Congress has not created such an exception. *Talbot v. Lucy Corr Nursing Home*, 118 F.3d 215, 220 (4th. Cir. 1997) (citing *Alacare, Inc.-North v. Baggiano*, 785 F.2d 963, 967-68 (11th. Cir. 1986).

*Spiegel v. City of Houston*, 636 F.2d 997, 1001 (5th Cir.1981), *reh. den.*, 641 F.2d 879; *see Gonannies, Inc. v. Groupair.Com, Inc.*, 464 F. Supp. 2d 603, 607 (N.D. Tex. 2006). Regardless of whether viewed as caused by HHSC's policies, TCHP's implementation of those policies, the interaction between both Defendant's actions, or TCHP's termination, Legacy will suffer immediate and non-compensable harm.

As explained by Legacy's Chief Executive Office Katy Caldwell, from November 1, 2013 to October 31, 2014, Legacy was reimbursed by TCHP for 51,869 patient visits relating to services provided to approximately 13,902 Medicaid patients enrolled with TCHP. *See* Ex. C, at ¶ 6. For those visits, TCHP reimbursed Legacy approximately $13,989,460. *Id.* Legacy, as an FQHC serving a medically-underserved population, the majority of whom are Medicaid or uninsured patients, operates on a budget with an anticipated net income of only $4,000,000. *Id.* at ¶ 10. As such, a loss of almost $14,000,000 would "have a severe impact on the financial stability of the organization." *Id.* at ¶ 6.

As Ms. Caldwell notes, a loss of that amount would force Legacy to make deep cuts into its existing service lines in order to remain financially sustainable. *Id.* at ¶10. Specifically, Legacy would be forced to eliminate a number of services, including school-based clinics that serve over 8,000 children, an emergency room diversion clinic, a residency program, dental services, education and social support services, and adult behavioral health services. Ex. C, at ¶ 10. Further, Legacy will need to halt implementation of a variety of initiatives designed to better monitor patients and improve continuity and quality of care, including purchasing analytical tools, hiring IT professionals, and constructing a data warehouse. *Id*. at ¶ 11. These losses would severely damage Legacy, and make it almost impossible for Legacy to continue offering the same breadth and quality of services that it does at present. This harm is "neither speculative

nor remote, but is actual and imminent." *West Alabama Quality of Life Coalition v. U.S. Fed. Highway Admin.*, 302 F. Supp.2d. 672, 684 (W.D. Tex. 2004).

Moreover, "courts have held that in making a determination regarding whether a likelihood of irreparable harm exists, 'both harm to the parties and to the public may be considered.'" *Hornbeck Offshore Services, LLC v. Salazar*, 696 F. Supp.2d 627,638-39 (E.D. La. 2010) (citing *In re Nw. Airlines Corp.,* 349 B.R. 338, 384 (S.D.N.Y. 2006)).  Especially here, where health care services for thousands of underserved Medicaid patients are concerned, "the irreparable harm and the public interest inquiries are intertwined." *Mississippi Power & Light Co. v. United Gas Pipe Line Co*., 760 F.2d 618, 623 (5th. Cir. 1985).  In addition to the harm to Legacy as a result of TCHP's termination, Legacy's patients enrolled with TCHP will also be harmed as they will be forced to terminate their relationships with their chosen Legacy providers.  Uprooting almost 14,000 FQHC patients in Southwest Houston, most of whom are children or expectant mothers, from their Legacy providers will cause substantial harm.  As Legacy is located in medically-underserved areas many of its patients live at or below the poverty line and lack transportation options to visit other less-convenient clinic sites, which will make transitioning those patients from their traditional Legacy providers even more challenging and harmful.  Ex. C, at ¶ 12.  As Ms. Caldwell notes, due to these barriers to access Legacy anticipates that regardless of TCHP's termination of Legacy's patients will still seek treatment from Legacy's providers.  *Id.*  Further, because as an FQHC Legacy cannot turn patients away due to their inability to pay, Legacy risks receiving no reimbursement for services provided to those TCHP patients who still seek treatment from Legacy.  *Id.*

In addition, Legacy's overall patient population will be harmed if Legacy is forced to curtail its services due to an anticipated loss in revenue.  As Ms. Caldwell explains, while there

are other FQHCs located in Southwest Houston where the greatest concentration of Legacy patients enrolled with TCHP are located, those FQHCs are very small and lack Legacy's capacity and services. *Id*. at ¶ 12. In fact, data from HRSA's Uniform Data System mapping bears this out. For 40 zip codes in Southwest Houston, Legacy's 2013 FQHC patients constituted 44% of the total FQHC patients in that area. *Id.* The next closest FQHC only served 23% of the FQHC population. *Id.* If Legacy's current patients attempt to seek comparable treatment elsewhere, many will invariably be turned away due to lack of capacity, lack of needed services, or both, and many will likely fall out of much-needed treatment.

Lastly, a preliminary injunction is particularly appropriate in this case as it is plainly necessary to preserve the status quo. *Exhibitors Poster Exchange, Inc. v. Ntn'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th. Cir. 1971). Legacy's provider agreement with TCHP will be terminated effective February 1, 2015. Ex. I, at 1. At that point, this Court's ability to fashion a remedy sufficient to prevent harm to Legacy stemming from HHSC and TCHP's actions that are contrary to federal law will be substantially reduced. For example, to the extent that this Court can order HHSC to modify TCHP's contractual payment requirements so as to eliminate the financial losses that are the gravamen of TCHP's decision to terminate Legacy's provider agreement, this Court's ability to do so will be nullified after February 1 when Legacy's contract with TCHP ceases to exist. Further, to prevent harm to TCHP's patients, any provisional remedy must preserve the status quo so that continuity and delivery of care is not needlessly disrupted while a permanent remedy is crafted; it would be needlessly harmful to disrupt patients' courses of treatment provided by Legacy physicians while a remedy is crafted. Indeed TCHP has already issued notices to Legacy's patients informing them that they must change providers by January 31, 2014 in order to continue receiving treatment. Ex. N, at 1. Issuance of an injunction is

therefore necessary to "preserve the court's ability to render a meaningful decision" on the merits. *Texas First Nat. Bank v. Wu*, 347 F. Supp. 2d 389, 397 (W.D. Tex. 2004). Absent injunctive relief prior to TCHP's termination of Legacy's contract, any victory in this action is likely to be a pyrrhic one for Legacy even if this Court later finds that HHSC and TCHP's actions were contrary to federal law.

**C.     The Balance Of Equities Favors Granting Preliminary Relief To Legacy**

First, enforcement of a pre-existing legal duty, particularly against a government, should not be considered harmful to it at all. *See Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th. Cir. 2003) (school board "is in no way harmed by issuance of a preliminary injunction which prevents it from enforcing a regulation, which, on this record, is likely to be found unconstitutional"). Granting the preliminary injunction would not result in greater harm to Texas because it "does not have an interest in the enforcement of an unconstitutional law." *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d. Cir. 2003).

Second, at most the granting of a preliminary injunction will cause HHSC to expend more public funds due to increased administrative costs, as contemplated by federal law. "The State's potential budgetary concerns are entitled to our consideration, but do not outweigh the potential harm to . . . indigent individuals, especially when the State's position is likely in violation of state and federal law." *Bontrager v. Indiana Family & Social Serv. Admin.*, 697 F. 3d 604, 611 (7th. Cir. 2012). Regardless, the financial impact to the State would be relatively minor as it would only entail administrative expenses. If ordered to make wraparound payments directly in accordance with federal law, HHSC has the power to modify its contract with TCHP to reduce capitation payments so as to take removal of Legacy's PPS rate into account. In sum, Texas's interest does not outweigh this Court's interest in enforcing compliance with federal law

and ensuring that HHSC acts in conformity with all Medicaid requirements, requirements that the Supreme Court has found binding on states. *Harris v. McRae*, 448 U.S. 297, 301 (1980).

Further, any harm TCHP would suffer would be relieved if this Court grants Legacy's request in full. As an initial matter, like HHSC, TCHP also has no interest in the enforcement of an illegal payment provision. *See ACLU v. Reno*, 929 F. Supp. 824, 849 (E.D. Pa. 1996) ("no party has any interest in the enforcement of an unconstitutional law"). TCHP is only terminating its provider contract with Legacy because of the burden of paying Legacy's full PPS rate. That burden will disappear if HHSC is required to properly make supplemental payments as contemplated by federal law and therefore disentangle TCHP's capitation payments from funds necessary to ensure Legacy receives reimbursement at its PPS rate. TCHP and Legacy could then negotiate rates that more closely resemble the rates TCHP contracts to pay other non-FQHC providers, as contemplated by CMS's guidance letter, removing the financial harm to TCHP that led it to terminate Legacy's provider agreement. Ex. B, at 1.

### D. Granting Injunctive Relief To Legacy Is In The Public Interest

Given the dual Congressional goals underpinning the Medicaid FQHC benefit – to provide medical assistance to Medicaid enrollees and to protect the limited § 330 grant funds allocated to serve FQHCs' underserved populations – the public interest plainly favors granting Legacy injunctive relief. As one court has noted, there is a "[r]obust public interest" in safeguarding access to health care for those eligible for Medicaid. *Cal. Pharm. Ass'n v. Maxwell-Jolley*, 596 F.3d 1098, 1115 (9th. Cir. 2010). Indeed, "[t]he public interest is served by caring for those who, through no fault of their own, are unable to care for themselves. It is the duty of a responsible society and its official bodies to ensure that those individuals are provided with adequate care. Should these officials fail in this duty by, for example, not following the

laws governing various programs, it is the responsibility of the Courts called upon to protect the individual's rights." *Evergreen Presbyterian Ministries, Inc. v. Hood*, 116 F. Supp. 2d 745, 755 (W.D. Lou. 2000).

Here, the public interest favors this Court issuing preliminary relief directing HHSC to reform its illegal payment methodology and preventing TCHP from terminating Legacy's provider agreement so as to prevent harm to Legacy and to preserve the ability of Legacy's underserved patients to receive the high-quality, low-cost FQHC services to which they are entitled under law. *See, e.g. U.S. v. Baylor University Medical Center*, 711 F.2d 38, 40 (5th. Cir. 1983) (finding that the public interest favored granting a stay because the plaintiff's anticipated loss of Medicaid funds would interrupt health care procedures and cause harm to patients); *see also Pashby v. Delia*, 709 F.3d 307, 331 (4th. Cir. 2013) ("public interest in this case lies with safeguarding public health"). The public interest favors preserving the ability of the thousands of Legacy's patients enrolled with TCHP to see their chosen Legacy providers, thus maintaining continuity and delivery of needed health care services to greater Houston's underserved Medicaid populations. Indeed, as the Second Circuit has noted, health centers occupy a "unique place in the health center ecology." *Cmnty. Health Care Ass'n*, 770 F.3d at 157. HHSC's policy and TCHP's termination decision would deny many underserved and low-income beneficiaries from access to Legacy's unique FQHC services.

## IV.     CONCLUSION

The Court should grant Legacy's requests for a temporary restraining order and a preliminary injunction.

Respectfully submitted,

LEGACY COMMUNITY HEALTH SERVICES, INC.

By: /s/ Michael J. Collins
Michael J. Collins – Attorney-in-Charge
Texas Bar No. 04614510
Southern District of Texas I.D. No. 15643
COLLINS, EDMONDS & POGORZELSKI, PLLC
1616 South Voss Rd., Suite 125
Houston, Texas 77057
Telephone: (713) 501-3425
Facsimile: (832) 415-2535
mcollins@cepiplaw.com

Of Counsel:

Edward T. Waters*
Gregory M. Cumming*
FELDESMAN TUCKER LEIFER FIDELL LLP
1129 20th Street, N.W., Fourth Floor
Washington, D.C. 20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)
ewaters@ftlf.com
gcumming@ftlf.com

* Application for admission *Pro Hac Vice* pending

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that Defendants will be served with copies of the foregoing document with the summons and complaint.

January 8, 2015                                    <u>/s/ Michael J. Collins            </u>
                                                  Michael J. Collins