IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____
                                                        )
LEGACY COMMUNITY                        )
HEALTH SERVICES, INC.,                    )
1415 California Street                           )
Houston, TX 77006                              )
                                                        )
    Plaintiff,                                      )
                                                        )
    v.                                                )    Case No.: 4:15-CV-00025
                                                        )
DR. KYLE L. JANEK, in his Official Capacity )
as Executive Commissioner of the Texas  )
Health and Human Services Commission, )
4900 North Lamar Boulevard,              )
Austin, TX 78751                                )
                                                        )
    and                                             )
                                                        )
TEXAS CHILDREN'S HEALTH PLAN,    )
2450 Holcombe Boulevard, Suite 340 L, )
Houston, TX 77021                              )
                                                        )
    Defendants.                                 )
_____

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Legacy Community Health Services, Inc. ("Legacy") files this first amended complaint to enjoin Dr. Kyle L. Janek, in his Official Capacity as Executive Commissioner of the Texas Health and Human Services Commission (hereafter referred to for simplicity as "HHSC"), and Texas Children's Health Plan ("TCHP"), a Texas Medicaid managed care organization ("MCO"), from continuing to violate federal Medicaid payment requirements with respect to Legacy, a federally-qualified health center ("FQHC"), violations that have resulted in TCHP's decision to terminate Legacy's provider agreement. Legacy further seeks to enjoin TCHP from

knowingly breaching its managed care contract with HHSC to the detriment of Legacy, an intended third party beneficiary of that contract.

HHSC's policy of requiring that MCOs directly reimburse FQHCs at their full federal payment rates, HHSC and TCHP's implementation of that policy, including their failure to ensure adequate payment for certain out-of-network services, and TCHP's termination of Legacy's provider agreement will collectively result in irreparable harm to Legacy in the form of lost patients and revenue, as well as cuts in services. Further, HHSC and TCHP's actions will substantially harm almost 14,000 Legacy patients in the Houston area, most of whom are children and expectant mothers, who will no longer have reasonable access to the comprehensive FQHC services that Legacy offers, and will needlessly displace those patients from their chosen health care providers, disrupting the delivery of health care services in Houston, Beaumont, and Baytown.

## JURISDICTION AND VENUE

1. This action arises under the provisions of Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq*, including 42 U.S.C. § 1320a-2, 42 U.S.C. § 1983, as well as Texas common law.

2. The Court has jurisdiction over Legacy's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). The Court has jurisdiction over Legacy's state claim pursuant to 28 U.S.C. § 1367(a). Venue is proper in this District under 28 U.S.C. § 1391(b). The declaratory and injunctive relief sought in this action is authorized under 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. § 1983.

## PARTIES

3. Plaintiff Legacy is an Internal Revenue Code § 501(c)(3) not-for-profit corporation established under the laws of the State of Texas that serves as a community health center providing comprehensive primary and preventive health care services at 22 locations around the greater Houston region.

4. The Texas Health and Human Services Commission ("HHSC") is designated as the "single state agency" that administers and is responsible for Texas's Medicaid program. *See* 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10. HHSC is the recipient of funds allocated to Texas under the Medicaid statute and is responsible for administering those funds in accordance with the statute, regulations promulgated thereunder, the State Medicaid plan, and the terms of any agreement with the Federal Government regarding those funds. Responsibilities for the State's management and operation of the Medicaid program are lodged within HHSC. *See* Texas State Medicaid Plan § 1.1(a).

5. Defendant Dr. Kyle L. Janek is the duly appointed Executive Commissioner of HHSC. As such, he is the Texas State official ultimately charged with supervision and control of public assistance programs and services, including the Medicaid program. He is sued in his official capacity.

6. Defendant Texas Children's Health Plan ("TCHP") is a Texas Medicaid MCO that contracts with HHSC to provide Medicaid services to its enrollees.

## LEGAL FRAMEWORK

### Health Centers

7. Community health centers are primarily § 501(c)(3) organizations that are eligible to receive grants under Section 330 of the Public Health Service ("PHS") Act, 42 U.S.C. § 254b,

in order to provide care to medically underserved populations in their communities. 42 U.S.C. §§ 254b(e), (k). Community health centers are required by Section 330, to, among other things: (1) serve a medically underserved population (42 U.S.C. § 254b(a)(1)); (2) provide primary health care services (42 U.S.C. §§ 254b(a)(1)(A) and 254b(k)(3)(A)); (3) provide health care services to Medicaid recipients (42 U.S.C. § 254b(k)(3)(E); and (4) serve all residents of their communities, regardless of any patient's ability to pay. 42 U.S.C. §§ 254b(a)(1) and 254b(k)(3)(G)(iii).

8. As grant funds provided under Section 330 are to be used only to serve economically disadvantaged patients who are unable to pay for the medical services that the health center provides, 42 U.S.C. § 254b(e)(5)(A), community health centers are required to make every reasonable effort to collect reimbursement for services from all available funding sources, including Medicaid. 42 U.S.C. § 254b(k)(F).

**The Medicaid Program**

9. The Medicaid program was initiated in 1965, and is jointly supported by federal and state funds. Medicaid makes health care services available to needy individuals and families whose resources are insufficient to meet the costs of necessary medical services. *See* 42 U.S.C. § 1396-1(1). A state that elects to participate in Medicaid must submit and have approved a State Medicaid plan through which the state defines, *inter alia*, groups of individuals covered, eligibility conditions, medical care and services, reimbursement, and federal-State requirements. *See generally* 42 U.S.C. §§ 1396a(a)(1)-(65) and 42 C.F.R. Part 430, *et seq.* A State Medicaid Plan "must describe the policy and methods to be used in setting payment rates for each type of service included in the State's Medicaid program." 42 C.F.R. § 447.201(b).

10. Under the Medicaid program, a community health center is deemed a "Federally-qualified health center," or FQHC, if it is a recipient of funds under Section 330 and maintains an outpatient health program. 42 U.S.C. § 1396d(*l*)(2)(B). "Federally-qualified health center services . . . and any other ambulatory services offered by a Federally-qualified health center" *must* be covered under a State's Medicaid plan. 42 U.S.C. §§ 1396d(a)(2)(C) and 1396a(a)(10)(A).

11. The Medicaid statute provides unique payment provisions for FQHCs. Currently this reimbursement obligation is based on a cost-related prospective payment system ("PPS") methodology, which requires states to reimburse FQHCs on a prospective, or predetermined, rate per patient visit (also known as an "encounter"). 42 U.S.C. § 1396a(bb). The per visit reimbursement rate for each FQHC, which is uniform for patient encounters regardless of the service performed during the visit, is computed on the basis of the average of 100 percent of the particular FQHC's reasonable costs for covered services in federal fiscal years 1999 and 2000 and is adjusted thereafter based on a medical inflation factor. 42 U.S.C. § 1396a(bb)(2). The PPS rate became effective January 1, 2001.

**Medicaid Managed Care**

12. States have the option of implementing their Medicaid programs through managed care systems. In such systems, a state contracts with managed care organizations (known generically as "health maintenance organizations" ("HMOs")) to provide and manage Medicaid services for a segment of the Medicaid population for which that MCO is responsible. 42 U.S.C. § 1396u-2(a)(1). In exchange for its services, an MCO receives a per-member per-month payment, called a "capitation" payment, from the state based on the number of beneficiaries enrolled with the MCO. 42 C.F.R. § 438.2. The MCO in turn contracts with

various providers, including FQHCs, to provide services to its enrollees. An MCO contract is risk-based; to the extent an MCO can manage its enrollees' health care costs so that the amount the MCO pays in reimbursement to its providers is less than the amount it receives from the state in capitation payments, the MCO makes a profit. 42 C.F.R. § 438.6(c). If payments to providers exceed capitation payments, the MCO incurs a loss. *See* 42 C.F.R. § 438.2 (defining the risk-based MCO contract model). To protect against excessive gains or losses, this capitation payment also must be "actuarially sound." 42 U.S.C. § 1396b(m)(2)(A)(xiii)(II).

13. Federal law provides that "[i]n the case of services furnished by [an FQHC] pursuant to a contract between the center and a [MCO] . . . the State plan shall provide for payment to the center or clinic by the State of a supplemental payment equal to the amount (if any) by which the [statutorily required per-visit rate] exceeds the amount of the payments provided under the contract." 42 U.S.C. § 1396a(bb)(5)(A). These supplemental "wraparound" payments "shall be made . . . in no case less frequently than every 4 months." *Id*. In addition, MCOs must pay FQHCs "not less" than they would pay non-FQHC providers for the same medical services. 42 U.S.C. § 1396b(m)(2)(A).

14. Further, in order to ensure that providers receive reimbursement for certain services that they are obligated to provide regardless of which MCO a patient is enrolled with, an MCO contract must provide that "in the case of medically necessary services which were provided . . . other than through the organization because the services were immediately required due to an unforeseen illness, injury, or condition, either the entity or the State provides for reimbursement with respect to those services." 42 U.S.C. §1396b(m)(2)(A)(vii). Per federal law, in the case of an FQHC such as Legacy reimbursement for medically necessary services must be made at the FQHC's PPS rate.

**FACTUAL BACKGROUND**

15. Legacy was formed in 2005 as the result of a merger of two leading Houston area community organizations, the Montrose Clinic and The Assistance Fund, and received its first FQHC grant funding in 2006. It operates eight school-based clinics, two education/outreach locations, and 12 outpatient clinics, including one emergency room diversion clinic. Legacy offers comprehensive primary, behavioral, and dental services, as well as other enabling services including case management, patient education, and enrollment eligibility services, pharmacy services, and referral coordination.

16. Legacy is certified as an FQHC for the purposes of Medicaid provider participation and reimbursement. As an FQHC Legacy is reimbursed for Medicaid services under the PPS system, and its PPS rate was approximately $266 per encounter in 2012, $271 per encounter in 2013, and is approximately $270 per encounter at present.

17. Texas has implemented a Medicaid managed care payment system by which to arrange for the delivery of health care services to individuals who are enrolled in Medicaid. Tex. Gov. Code § 533.001, *et seq*. Pursuant to the implementation of that system, the Texas state Medicaid Plan properly provides for payment of wraparound funds to FQHCs through State Plan amendment 10-61, effective October 2, 2010, which notes that if "the total amount paid to an FQHC by a [MCO] is less than the amount the FQHC would receive under PPS . . ." the State will "reimburse the difference on a state quarterly basis."

**Changes to Texas's FQHC Payment System and TCHP's Response**

18. Notwithstanding that language, since 2011 Texas has imbedded the amount of an FQHC's full PPS rate directly into the monthly capitation payments it makes to MCOs. It has then, through MCO contracts, required MCOs to reimburse FQHCs at their PPS rates, instead of

7

at negotiated rates. On June 17, 2011, as part of House Bill No. 1, the General Appropriations Bill, the Texas legislature amended the wraparound process by stating that: "[t]o the extent allowable by law, in developing the premium rates for Medicaid and CHIP Managed Care Organizations [], the Health and Human Services Commission shall include provisions for payment of the FQHC Prospective Payment System (PPS) rate and establish contractual requirements that require MCOs to reimburse FQHCs at the PPS rate." That provision was later replicated in the 2013 appropriations bill. HHSC's MCO contract with TCHP similarly states that:

> The MCO must make reasonable efforts to include FQHCs . . . in its Provider Network. If a Member visits an FQHC . . . at a time that is outside of regular business hours (as defined by HHSC in rules, including weekend days or holidays), the MCO is obligated to reimburse the FQHC . . . for Medically Necessary Covered Services. The MCO must do so at a rate that is equal to the allowable rate for those services . . . .
>
> The MCO must pay full encounter rates to FQHCs . . . using the prospective payment methodology described in Sections 1902(bb) and 2107(e)(1) of the Social Security Act. Because the MCO is responsible for the full payment amount in effect on the date of service, HHSC cost settlements (or "wrap payments") will not apply.

19. This change specifying that MCOs must pay FQHCs at their PPS rates also appears in TCHP's contract with Legacy. In 2009, when Legacy first entered into a provider contract with TCHP, the contract provided that Legacy would be reimbursed by TCHP at a rate of $67.00 per visit, presumably a negotiated rate. On July 29, 2011, following HHSC's policy change, Legacy's contract with TCHP was amended to provide that TCHP would reimburse Legacy at its full PPS rate.

20. As a result of this 2011 contract amendment, on September 19, 2013, TCHP President Christopher Born contacted Legacy to note that Legacy's increased visits were not covered by the "trend increase" built into TCHP's capitation rate from HHSC, and that because

"utilization at FQHCs" such as Legacy was increasing, TCHP's rates from HHSC were insufficient to cover its costs. On October 8, 2013, Mr. Born again wrote to Legacy noting that HHSC's current wraparound payment model was "not sustainable" and that TCHP needed "immediate rate relief." TCHP then requested that Legacy accept a per-encounter rate of $133 for original Legacy sites and a rate of $59 for acquired physician practices, less than Legacy's PPS rate at the time.

21. At that same time, on November 13, 2013, as part of a larger correspondence with HHSC, TCHP stated that it believed that its MCO contract with HHSC would not permit it to terminate Legacy's (or any other FQHC's) provider agreement solely due to its obligation to reimburse Legacy at its PPS rate. Specifically, TCHP's Chief Financial Officer stated that "I do not believe we can terminate them [an FQHC] from network participation on the sole basis of cost as this would be in conflict with 'reasonable efforts to include' [FQHCs in TCHP's provider network] since cost is pre-determined by HHSC." Despite this interpretation, TCHP terminated Legacy's provider agreement on the "sole basis" of cost.

**TCHP's November 2014 Termination of Legacy's Provider Agreement**

22. On November 1, 2014, TCHP informed Legacy that, notwithstanding TCHP's interpretation of the contract and its receipt of capitation funds from HHSC that were intended to cover the payment of Legacy's PPS rate, TCHP was terminating Legacy's provider agreement effective February 1, 2015. TCHP stated that it was doing so due to a "utilization trend that far exceeds the trend in the Medicaid premium."

23. Following that notice Legacy sought to clarify the basis for the termination. In a December 1, 2014 email from TCHP President Christopher M. Born, Mr. Born stated:

> The November 1st letter should not have been a surprise to Legacy. As you know, TCHP has had several meetings with you and your staff regarding the unsustainable

trend. TCHP also previously provided to Legacy data illustrating this trend. To reiterate and update, Legacy membership has increased about 284% from 2012-2014 much of which is due to the acquisition of existing primary care, obstetric and behavioral health providers in the community. This has resulted in an increase of 283% in claims expense, *much of which is due to the conversion of an average office visit rate of $59 for non-FQHC providers to the average rate paid to Legacy of $293.*

(emphasis added.) In short, TCHP objected to paying Legacy the mandatory PPS rate even though it had signed a contract with HHSC to pay that very rate and also objected to Legacy expanding access to medically underserved individuals in the Houston area – the very purpose of the Section 330 funding Legacy receives.

24. Legacy continued with its efforts to resolve these issues with TCHP. In a meeting with TCHP on December 4, 2014, Mr. Born stated that TCHP did not intend to change its decision regarding termination, including denying Legacy's request that TCHP delay termination until the end of Legacy's contract period. He also reiterated that cost was the sole reason for TCHP's termination decision.

25. On December 19, 2014, TCHP informed Legacy that, despite statutory language mandating full payment for certain specified out-of-network services the need for which is "immediately required" and "unforeseen," "Legacy will need to obtain authorization to ensure that services can be evaluated to determine whether they qualify for payment."

26. In a further attempt to resolve these issues, Legacy met with HHSC on December 12, 2014 to explain its concerns. At that meeting HHSC informed Legacy that it would not be able to render a decision on the issues until after January 1, 2015. Legacy also sent HHSC two letters, one before the December 12 meeting on December 9, 2014 and one after, on December 24, 2014, detailing Legacy's concerns with the wraparound payment process as well as the expected harm to Legacy's services and patients that would result from TCHP's termination of

Legacy's provider agreement. Legacy's second letter specifically addressed the requirement that HHSC or TCHP ensure reimbursement at Legacy's PPS rate for certain out-of-network services.

27. Lastly, on December 29, 2014, TCHP mailed a notification to Legacy's patients informing them that after February 1, 2015 Legacy would no longer be included in TCHP's network of providers. The notice further directed Legacy's patients to "pick a new main doctor" by January 31, 2015 or that if they failed to do so a new provider would be chosen for them. HHSC confirmed its support of this notice in a January 8, 2015 email to Legacy.

## HARM TO PLAINTIFF

28. Because of HHSC's requirement that TCHP reimburse Legacy directly at its PPS rate rather than a negotiated rate, on November 1, 2014 TCHP terminated Legacy's provider agreement effective February 1, 2015. Following termination of that provider agreement Legacy's patients who are enrolled with TCHP, most of whom are children and expectant mothers, will no longer be able to see their usual Legacy providers unless their visit falls into a number of specific exceptions. Further, because of HHSC's failure to ensure adequate payment to Legacy for out-of-network visits and TCHP's misinterpretation of federal law, Legacy risks not receiving reimbursement when it provides care to out-of-network TCHP patients.

29. From November 1, 2013 to October 31, 2014, TCHP reimbursed Legacy for 51,869 patient visits relating to services provided to approximately 13,902 Medicaid patients enrolled with TCHP. For those visits, TCHP reimbursed Legacy approximately $13,989,460. Legacy, as an FQHC serving a medically underserved patient population, the majority of whom are enrolled in Medicaid or uninsured, operates on a budget with an anticipated net income of only $4,000,000. As such, a loss of almost $14,000,000 would severely impact the financial stability of the organization.

30. This loss of revenue will force Legacy to close clinic locations and eliminate certain services. Specifically Legacy would need to close school-based clinics, a residency training program, and facilities providing dental, educational, social support, and adult behavioral health services. Further, Legacy would be forced to halt implementation of a variety of initiatives designed to improve the quality and continuity of services, including patient monitoring and connections to providers, such as purchasing analytical tools, hiring IT professionals, and constructing a data warehouse.

31. In addition to the harm to Legacy, HHSC's reimbursement policy and TCHP's termination of Legacy's provider agreement will harm Legacy's patients and the quality of health care in Legacy's communities. Uprooting the almost 14,000 Legacy patients who are enrolled with TCHP from their chosen providers will harm those patients' continuity and quality of care, and will needlessly disrupt the provision of health care services. This is exacerbated by the fact that because Legacy is located in medically underserved areas, many of its patients live at or below the poverty line and lack the transportation options and resources to visit other clinic sites, which will make transitioning patients to other non-Legacy providers even more challenging and harmful. Further, cuts to Legacy's services will harm all of its patients, regardless of whether they are enrolled with TCHP, as Legacy would be unable to maintain sufficient capacity to meet the significant need in its communities and its patients, and particularly the uninsured, would encounter significant challenges in obtaining comparable care from different providers.

# CAUSES OF ACTION

## COUNT I

## 42 U.S.C. § 1983

**HHSC And TCHP's Violation Of The FQHC Payment Provision In 42 U.S.C. § 1396a(bb)**

32. Legacy re-alleges and incorporates by reference paragraphs 1-31, above.

33. Federal law requires that states directly provide for supplemental payments to FQHCs so as to ensure an FQHC's total reimbursement (*i.e.* MCO payments plus supplemental payments) equals its PPS rate. HHSC's policy of making those supplemental FQHC payments indirectly by incorporating the full value of FQHCs' PPS rates into the payments it makes to MCOs is contrary to federal law. At issue here, HHSC makes payments to TCHP that incorporate Legacy's PPS rate and TCHP is responsible for then reimbursing Legacy at its PPS rate for FQHC services rendered to TCHP enrollees. HHSC, and TCHP as its agent, have therefore violated federal Medicaid payment provisions by comingling FQHC supplemental payment funds with the general payments HHSC makes to TCHP.

34. Federal law also prescribes that states not require MCOs to reimburse FQHCs more or less than a negotiated rate similar to that which is contracted for by the MCO with other non-FQHC providers. HHSC, and TCHP as its agent, have improperly required that TCHP reimburse Legacy at its higher PPS rate rather than at a negotiated rate similar to that paid to other providers, and in doing so have made Legacy more expensive and incentivized TCHP to terminate its provider agreement with Legacy.

35. Lastly, federal law requires that states ensure MCO contracts state whether the MCO or the state is responsible for reimbursing an FQHC at its PPS rate for certain out-of-network services provided under specific circumstances. Here, TCHP's MCO contract does not provide as such, and TCHP has indicated that its understanding of the payment requirement for

those out-of-network services is contrary to the plain language of federal law. As such, HHSC and TCHP have violated federal Medicaid payment provisions for FQHCs by failing to ensure payment at Legacy's PPS rate for certain out-of-network services.

## COUNT II

### Breach of Contract

**TCHP's Termination Of Legacy's Provider Agreement Breaches Its Contract With HHSC, Which Requires That It Reimburse FQHCs At Their PPS Rates**

36. TCHP's Medicaid MCO contract with HHSC requires that TCHP reimburse FQHCs such as Legacy at their PPS rates. This provision appears in TCHP's MCO contract solely to pass HHSC's federal legal obligation to reimburse FQHCs at their PPS rates on to MCOs such as TCHP.

37. TCHP's decision to terminate Legacy's provider agreement for the sole reason that it must reimburse Legacy at its PPS rate is therefore a breach of TCHP's MCO contract with HHSC. In fact TCHP indicated to HHSC that taking such action would place it in breach of its contractual obligations as an MCO but chose to do so regardless. Further, because that payment provision simply passes on HHSC's federal legal payment obligation to TCHP, Legacy as an FQHC is an intended third party beneficiary of that contract.

38. In addition, as detailed above, because TCHP has indicated that it will not reimburse Legacy at its PPS rate for certain out-of-network services as required by federal law, TCHP is in breach of its MCO contract with HHSC, which requires that TCHP comply with all federal Medicaid statutes and regulations.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court enter an order:

1. Declaring HHSC's current policy of passing through its legal obligation to make supplemental payments to FQHCs in a managed care setting as required by 42 U.S.C. § 1396a(bb)(5) contrary to law;

2. Enjoining HHSC and TCHP from continuing to reimburse Legacy in a manner contrary to federal law;

3. Directing HHSC to implement a payment system for services provided by FQHCs that is compliant with all applicable federal laws and requirements;

4. Directing HHSC to ensure that Legacy will receive full PPS reimbursement for services it provides to out-of-network patients under statutorily specified circumstances;

5. Enjoining TCHP from terminating its Medicaid provider agreement with Legacy; and

6. Afford Legacy such further relief as the Court deems just and equitable.

Respectfully submitted,

LEGACY COMMUNITY HEALTH SERVICES, INC.

By: /s/ Michael J. Collins
Michael J. Collins – Attorney-in-Charge
Texas Bar No. 04614510
Southern District of Texas I.D. No. 15643
COLLINS, EDMONDS & POGORZELSKI, PLLC
1616 South Voss Rd., Suite 125
Houston, Texas 77057
Telephone: (713) 501-3425
Facsimile: (832) 415-2535
mcollins@cepiplaw.com

Of Counsel:

Edward T. Waters*
Gregory M. Cumming*
FELDESMAN TUCKER LEIFER FIDELL LLP
1129 20th Street, N.W., Fourth Floor
Washington, D.C. 20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)
ewaters@ftlf.com
gcumming@ftlf.com

* Application for admission *Pro Hac Vice* pending

**CERTIFICATE OF SERVICE**

I hereby certify that Defendants will be served with copies of the foregoing document with the summons.

January 9, 2015 /s/ Michael J. Collins
Michael J. Collins