IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS,
HOUSTON DIVISION

| | | |
|---|---|---|
| LEGACY COMMUNITY HEALTH SERVICES, INC., *Plaintiff,* | § § § § | |
| v. | § § | Civil Action No. 4:15-CV-00025 |
| DR. KYLE JANEK, In His Official Capacity as Executive Commissioner of the Texas Health and Human Services Commission, | § § § § § § | |
| and | § § | |
| TEXAS CHILDREN'S HEALTH PLAN, *Defendants.* | § § | |

RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Table of Contents ..................................................................................................... ii

I.   Introduction ..................................................................................................... 1

II.  Nature and posture of the case ........................................................................ 2

III. Statement of the issues ................................................................................... 2

   (1)  Has Legacy established Article III standing to bring its claims against HHSC? .. 2

   (2)  Has Legacy established that its claims regarding out-of-network services are ripe for adjudication? ................................................................................. 2

   (3)  If Legacy has established standing, has it met its burden to establish its entitlement to a mandatory injunction under the four-prong test established by the United States Supreme Court and the United States Fifth Circuit Court of Appeals? .... 2

IV.  Argument and authorities .............................................................................. 2

   1.  Legacy does not have standing to challenge the violations it has alleged, and its claims for out-of-network services are not ripe for adjudication ................................... 4

     a.  Legacy does not have standing to bring its claims against HHSC ...................... 4

     b.  Legacy's claims for payment provided to out-of-network patients is not ripe for review ........................................................................................................... 10

   2.  Legacy cannot establish that it is likely to succeed on the merits of its claims against HHSC ............................................................................................................ 11

     a.  Legacy can state no claim to "enforce" the Medicaid Act, and  CMS has signed off on Texas' actions ............................................................................................. 12

     b.  The Medicaid Act does not contain a right for FQHCs to set state reimbursement policies ......................................................................................... 17

     c.  HHSC's rules provide for out-of-network payments to FQHCs by MCOs for treatment received by MCO members ................................................................... 20

   4.  This case is about claimed economic loss, which as a matter of law cannot justify injunctive relief .............................................................................................. 25

   5.  The balance of equities favor denying Legacy's requested relief .......................... 27

   6.  A preliminary injunction would disserve the public interest by forbidding enforcement of a democratically enacted law, disturbing the status quo, and creating confusion for HHSC, MCOs, and FQHCs across the State ........................................... 28

     a.  Enforcement of a duly enacted law is inherently in the public interest ............. 28

     b.  A preliminary injunction would undermine the public interest by changing the status quo ................................................................................................................ 28

     c.  Changing the status quo would create numerous legal and practical problems for HHSC and MCOs ................................................................................................ 29

    d.   Legacy has not "clearly shown" that a preliminary injunction would not disserve the public interest ................................................................. 29

V.  Conclusion ................................................................................................ 30

Certificate of Service ....................................................................................... 31

# TABLE OF AUTHORITIES

**Cases:**

*Black Fire Fighters Ass'n of Dallas v. City of Dallas,*
  905 F.2d 63 (5th Cir. 1990) ............................................................3

*Blessing v. Freestone,*
  520 U.S. 329 (1997) .........................................................18, 20, 26

*Cinel v. Connick,*
  15 F.3d 1338 (5th Cir.1994) ..........................................................5

*Christensen v. Harris Cnty.,*
  529 U.S. 576 (2000) .....................................................................5

*Dennis Melancon, Inc. v. City of New Orleans,*
  703 F.3d 262 (5th Cir. 2013) ............................ 3, 17, 18, 19, 29, 31

*Equal Access for El Paso, Inc. v. Hawkins,*
  509 F.3d 697 (5th Cir. 2007) ................................................ 12, 19

*Evergreen Presbyterian Ministries Inc. v. Hood,*
  235 F.3d 908 (5th Cir. 2000) .......................................................17

*Frame v. City of Arlington,*
  657 F.3d 215 (5th Cir.2011) ......................................................... 6

*Frazar v. Gilbert,*
  300 F.3d 530 (5th Cir. 2002) ........................................................19

*Frew v. Hawkins,*
  540 U.S. 431 (2004) ................................................................... 20

*Golden State Transit Corp. v. Los Angeles,*
  493 U.S. 103 (1989) .....................................................................14

*Gonzaga Univ. v. Doe,*
  536 U.S. 273 (2002) ............................................................ passim

*Harris v. Wilters,*
  596 F.2d 678 (5th Cir. 1979) .........................................................3

*Lake Charles Diesel, Inc. v. Gen. Motors Corp.,*
    328 F.2d 192 (5th Cir. 2003)............................................................13

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)........................................................................5, 6

*Maine v. Thiboutot,*
    448 U.S. 1 (1980)..............................................................................14

*Middlesex County Sewerage Auth. v. National Sea Clammers Assoc.,* 453 U.S. 1, 19
    (1981) ...............................................................................................14

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.,*
    760 F.2d 618, 621 (5th Cir. 1985).....................................................3

*Nat'l Park Hospitality Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003).........................................................................12

*Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,*
    335 F.3d 357 (5th Cir. 2003)..............................................................2

*Pharmacy Buying Ass'n, Inc. v. Sebelius,*
    906 F.Supp.2d 604 (W.D. Tex. Oct. 29, 2012) ..........................6, 11

*Presbyterian Ministries, Inc. v. Hood,*
    235 F.3d 908 (5th Cir. 2000).............................................................19

*Rush v. National Bd. of Medical Examiners,*
    268 F. Supp. 2d 673 (N.D. Tex. 2003).................................................3

*Romano v. Greenstein,*
    721 F.3d 373 (5th Cir. 2013).............................................................10

*S.D. v. Hood,*
    391 F.3d 581 (5th Cir. 2004) .............................................................19

*Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan,*
    883 F.2d 345 (5th Cir.1989)................................................................5

*Suter v. Artist M.,*
    503 U.S. 347 (1992).........................................................................18

*Three Lower Counties v. Maryland,*
498 F.3d 294 (4th Cir. 2007) ...................................................... 21

*Warth v. Seldin,*
422 U.S. 490 (1975) ...................................................................... 6

*Wenner v. Texas Lottery Comm.,*
123 F.3d 321 (5th Cir. 1997) ........................................................3

*Wilder v. Va. Hosp. Assoc.,*
496 U.S. 498 (1990) .................................................................... 17

*Winter v. Natural Res. Def Council, Inc.,*
555 U.S. 7 (2008) .................................................................... 2, 28

*Wright v. Roanoke Redevelopment and Housing Authority,*
479 U.S. 418 (1987) .................................................................... 18

## Statutes

§ 1396a(bb)(2)-(4).) .................................................................... 21

§ 1983 .............................................................................. passim

1 Tex. Admin. Code § 353.4 (West 2014) ...................... 7, 11, 23, 30

1 Tex. Admin. Code § 353.4(c) ...................................................... 24

1396a(bb) ...................................................... 13, 21, 22, 26

42 U.S.C. § 1396a(a)(23) ..............................................................7

42 U.S.C. § 1396a(bb) ...................................................... 1, 21, 22

42 U.S.C. § 1396a(bb)(6)(B) ........................................................ 21

42 U.S.C. § 1983 ...................................................... 1, 13, 21, 26

42 U.S.C. §§ 1395x(aa)(1)(B) & (3)(A) ........................................ 21

Texas Human Resources Code § 32.028 ........................................ 15

## Regulations

42 CFR 438.6(c) .................................................................................................... 14

Stipulation in *Pharmacy Buying Assoc., Inc. v. Sebelius, et al*, Civil Action No. A-12-CV-0156-SS, filed 1/2/13 .................................................................................. xx

## I.    Introduction

This case arises from Legacy Community Health Service's ("Legacy") dissatisfaction with a business decision made by the Texas Children's Health Plan ("TCHP")[1] to terminate its business relationship with the Legacy. As a result of the pending termination, Legacy now seeks relief from this Court to unwind a legislative mandate from the Texas Legislature that has been in place since 2011. Specifically, Legacy's action seeks to force the Texas Health and Human Services Commission ("HHSC" or "Commission")[2], through a 42 U.S.C. § 1983 naming Dr. Kyle Janek in his Official Capacity only, to end its current system of requiring that Texas Managed Care Organizations ("MCO" or "MCOs") pay in full the federally required encounter rate[3] for services rendered by Federally Qualified Health Centers ("FQHC" or "FQHCs").

As established below, Legacy does not have Article III standing to raise its claims against HHSC. Even if Legacy has standing, Legacy cannot establish a substantial likelihood of success on the merits of its claims for injunctive relief because it has no private right of action enforceable through 42 U.S.C. § 1983 under 42 U.S.C. § 1396a(bb). Legacy further failed to establish an irreparable injury meriting issuance of a mandatory

---

[1] Texas Children's Health Plan is a Managed Care Organization.

[2] Plaintiff has sued Dr. Kyle Janek in his Official Capacity only. It is well established that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *See Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (internal citation omitted). Hence, this response treats Dr. Janek and the Texas Health and Human Services Commission as one in the same, and refers only to HHSC throughout the body of this response.

[3] Pursuant to 42 U.S.C. § 1396a(bb), FQHCs such as Legacy are required to be paid a per visit encounter rate, which is either calculated based upon a methodology specified in the statute ("PPS Rate"), which reflects, among other things, cost data from the years 1999 and 2000 and an inflation factor, or, alternatively, a method agreed to between HHSC and the FQHC which pays the FQHC the same or greater amount than the PPS Rate ("Alternative Rate"). Here, Legacy is subject to an Alternative Rate which can be adjusted by HHSC based on, among other factors, cost data for years other than 1999 and 2000. (*See* Affidavit of Gary Jessee (hereinafter "Jessee Aff.") at ¶ 10; Ex. C.)

injunction. Finally, issuance of an injunction in this matter is neither in the public interest, and issuance would cause far more harm to the State of Texas than to Legacy.

## II. Nature and posture of the case

Legacy filed its Original Complaint in this matter on January 7, 2015. (Docket No. 1.) Legacy filed an amended complaint on January 9, 2015. (Docket No. 9.) This matter is currently set for hearing on Plaintiff's request for a temporary restraining order and preliminary injunction on January 28-29, 2015. Defendant HHSC has filed this response.

## III. Statement of the issues

(1) Has Legacy established Article III standing to bring its claims against HHSC?

(2) Has Legacy established that its claims regarding out-of-network services are ripe for adjudication?

(3) If Legacy has established standing, has it met its burden to establish its entitlement to a mandatory injunction under the four-prong test established by the United States Supreme Court and the United States Fifth Circuit Court of Appeals?

## IV. Argument and authorities

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). In the Fifth Circuit, preliminary injunctive relief is an "extraordinary remedy . . . to be treated as an exception rather than the rule." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 335 F.3d 357, 363-64 (5th Cir. 2003) (*quoting Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 621 (5th Cir. 1985)). A plaintiff "[g]enerally...must satisfy *each* of four traditional criteria in order to be entitled to a preliminary injunction." *Dennis Melancon, Inc. v. City of New*

*Orleans*, 703 F.3d 262, 268 (5th Cir. 2013) (*quoting Black Fire Fighters Ass'n of Dallas v. City of Dallas*, 905 F.2d 63, 65 (5th Cir. 1990) ("The denial of a preliminary injunction will be upheld where the movant has failed sufficiently to establish any one of the four criteria.") (emphasis in original).

Significantly, the issuance of a preliminary injunction is designed primarily to freeze the status quo until a full hearing permits final relief. *See Wenner v. Texas Lottery Comm.*, 123 F.3d 321, 326 (5th Cir. 1997). The Fifth Circuit has admonished that "[o]nly in rare instances is the issuance of a mandatory preliminary injunction proper." *Harris v. Wilters*, 596 F.2d 678, 680 (5th Cir. 1979) (per curiam). "Mandatory preliminary relief which goes well beyond simply maintaining the status quo pendente lite is particularly disfavored and should not be issued unless the facts and law clearly favor the moving party." *Rush v. National Bd. of Medical Examiners*, 268 F. Supp. 2d 673, 678 (N.D. Tex. 2003). Legacy has not demonstrated its right to a court-endorsed and court-ordered contract. HHSC believes that TCHP is within its rights to terminate this provider. Furthermore, close examination of Legacy's proposed relief demonstrates that Legacy is seeking not only to preserve the status quo but to significantly improve its position vis-à-vis both defendants.

Under these rules, Legacy's motion for preliminary injunctive relief should be denied. Legacy's motion seeks a mandatory injunction as to HHSC and Legacy has not established that the facts and law clearly favor its position under the heightened standard applicable to the relief it seeks. Further, Legacy has no basis to prevail on the merits, and granting the relief that it seeks would disserve the public interest by undermining the decisions of the elected officials in the Texas legislature that lawfully enacted the current statutes supporting the HHSC policy. Moreover, the relief Legacy seeks –*i.e.,* a complete

rewrite of the rules governing the contractual relationship between HHSC and its Managed Care Organizations– is not susceptible to emergency relief because it does not seek to maintain the status quo but rather to change it through an order of this Court.

1. Legacy does not have standing to challenge the violations it has alleged, and its claims for out-of-network services are not ripe for adjudication

   a. Legacy does not have standing to bring its claims against HHSC

Article III of the Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. The reason for a case-or-controversy limitation is to restrain the federal courts from enmeshing themselves in deciding abstract and advisory questions of law. Accordingly, any federal court plaintiff must have case-or-controversy "standing" to assert a claim—specifically, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus,* –––U.S. ––––, ––––, 134 S.Ct. 2334, 2341 (2014) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992) (some internal quotation marks omitted)). Courts have also developed justiciability doctrines, such as ripeness. *United Transp. Union v. Foster,* 205 F.3d 851, 857 (5th Cir.2000); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992). Since standing and ripeness are essential components of federal subject-matter jurisdiction, the lack of either can be raised at any time by a party or by the court. *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan,* 883 F.2d 345, 348 (5th Cir.1989); *see also Cinel v. Connick,* 15 F.3d 1338, 1341 (5th Cir.1994).

To establish standing, a party must demonstrate (1) an injury in fact; a causal connection between the injury and the conduct of which the party complains; and that it

is likely, as opposed to merely speculative, that a favorable decision will redress the injury. *Lujan,* 504 U.S. at 560–61. The first requirement—that a plaintiff have sustained an injury-in-fact—"helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.' " *Susan B. Anthony List,* 134 S.Ct. at 2341 (citing *Warth v. Seldin,* 422 U.S. 490, 498 (1975) (internal quotation marks omitted)). An injury-in-fact must be "'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Ibid* (some internal quotation marks and citations omitted).

Standing can be based on either actual or imminent harm. *Pharmacy Buying Ass'n, Inc. v. Sebelius,* 906 F.Supp.2d 604, 617-18 (W.D. Tex. Oct. 29, 2012) (internal citations omitted).  But, as the Fifth Circuit has reiterated, a plaintiff may seek injunctive relief with respect to threatened harm only if he "shows a sufficiently high degree of likelihood" he will be injured. *Frame v. City of Arlington,* 657 F.3d 215, 235 (5th Cir.2011). Legacy here bears the burden of establishing standing. *Susan B. Anthony List,* 134 S.Ct. at 2342.

Legacy's Amended Complaint, without explanation, alleges that HHSC's policy caused TCHP to terminate its provider agreement, and that it now *risks* "not receiving reimbursement when it provides care to out-of-network TCHP patients it is legally obligated to serve." (*See* Docket No. 9 at ¶ 28.) Legacy goes on to allege that it may lose approximately $14,000,000.00 in revenue as a result of TCHP's termination. (*Id.* at ¶ 29.) The balance of harms alleged are generalized harms to Legacy's business and its "general patient population." (*Id.* at ¶ 30-31.)

To begin, nothing in the Medicaid Act creates an *entitlement* for any provider to participate in the program.[4] In particular, although the Medicaid Act contains a "freedom of choice" provision for Medicaid recipients, 42 U.S.C. § 1396a(a)(23), nothing in the Medicaid Act creates a right in any FQHC to provide services to a Medicaid recipient. Legacy's contention that timely payment in full of its federally mandated rate for services resulted in termination without cause of its contract does not indicate a harm caused by HHSC, but rather a business judgment by TCHP. (*See* Jessee Aff. at ¶ 29.) Further, there are multiple provisions in place for Legacy under both its provider agreement with TCHP, Texas statutes and administrative rules, and also provisions in HHSC's contract with TCHP relating to TCHP's obligations vis-à-vis out-of-network services, which will ensure that Legacy does not deliver services under the cloud of non-payment. *See generally* 1 Tex. Admin. Code § 353.4 (West 2014) ("Managed Care Organization Requirements Concerning Out-of-Network Providers"); Section IV.2.c, *infra*. Legacy cannot establish standing based upon a theory that it has received full, timely payment of its encounter rate and that it has adequate administrative protections for out-of-network services it is required to provide.

Legacy further contends that without its contract, it will suffer an approximately $14,000,000.00 loss. (Docket No. 9 at ¶ 29.) As noted above, Legacy has no entitlement to its contract with TCHP or the historical profits thereunder, which appear to be the sole basis for its alleged loss, and cannot prove that HHSC caused it harm where TCHP made a business decision to terminate Legacy's contract per the terms of the agreement. Both Legacy's contract with TCHP, and at least one of Legacy's provider agreements with

---

[4] By this, HHSC does not mean that Legacy is not entitled to payment for services rendered, but Legacy is certainly not entitled to a contract with TCHP.

HHSC explicitly permits TCHP and HHSC to terminate without cause. Notably, in its Amended Complaint, Legacy neither alleges a breach of its contract with TCHP, nor any of its provider agreements with HHSC. Moreover, there is nothing in HHSC's contract with TCHP which prohibits TCHP from terminating agreements with FQHCs like Legacy. (*See* Jessee Aff. at Ex. B, at Section VI; Declaration of Christopher Born (Docket No. 18-2) (hereinafter "Born Decl."), at Ex. F, at Section 15.2 (providing for termination "without cause")). At best, HHSC's contract with TCHP requires that it make "reasonable efforts" to include any FQHCs in its network; it does not, however, require that it make "reasonable efforts" or any effort to include a particular FQHC in its network, nor does it explicitly refer to any required "reasonable efforts" to retain an FQHC like Legacy in network. (*See* Jessee Aff. at Ex. A, Attachment B-1 – Medicaid and CHIP Managed Care Services RFP (hereinafter "RFP"), at Section 8.1.22.)[5] CMS does not require MCOs to include any FQHCs in their networks. (*See* February 10, 2010 Letter from CMS to State Health Officials, available http://downloads.cms.gov/cmsgov/archived-downloads/SMDL/ downloads/ SHO10004.pdf); Jessee Aff. at ¶ 23.)

Based on HHSC information and research, TCHP has ample other FQHCs in its network other than Legacy, more than sufficient to meet its contractual obligation to HHSC and to meet client needs. In addition to these FQHCs, TCHP has hundreds of other providers in its network, enough to satisfy its contractual obligations to HHSC and to meet client needs. (*See* Jessee Aff. at ¶¶ 25, 26; Exs. I, J, and K.) When TCHP informed HHSC that it was planning to terminate its contract with Legacy in 2014, HHSC, though

---

[5] The RFP is incorporated into the contract between HHSC and TCHP pursuant to Section 3.1.1 of the RFP. The contract between HHSC and TCHP ("the HHSC/TCHP Contract"), which relates to TCHP's role as a MCO, includes HHSC's standard MCO contract (a Uniform Managed Care Contract and its attachments, one of which is the RFP). (*See* Jessee Aff. at ¶ 2; Ex. A.)

not required to do so by contract, asked TCHP to complete geomapping studies to determine whether sufficient coverage would be available without Legacy in network. (*See* Jessee Aff. at ¶¶ 27, 28; Born Decl. at Ex. R.) The average distance to various providers in both Harris County and Jefferson County did not change with the exclusion of Legacy from the provider network.[6] (*See, e.g.,* Jessee Aff. at ¶ 27; Born Decl. at Ex. R.) HHSC was satisfied as a result of those studies that significant coverage would be available to Legacy's former patients. (*See* Jessee Aff. at ¶ 28.) Moreover, even the State of Texas's Healthcare Transformation and Quality Improvement Program ("Texas Demonstration") approved by CMS only requires that enrollees be guaranteed the choice "of at least one MCO which has at least one FQHC as a participating provider..." (*See* Jessee Aff. at Ex. H, at ¶ 35.)

Finally, TCHP is required by contract with HHSC to "provide Members with access to qualified Network Providers within the travel distance and waiting time for appointment standards defined in this RFP", and "[f]or each proposed Service Area and for each MCO Program bid (if the proposed Provider Network would be different across MCO Programs within a Service Area), submit tables created using GeoAccess, or a comparable software program, to demonstrate the geographic adequacy of the Respondent's proposed Provider Network compared to the projected population in each proposed Service Area.") *See* Jessee Aff. at Ex. A, RFP at Sections 1.5 and 4.3.4.1. Moreover, the HHSC/TCHP contract requires (subject to limited exceptions not applicable here) that:

---

[6] With Legacy in Harris County, the average distance to one provider was 1.1 miles in Harris County and 1.3 miles in Jefferson County; and 1.4 miles and 1.6 miles to two providers, respectively, for example, which did not appear to change in the geomapping study which did not include Legacy. In addition, neither the distances to ob-gyn providers or behavioral health providers changed.

**Medicaid PCP Access:** At a minimum, the MCO must ensure that all adult Members have access to one age-appropriate Network PCP with an Open Panel within 30 miles of the Member's residence. Child Members must have access to two age-appropriate Network PCPs with an Open Panel within 30 miles of the Member's residence.

**CHIP PCP Access:** At a minimum, the MCO must ensure that all Members have access to one age-appropriate PCP in the Provider Network with an Open Panel within 30 miles of the Member's residence. This provision does not apply to CHIP Perinates, but it does apply to CHIP Perinate Newborns.

(*See* Jessee Aff. at Ex. A, RFP at Section 8.1.3.2.)

Legacy is not alleging TCHP has breached any of these provisions provision, and, as noted, *supra*, HHSC has been provided with geomapping studies where there are no Legacy providers, where the travel distances have not changed. (*See* Jessee Aff. at ¶¶ 27, 28.) Moreover, as Legacy has already done, there is nothing prohibiting it from asking its patients to switch to other MCOs which still have Legacy in their network. (*See* Born Decl. at Exs. B and C.)

Lastly, Legacy argues that its loss of revenue will force it to close clinic locations and eliminate services. That, Legacy says, will harm its almost 14,000 patients who are enrolled with TCHP, ignoring that extensive FQHC coverage will continue to exist in TCHP's network following Legacy's termination, in addition to hundreds of individual providers, as noted *supra*.

Even assuming Legacy's consumers will be harmed by the termination of its contract with TCHP, which they will not be, Legacy's alleged harm implicates standing on behalf of its customers. Legacy cannot establish standing based on the harm that it alleges its customers will suffer. "The United States Supreme Court has "adhered to the rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" The rule is not absolute, however.

The United States Supreme Court has recognized a limited exception when: (1) the litigant seeking third-party standing has suffered an "injury in fact" giving him a "sufficiently concrete interest" in the outcome of the issue; (2) the litigant has a "close" relationship with the third party on whose behalf the right is asserted; and (3) there is a "hindrance" to the third party's ability to protect his own interests. Courts generally "have not looked favorably upon third-party standing." *Pharmacy Buying Ass'n, Inc. v. Sebelius*, 906 F.Supp.2d 604, 615 (W.D. Tex. Oct. 29, 2012) (internal citations and markings omitted).

Legacy's claimed injury in fact is speculative at best. Legacy's complaint suggests that it may not receive full payment for out-of-network services, but ignores the state administrative scheme enacted by HHSC to guarantee payments to out-of-network providers. *See generally* 1 Tex. Admin. Code § 353.4 (West 2014) ("Managed Care Organization Requirements Concerning Out-of-Network Providers"); Section IV(2)(c), *infra*. Legacy's claim also assumes more than it can prove. Legacy will not face 14,000 out-of-network claims on February 2, 2015, that will result in Legacy being either underpaid or not paid, even if this Court does not grant the relief Legacy requests.

Secondly, any argument that Legacy's 14,000 customers are hindered from enforcing their rights under relevant Medicaid laws is easily be rebutted by the participation of Medicaid recipients in litigation seeking to vindicate their rights. *See generally Romano v. Greenstein*, 721 F.3d 373 (5th Cir. 2013); *see also Equal Access for El Paso v. Hawkins*, 509 F.3d 697 (5th Cir. 2007).

     b. <u>Legacy's claims for payment provided to out-of-network patients is not ripe for review</u>

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract

disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (citation omitted).

As indicated in Section IV(2)(c), *infra*, Legacy has both contractual, statutory, and rule based rights to receive payment for out-of-network services it risks having to provide as an eligible FQHC. Legacy, however, has yet to treat a single out-of-network patient under the circumstances it alleges in its Amended Complaint, alleging instead that the status quo creates a *risk* that Legacy may not receive payment for such services. (Docket No. 9 at ¶ 28.) In the absence of any tangible legal injury for Legacy to allege, Legacy's claim as to the risk of non-payment for out-of-network services are not ripe for adjudication.

2. Legacy cannot establish that it is likely to succeed on the merits of its claims against HHSC

Subject to the foregoing, Legacy's motion for preliminary injunction should be denied because Plaintiff has not established that it is likely to succeed on the merits of its claims. *See Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 203 (5th Cir. 2003) ("[T]he absence of likelihood of success on the merits is sufficient to make the district court's grant of a preliminary injunction improvident as a matter of law."). Legacy has not established that it has rights enforceable through § 1983 under § 1396a(bb). Even if such rights exist – and HHSC contends that they do not – Plaintiff cannot establish a substantial likelihood of success that (a) Legacy has an enforceable claim under § 1983; (b) that HHSC has violated federal law by requiring timely and full payment to FQHCs at

their full encounter rate; or, (c) that HHSC's administrative rules for payment of out-of-network obligations fails to meet federal requirements.

      a. <u>Legacy can state no claim to "enforce" the Medicaid Act, and CMS has signed off on Texas' actions</u>

As an initial matter, because all of Legacy's claims brought under 42 U.S.C. § 1983 seek to vindicate alleged violations of the Medicaid Act, all of their claims fail because Legacy simply possesses no right to enforce the Medicaid Act, regardless of the cause of action pled.

For example, litigants may sue under section 1983 if state officials violate a federal statute, and then only if the statute confers "rights, privileges, or immunities" on individuals. *See Maine v. Thiboutot*, 448 U.S. 1 (1980). But a section 1983 lawsuit cannot get off the ground unless a litigant first shows that a state officer has violated a federal legal obligation. *See Wright v. City of Roanoke Redev. and Hous. Auth.*, 479 U.S. 418, 423 (1987) ("*Maine v. Thiboutot*, 448 U.S. 1 (1980), held that § 1983 was available to enforce *violations of federal statutes* by agents of the State.") (emphasis added). Only after such a showing can one proceed to the next steps of the *Thiboutot* inquiry, and consider whether the federal statute creates individual "rights" that can be vindicated under section 1983, *see Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 106 (1989) ("Section 1983 speaks in terms of 'rights, privileges, or immunities,' not violations of federal law."); and whether Congress nevertheless intended to preclude private litigants from using section 1983 to enforce these federally protected "rights," *see, Middlesex County Sewerage Auth. v. National Sea Clammers Assoc.*, 453 U.S. 1, 19 (1981).

Here, the Centers for Medicare and Medicaid Services ("CMS"), a federal agency, has signed off on the obligation of TCHP to pay the full encounter rate and attendant elimination of the wrap payment. HHSC's contract with TCHP is subject to CMS approval. (*See* Jessee Aff. at ¶¶ 17-21.) Section 1.9 of the RFP (which, as noted in n. 4, *supra*, is incorporated into the contract itself pursuant to Section 3.1.1 of the RFP, provides that "[c]ontracts awarded under this RFP are subject to all necessary federal and state approvals, including, but not limited to, Centers for Medicare and Medicaid Services (CMS) approval." (*See* Jessee Aff. at ¶ 17; Ex. A, RFP, at Section 3.1.1.) Section 8.1.22 of the RFP expressly indicates that there is no need for a wrap payment because the MCO is required to pay the full encounter rate. (*See* Jessee Aff. at ¶ 18; Ex. A, RFP, at Section 8.1.22 ("The MCO must pay full encounter rates to FQHCs and RHCs for Medically Necessary Covered Services provided to Medicaid and CHIP Members using the prospective payment methodology described in Sections 1902(bb) and 2107(e)(1) of the Social Security Act. Because the MCO is responsible for the full payment amount in effect on the date of service, HHSC cost settlements (or "wrap payments") will not apply.")). This provision, and its predecessor which also provided for the encounter rate to be paid by TCHP, have been approved by CMS.[7] (*See* Jessee Aff. at ¶¶ 17-21; Ex. E.)

---

[7] Version 2.1 of the HHSC/TCHP contract included the following language:

8.1.22    Federally Qualified Health Centers (FQHCs) and Rural Health Clinics (RHCs)

The MCO must make reasonable efforts to include FQHCs and RHCs (freestanding and Hospital-based) in its Provider Network. If a Member visits an FQHC or RHC (or a Municipal Health Department's public clinic for Health Care Services) at a time that is outside of regular business hours (as defined by HHSC in rules, including weekend days or holidays), the MCO is obligated to reimburse the FQHC, RHC, or public clinic for Medically Necessary Covered Services. The MCO must do so at a rate that is equal to the allowable rate for those services as determined under Section 32.028 of the Human Resources Code. The Member does not need a referral from his/her PCP. MCOs are required to pay full encounter rates (as determined by HHSC) directly to FQHCs and

Moreover, HHSC's actuaries have submitted documentation to CMS which makes clear that the wrap payments, and, accordingly, an encounter rate, are factored into the capitation rate paid by HHSC to TCHP.[8] (*See* Jessee Aff. at Ex. F at p. 2 , 8, 14) (providing, among other things, that actuaries considered "[i]nformation provided by HHSC regarding historical FQHC wrap payments currently paid by HHSC" to develop "HMO Premium Rates", and noting that Medicaid provider reimbursements provided to actuaries included "the inclusion of wrap payments for FQHCs effective 9/1/2011", and providing the "actuarial certification required under [CMS] requirements 42 CFR 438.6(c)"). CMS has also made it clear that states may set minimum payment amounts MCOs such as TCHP must pay to their providers:

> The Secretary [of the United States Department of Health and Human Services] maintains that a state administering a managed care system is not prohibited by the federal statutes, regulations, and operating procedures governing the Medicaid program from establishing minimum payment rates for specific services in MCO contracts, but CMS does not require that states do so or otherwise regulate subcontractual payment arrangements between MCOs and their contracted providers.

(*See* Jessee Aff. at ¶¶ 20, 21; Ex. G.) The capitation rates factoring in the wrap payments are also approved by the Governor's Office and the Legislative Budget Board. (*See* Jessee Aff. at ¶ 19.) Moreover, the inclusion of the wrap payments in the calculation of the capitation rate, and accordingly, payment of the full encounter rate by the MCO to

RHCs for Medically Necessary Covered Services. HHSC cost settlements (or "wrap payments") no longer apply.

(*See* Jessee Aff. at n.2.) Version 2.6 contains the more recent language cited above, which is identical to the language in Version 2.12, which is the current contract between TCHP and HHSC. (*See id.*)

[8] In addition, a similar system is employed in five other states. (*See National Association of Community Health Centers,* Update on the Status of the FQHC Medicaid Prospective Payment System in the States, State Policy Report #40, November 2011, available http://www.nachc.com/client/2011 %20PPS%20Report%20SPR%2040.pdf, at p. 5.)(" 5 states (CO, CT, MA, MS, DE) actually pay the managed care organizations the wrap-around who in turn pay the health centers. Texas just made this change, which is effective September 1st. NJ, NC, and TN are considering this change.")

providers such as Legacy, is mandated by the Texas Legislature. (*See* Plaintiff's Ex. F at

Rider 79.) House Bill 1, Article II, Rider 79 provides:

> FQHC Reimbursement in Managed Care. To the extent allowable by law,
> in developing the premium rates for Medicaid and CHIP Managed Care
> Organizations (MCOs), the Health and Human Services Commission shall
> include provisions for payment of the FQHC Prospective Payment System
> (PPS) rate and establish contractual requirements that require MCOs to
> reimburse FQHCs at the PPS rate.

(*Id.*)

The contract between TCHP and HHSC, and state and federal law, also prohibit HHSC

from delegating "policy-making authority", which is essentially what Legacy seeks to do

here. (*See* Jessee Aff. at Ex. A, RFP at Section 3.3.1 ("State and federal laws generally

limit HHSC's ability to delegate certain decisions and functions to a vendor, including,

but not limited to: (1) policy-making authority...").)

It is true that in the past the Supreme Court has permitted at least one provision

of the federal Medicaid Act to be enforced under Section 1983. *See Wilder v. Va. Hosp.*

*Assoc.*, 496 U.S. 498 (1990) (allowing hospitals to sue under Section 1983 to enforce the

"Boren Amendment," which requires participating States' Medicaid programs to

reimburse providers at "reasonable and adequate" rates), superseded by statute as

discussed in *Evergreen Presbyterian Ministries Inc. v. Hood*, 235 F.3d 908, 919 n.12 (5th

Cir. 2000) (recognizing Congressional repeal of Boren Amendment to preclude private

right of action). But *Gonzaga Univ. v. Doe* limited *Wilder*'s holding to provisions in the

Medicaid Act that "explicitly confer[] specific monetary entitlements upon the plaintiffs."

536 U.S. 273 (2002). The *Gonzaga* Court also noted that "[o]ur more recent decisions ...

have rejected attempts to infer enforceable rights from Spending Clause statutes." *Id.* at

281 (noting that in *Suter v. Artist M.*, 503 U.S. 347 (1992) and *Blessing v. Freestone*, 520

U.S. 329 (1997), the Court rejected attempts to infer enforceable rights from Spending

Clause statutes analyzed in those suits). And *Gonzaga* quoted with approval the following passage from *Pennhurst*:

> In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions in not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State.

536 U.S. at 280 (emphasis added) (internal citation omitted). After *Gonzaga*, *Wilder* cannot stand for the proposition that any provision of the Medicaid statute can be enforced via Section 1983. If anything, *Gonzaga* indicates that *Wilder* and *Wright v. Roanoke Redevelopment and Housing Authority*, 479 U.S. 418 (1987), represent narrow exceptions to a general principle that excludes spending legislation from judicial enforcement. *See Gonzaga*, 536 U.S. at 280 ("Since *Pennhurst*, only twice have we found spending legislation to give rise to enforceable rights.").

The Fifth Circuit has also recognized that *Gonzaga* limits the ability of Medicaid recipients to bring Section 1983 claims. In *Equal Access for El Paso, Inc. v. Hawkins*, 509 F.3d 697 (5th Cir. 2007), the court refused to allow Medicaid recipients to sue under Section 1983 to enforce the "equal access" provisions of the Medicaid statute—even though an earlier-decided case had allowed such a claim to proceed. Wrote the Court:

> We may no longer, as we did in *Evergreen* [*Presbyterian Ministries, Inc. v. Hood*, 235 F.3d 908 (5th Cir. 2000)], resolve the ambiguities of *Blessing*, *Wilder*, and the *Equal Access* provision in favor of finding a Congressional intent to authorize Medicaid recipients to bring Equal Access provision suits under § 1983. We are forced by *Gonzaga* to abjure the notion that anything short of an unambiguously conferred private individual 'right,' rather than the broader or vaguer 'benefits' or 'interests,' may be enforced under § 1983. *Equal Access*, 509 F.3d at 704.

This argument should apply with even greater force when a provider such as Legacy, as opposed to a Medicaid recipient, seeks to bring a Section 1983 claim. To the extent that other Fifth Circuit decisions allow Medicaid recipients to sue to enforce

provisions other than those that secure specific monetary entitlements to the party bringing suit, those rulings either pre-date *Gonzaga* or else rely on the now-overruled *Evergreen* decision.[9] *See, e.g., S.D. v. Hood*, 391 F.3d 581, 605 (5th Cir. 2004) (relying on *Evergreen* to permit a Section 1983 lawsuit to enforce provisions in the Medicaid Act); *id.* at 604 (relying on pre-*Gonzaga* case law from other circuits); *Frazar v. Gilbert*, 300 F.3d 530 (5th Cir. 2002) (relying on *Evergreen*), rev'd on other grounds, *Frew v. Hawkins*, 540 U.S. 431 (2004).

In sum, no provision of the Medicaid Act obligates a State to establish any Medicaid program, let alone one that complies with the various standards set out in section 1396a. As a consequence, this Court is compelled to dismiss all of Plaintiffs claims, as they all turn on claimed "violations" of the Medicaid Act by Texas.

b. <u>The Medicaid Act does not contain a right for FQHCs to set state reimbursement policies</u>

"In order to seek redress through § 1983, ... a plaintiff must assert the violation of a federal *right* not merely a violation of federal *law.*" *Blessing v. Freestone,* 520 U.S. 329, 340 (1997). To determine whether a particular statutory provision gives rise to federal right, courts look to whether "Congress [1] must have intended that the provision in question benefit the plaintiff ... [,] [2] the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence ... [,] [and] [3] the statute must unambiguously impose a binding obligation on the States." *Id.* at 340–41, 117 S.Ct. 1353. The Court, in *Gonzaga*, emphasized that Congressional authorization of a private right of action must be clear: "We now reject the notion that our

---

[9] If this Court concludes that either *S.D.* or some other decision of the Fifth Circuit compels it to permit Plaintiffs to seek judicial enforcement of their Medicaid Act claims, then we ask this Court to limit those rulings to the specific provisions.

cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." *Id.* at 283, 122 S.Ct. 2268.

The Medicaid Act provides that (1) an FQHC must provide core services (42 U.S.C. §§ 1395x(aa)(1)(B) & (3)(A); 1396d(*l*)(2)), and (2) a "State plan shall provide for payment for services ... furnished by a Federally-qualified health center...." (42 U.S.C., § 1396a(bb)(1); see also § 1396a(bb)(2)-(4).) The provisions further require timely payments. (42 U.S.C. § 1396a(bb)(5)(A) & (6)(B).) And the methodology used for payments to the FQHC must "result[ ] in payment to the center or clinic of an amount which is at least equal to the amount otherwise required to be paid to the center or clinic under this section." 42 U.S.C. § 1396a(bb)(6)(B).

Neither the United States Fifth Circuit Court of Appeals nor the United States Supreme Court has found a private of right of action for providers to enforce § 1396a(bb) through 42 U.S.C. § 1983.[10] Legacy appears to be asking for this Court to find a new "right" – one that would turn the Medicaid system on its head, and provide authority to FQHCs to dictate payment methodology under circumstances where the FQHC is otherwise receiving full, timely reimbursements required under the Medicaid statutes. The provisions cited by Legacy neither mention nor implicate a requirement that HHSC create a payment system that includes wrap-around payments, where the FQHC is otherwise

---

[10] It is true that at least two circuits have recognized that a federally-qualified health center can bring an action under 42 U.S.C. § 1983 to enforce its right to timely reconciliation payments. *Three Lower Counties Maryland,* 498 F.3d 294, 303 (4th Cir. 2007) ("At bottom, we conclude that the Medicaid Act requires Maryland to pay FQHCs fully compensatory supplemental payments not less frequently than four months after Maryland has received the claim for supplemental payment, as required by 42 U.S.C. § 1396a(bb) (5)."); *Rio Grande Community Health Ctr., Inc. v. Rullan,* 397 F.3d 56, 75 (1st Cir.2005) ("We conclude that a private action can be brought by an FQHC under section 1983 to enforce 42 U.S.C. § 1396a(bb)."); *see also Pee Dee Health Care, P.A. v. Sanford,* 509 F.3d 204, 210–11 (4th Cir.2007) ("This court has also allowed a healthcare provider to pursue a § 1983 action to enforce § 1396a(bb)(5) of the Medicaid Act."). Legacy, however, does not point to any controlling authority in this case that establishes such a right in the Fifth Circuit. Moreover, the federal "right" recognized by the foregoing cases bears no relationship to the circumstances set out in Legacy's Amended Complaint.

receiving its full, timely reimbursement. To be sure, the statute relied upon by Legacy

clearly contemplates payment systems that do not include wrap-around payments:

> "In the case of services furnished by a Federally-qualified health center...pursuant to a contract between the center... and a managed care entity..., the State plan shall provide for payment...of a supplemental payment equal to the amount *(if any)* by which the amount determined under paragraphs (2), (3), and (4) of this subsection exceeds the amount of the payments provided under the contract."

42 U.S.C. § 1396a(bb)(5)(A)(*emphasis added*).

Legacy would have this Court read the "if any" provision out of § 1396a(bb)(5)(A).

Under Legacy's construction of the statute, a provider has a federal right to dictate the

procedures used by the State to guarantee full, timely reimbursement, even where, as

here, the system in place is guaranteeing that the FQHC is timely receiving all funds due

and owing under federal law. (*See* Jessee Aff. at Ex. A, RFP at Section 8.1.22 (referring to

wrap payments not "apply[ing]", not being eliminated); n.1; Texas State Plan Under Title

XIX of the Social Security Act Medical Assistance Program, at Attachment 4.19-B, p. 24g

(available    http://www.hhsc.state.tx.us/medicaid/about/state-plan/docs/basic-state-

plan-attachments.pdf, at p. 893 of PDF document) ("*In the event that the total amount

paid to an FQHC by a managed care organization is less than the amount the FQHC

would receive under PPS or APPS*, whichever is applicable, the state will reimburse the

difference on a state quarterly basis. The state's quarterly supplemental payment

obligation will be determined by subtracting the baseline payment under the contract for

services being provided from the effective rate without regard to the effects of financial

incentives that are linked to utilization outcomes, reductions in patient costs, or

bonuses.") (emphasis added) (approved by CMS). The right Legacy seeks to enforce

under § 1396a(bb) is not expressly provided under the statute, and enforcing the right

Legacy seeks to have this Court find would require it to step into the role of state regulator.

### c. HHSC's rules provide for out-of-network payments to FQHCs by MCOs for treatment received by MCO members

Legacy contends that its agreement with TCHP violates federal law because it does not include a provision providing for payment to Legacy for out-of-network services. (*See* Docket No. 8-6 at p. 19.) In support of its contention, Legacy claims its agreement with TCHP does not explicitly provide for reimbursement of out-of-network costs it may incur. The HHSC/TCHP Contract incorporates a payment mechanism for out-of-network services provided by Legacy. That compliance requirement includes applicable provisions in Texas statutes.

Payment for out-of-network services are detailed in 1 Tex. Admin. Code § 353.4 (West 2014) ("Managed Care Organization Requirements Concerning Out-of-Network Providers"). Sec. 353.4 provides in relevant part:

> (b) MCO requirements concerning treatment of members by out-of-network providers.
> (1) The MCO must allow referral of its member(s) to an out-of-network provider, must timely issue the proper authorization for such referral, and must timely reimburse the out-of-network provider for authorized services provided when:
> (A) Medicaid covered services are medically necessary and these services are not available through an in-network provider;
> (B) a provider currently providing authorized services to the member requests authorization for such services to be provided to the member by an out-of-network provider; and
> (C) the authorized services are provided within the time period specified in the MCO's authorization. If the services are not provided within the required time period, a new request for referral from the requesting provider must be submitted to the MCO prior to the provision of services.

1 Tex. Admin. Code § 353.4(b)(1) (West 2014). An MCO "may not refuse to reimburse an out-of-network provider for emergency services." 1 Tex. Admin. Code § 353.4(b)(2) (West 2014). Additionally, the Texas Administrative Code provides a reimbursement methodology, *see* 1 Tex. Admin. Code § 353.4(c); a method for providers to report and

protest MCO reimbursements; and, for HHSC to enforce the requirements of its rules. 1 Tex. Admin. Code § 353.4(f) & (g). *See also* Human Resources Code § 32.028.

The HHSC/TCHP Contract explicitly provides for a payment scheme for out-of-network services, which is consistent with the statutory requirements, in various provisions, including Sections 8.1.3, 8.1.3.2, 8.1.4, 8.1.8, 8.1.8.1, 8.1.22, 8.2.1, 8.2.2, 8.2.4.2, 8.2.8, 8.2.16, 8.4.3, 8.4.4, and Attachment B-2.1. A chart of the relevant language in those provisions is attached hereto as Appendix A. (*See also* Jessee Aff. at ¶ 31; Ex. A.) As noted, *supra*, the Contract between HHSC and TCHP containing each of these provisions relating to out-of-network services is subject to CMS approval. In addition, the Texas Administrative Code, which is referenced in the Contract, provides a reimbursement methodology, *see* 1 Tex. Admin. Code § 353.4(c); a method for providers to report and protest MCO reimbursements; and, for HHSC to enforce the requirements of its rules. 1 Tex. Admin. Code § 353.4(f) & (g). There are also protections for out-of-network services, and continuing care by Legacy providers, in Legacy's contract with TCHP. Legacy's contract with TCHP provides for a phase-out period and the continuing provision of Covered Services in certain circumstances, if the contract is terminated, regardless of whether such termination is with or without cause. (*See* Born Decl. at Ex. F, Sections 15. 6 and 15. 7.) Section 15.7 of Legacy and TCHP's contract provides:

> Following termination of this Agreement, Provider shall continue to provide Covered Services to any Member who is under active treatment either until such treatment is completed or responsibility is assumed by another Participating provider....Provider shall be compensated for any such above Covered Services in accordance with the terms of TCHP's standard fee-for-service rates. Except for reasons of medical competence or professional behavior of Provider, termination of this Agreement shall not release the obligation of TCHP to compensate Provider for Covered Services rendered to a Member of Special Circumstance, at no less than the rate of compensation under this Agreement for up to ninety (90) days from the effective date of termination of this Agreement...TCHP's obligation to compensate Provider for oinging treatment of a Member shall be as follows: (a) in the case of a

Member who at the time of termination of Provider has been diagnosed with a terminal illness, for a period not to exceed nine (9) months after the effective date of such termination; (b) in the case of a Member who at the time of termination of Provider is past the twenty-fourth (24th) week of pregnancy, for a period which includes the delivery of the child, immediate postpartum care, and the follow-up check-up within the first six (6) weeks of delivery; or (c) in the case of all other Members, for a period not to exceed ninety (90) days after the effective date of termination."

The contract also provides for the payment of "(100%) of the current FQHC encounter rate issued to Provider per Health and Human Services Commission (HHSC)," for both Medicaid HMO Services and CHIP HMO Services". (*See* Born Decl. at Ex. F, September 1, 2011 Amendment.)    Moreover, Legacy's contract with TCHP also contains provisions dealing with out-of-network services. (*See* Born Decl. at Ex. F, Section 3.10) ("In circumstances where it is reasonably possible for Provider to do so, Provider shall provide, arrange for or assist in arranging for Covered Emergency Care and Covered Out-of Area Urgent Care.  TCHP will pay for Covered Emergency Care and Covered Out-of-Area Urgent Care performed by non-network physicians or providers at the negotiated or usual and customary rate.").  In the event TCHP's contracts with other providers have similar provisions, Legacy, as an out-of-network provider, will be paid negotiated or usual and customary rates for Covered Emergency Care and Covered Out-of-Area Urgent Care rendered.

As discussed in Section III.2.a., "[i]n order to seek redress through § 1983, ... a plaintiff must assert the violation of a federal *right* not merely a violation of federal *law*." *Blessing v. Freestone,* 520 U.S. 329, 340 (1997). Again, Legacy cites no binding authority from either the United States Fifth Circuit Court of Appeals nor the United States Supreme Court for providers to enforce § 1396a(bb) through 42 U.S.C. § 1983. Here, Legacy is mistaken that its agreement with TCHP lacks a method for reimbursement of out-of-network services, and it is mistaken that HHSC has failed to provide provisions for

out-of-network care by Legacy in the event an MCO refuses to properly reimburse it for costs incurred for out-of-network treatments. Legacy's claim does not seek to enforce a federal right recognized in the Fifth Circuit, but rather to extend current federal statutes and case law to provide greater rights for FQHCs to dictate the terms of engagement between the State, MCOs, and FQHCs. That expansive reading of section 1396a(bb) is not supported by a plain reading of relevant statutes or by case law.

3. <u>Even if Legacy has a cause of action under § 1396a(bb) it cannot prove that it is substantially likely to succeed on the merits of its claims</u>

Legacy cannot establish a substantial likelihood of success on the merits of its claims that HHSC has violated the payment provisions under § 1396a(bb). As indicated, *supra*, HHSC's payment system requires that MCOs pay the full encounter rate to participating FQHCs, and it is undisputed by Legacy that they have received and will continue to receive the full encounter rate for services rendered pursuant to their provider agreement with TCHP until the agreement is terminated. (*See* Jessee Aff. at ¶¶ 9-12.) Legacy argues in their memorandum that CMS has already weighed in, requiring states to make wraparound payments directly to FQHCs, not through MCOs. (*See* Docket No. 8-6 at p. 16.)

Legacy's reliance on the April 20, 1998, guidance letter is misplaced. CMS interpretations are "entitled to respect" under *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944), "to the extent that those interpretations have the power to persuade." *Christensen,* 529 U.S. 576, 587 (2000) (internal quotation marks and citation omitted). But, they do not warrant *Chevron-* style deference. *Christensen v. Harris Cnty.,* 529 U.S. at 587. The April 20, 1998, guidance came several years before the current Prospective Payment System was enacted by Congress. While timing should not be dispositive on issue of

persuasion, in this case the guidance letter was issued before the enactment of the current prospective payment system. Putting aside the fact that the interpretation is seventeen years old, the guidance clearly did not apply to a payment system enacted in 2000.

Moreover, the guidance itself is open to several readings. The guidance relied upon by Plaintiffs reads as follows:

> "Section 4712(b) of BBA requires States to make up the difference, if any, between the amounts paid FQHCs or RHCs by MCOs with which they have a contractual relationship, and the amount the FQHC or RHC would have received under the reasonable cost-based reimbursement provision contained in section 1902(a)(13)(C)(I) of the Social Security Act. The language in that section specifically requires States to make these supplemental payments. It is our conclusion that this requirement cannot and should not be delegated to an MCO, and that each State must determine any differences in payment and make up these amounts."

(Plaintiff's Ex. A. at 1.) It is unclear from the language used whether the guidance would precludes requiring MCOs from paying FQHCs at their full rate, thus eliminating supplemental payments altogether, or whether it precludes states from requiring that MCOs from delegating the duty to pay supplemental payments where a state has determined a supplemental payment is appropriate.

The CMS guidance letter notwithstanding, Legacy does not point to any case, statute, or authority that would prevent HHSC from enacting rules that eliminate supplemental payments by requiring that MCOs timely pay FQHCs, like Legacy, their federally mandated encounter rate. Moreover, HHSC included in its MCO contract with TCHP a provision that specifically provides that the MCO shall pay the full encounter rate to an FQHC provider. As noted, supra, it reads in relevant part:

> The MCO must pay full encounter rates to FQHCs and RHCs for Medically Necessary Covered Services provided to Medicaid and CHIP Members using the prospective payment methodology described in Sections 1902(bb) and 2107(e)(1) of the Social Security Act. Because the MCO is responsible for the full payment

amount in effect on the date of service, HHSC cost settlements (or "wrap payments") will not apply.

(See Jessee Aff. at Ex. A, RFP at Section 8.1.22.)

HHSC has not received any guidance or request from CMS to remove the language, and, as noted *supra*, CMS has approved versions of the Contract which contain this language or language like it. (*See* Jessee Aff. at ¶¶ 17-21; Exs. E, F, and G.)

4. <u>This case is about claimed economic loss, which as a matter of law cannot justify injunctive relief</u>

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def Council, Inc.,* 555 U.S. 7, 22 (2008). A mere possibility of irreparable harm is not enough, *see Winter,* 555 U.S. at 22, and a court may deny a motion for preliminary relief without considering any other factors when irreparable harm is not established.

Assuming that Legacy even has a claim, any damage it may suffer in the future can be remedied through money. The availability of monetary damages militates against issuance of an injunction. *See, e.g., Dennis Melancon, Inc. v. City of New Orleans,* 703 F.3d 262, 279 (5th Cir. 2012) (explaining that injunctive relief requires an injury that "cannot be undone through monetary remedies") (citation omitted). Potential loss by Legacy from the termination of its contract with TCHP does not constitute irreparable harm. *See Hendricks v. UBS Fin. Servs. Inc.,* Nos. 13-40692 & 13-40693, 2013 WL 5969888, at *5 (5th Cir. Nov. 11, 2013) ("[A]n injunction is not appropriate when the plaintiff would not benefit from prospective relief, the plaintiff's relationship with the defendant has ended, or the plaintiff essentially seeks monetary damages.")(unpublished opinion). The extraordinary relief of a preliminary injunction is typically not authorized solely to redress claims for monetary damages. *Id.; see also Deerfield Med. Ctr. v. City of*

*Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (explaining irreparable injury is one that cannot be undone by an award of monetary damages).

Legacy points out, correctly, that retroactive monetary damages from HHSC are unavailable under the theories it has alleged. (Docket No. 8-6 at p. 24.) Legacy points out, correctly, that such damages are barred by sovereign immunity. *Id.* at 26. Legacy then argues that because retrospective damages are unavailable, it has proven a *'per se'* irreparable injury. *Id.* Legacy's Amended Complaint, without explanation, alleges that HHSC's policy caused TCHP to terminate its provider agreement, and that it now *risks* "not receiving reimbursement when it provides care to out-of-network TCHP patients it is legally obligated to serve."[11] (*See* Docket No. 9 at ¶ 28.) Legacy goes on to allege that it will lose approximately $14,000,000.00 in revenue as a result of TCHP's termination. (*Id.* at ¶ 29.) The balance of harms alleged are generalized harms to Legacy's business and its "general patient population." (*Id.* at ¶ 30-31. )

Legacy's claimed harms are all based in future concerns over risk of repayment and injury to third-party patients. Legacy has not alleged that it is being underpaid or that it has suffered monetary losses to date, meaning there are no retrospective monetary damages to recoup.[12] Legacy stretches the case law in suggesting that sovereign immunity creates irreparable harm where Legacy does not also show a concomitant concrete monetary damage that the Eleventh Amendment to the United States Constitution will

---

[11] As indicated in the exhibits Plaintiff attached in support of its Motion for Preliminary Injunction, TCHP terminated Plaintiff's provider agreement "without cause," but referenced utilization issues. HHSC would suggest that TCHP exercised its sound business discretion to terminate a provider contract, including taking the additional step of conferring with HHSC to ensure that termination of Legacy would not be in breach of its contractual relationship with HHSC, and providing an explanation is provided for in TCHP's Contract with Legacy. (*See* Born Decl. at ¶ 51; Ex. F at Section 15.9.)

[12] As noted *supra*, HHSC's administrative rules and various provisions of HHSC's contract with TCHP and TCHP's contract with Legacy provide mechanisms for recovering the out-of-network costs forming the basis of Legacy's risk allegations. *See generally* 1 Tex. Admin. Code § 353.4 (West 2014); Section IV(2)(c), *supra*.

bar Legacy from recovering. Without that showing, this Court should not find that Legacy has established an irreparable harm.

5.  The balance of equities favor denying Legacy's requested relief

An injunction would irreparably harm the State. Legacy seeks to enjoin a duly enacted statutory law, which passed with overwhelming majorities. Enjoining democratically enacted legislation harms state officials by restraining them from implementing the will of the people that they represent. *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers); *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("[A]ny time a State is enjoined by a Court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("[I]t is clear that a state suffers irreparable injury whenever an enactment of its people . . . is enjoined.").

Legacy's alleged harms, on the other hand, are illusory. Legacy asserts a single irreparable harm: financial loss. With respect to their first asserted ground, a temporary financial loss is neither a substantial nor irreparable injury. *See Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction], are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm." (internal quotation marks omitted)).

Legacy's alleged irreparable injury—financial loss—turns entirely on the likelihood of success on the merits. But given that Legacy has failed to show that enforcement of

HHSC's payment requirements for FQHC violate any of Legacy's rights, it cannot be said that they would suffer an irreparable injury if preliminary injunctive relief is not granted. Absent a preliminary injunction, the status quo will be maintained and Legacy will continue to receive payments under the same payment system that has been in place since 2011. Accordingly, Plaintiffs have not "clearly shown" an irreparable injury from enforcement of Texas law.

6. <u>A preliminary injunction would disserve the public interest by forbidding enforcement of a democratically enacted law, disturbing the status quo, and creating confusion for HHSC, MCOs, and FQHCs across the State</u>

a. <u>Enforcement of a duly enacted law is inherently in the public interest</u>

A preliminary injunction would override the statutory policy of the Legislature, which is a "declaration of public interest and policy which should be persuasive." *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937); *Ill. Bell Tel. Co. v. WorldCom Technologies, Inc.*, 157 F.3d 500, 503 (7th Cir. 1998) ("When the opposing party is the representative of the political branches of a government the court must consider that all judicial interference with a public program has the cost of diminishing the scope of democratic governance."). For that reason alone, a preliminary injunction would disserve the public interest.

b. <u>A preliminary injunction would undermine the public interest by changing the status quo</u>

An injunction at the preliminary stage would be particularly injurious to the public interest because it would effectively change—temporarily—the payment requirements for HHSC and MCOs statewide. That would radically alter the status quo in contravention of the justification for preliminary relief. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."

*Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party."). The status quo in Texas is, as it has been since 2011, that MCOs pay full encounter rates to their FQHC providers. Suspending the current HHSC policy of requiring MCOs to reimburse FQHCs at their federally required rates would change the status quo, contrary to the animating reason for preliminary injunctive relief.

c. Changing the status quo would create numerous legal and practical problems for HHSC and MCOs

Changing the status quo for HHSC would require significant and costly resource reallocation by the State. The current payment system eliminates all supplemental payment analysis by HHSC and MCOs, and limits the administrative costs for all parties involved. (*See* Jessee Aff. at ¶ 15.) A change to the status quo obviously would reverse those cost-savings, and require resource shifts to guarantee that HHSC continued to comply with federal law during the pendency of any preliminary injunction.

d. Legacy has not "clearly shown" that a preliminary injunction would not disserve the public interest

In the face of the significant disservice a preliminary injunction would work on the public interest, as mentioned above, Legacy attempts to satisfy its burden simply by arguing that the public interest favors providing health care to those unable to care for themselves. (Docket No. 8-6 at p. 32-33.) This generalized assertion—which could be made in any Medicaid challenge and depends entirely on the legal merit of the claim— falls woefully short of the "clear showing" required to qualify for the "drastic remedy" of a preliminary injunction. As already explained, Legacy's claims are not likely to succeed

on the merits, as they are foreclosed by Legacy's lack of standing, application of the *Gonzaga* factors to the claimed private right of action, and by Legacy's failure to clearly establish its substantial likelihood of success on its claims. Accordingly, Legacy has failed to meet its burden, especially in light of the numerous, compelling reasons articulated by HHSC that a preliminary injunction would harm the public interest.

## V.     Conclusion

Legacy's motions for temporary restraining order and preliminary injunction should be denied.

Date: January 23, 2015

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Defense
Litigation

ROBERT O'KEEFE
Division Chief
Financial Litigation, Tax, and
Charitable Trusts Division

/s/Eric A. Hudson
ERIC A. HUDSON
Assistant Attorney General
Texas Bar No. 24059977
LINDSEY WOLF
Assistant Attorney General
Texas Bar No. 24088782
Financial, Tax, and
Charitable Trusts Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tele:  (512) 936-6417
Fax:  (512) 478-4013 and
(512) 477-2348
Eric.hudson@texasattorneygeneral.gov
lindsey.wolf@texasattorneygeneral.gov
*Attorneys for Dr. Kyle Janek, In His Official*
*Capacity as Executive Commissioner of the*
*Texas Health and Human Services*
*Commission*

## CERTIFICATE OF SERVICE

I certify that on January 23, 2015, a copy of this response was electronically filed on the on the CM/ECF system, which will automatically serve a Notice of Electronic Filing on the following attorneys in charge for plaintiff:

Michael J. Collins
COLLINS, EDMONDS, POGORZELSKI,
SCHLATHER & TOWER, PLLC
1616 South Voss Road, Suite 125
Houston, Texas 77057
Telephone: (281) 501-3425
Facsimilie: (832) 415-2535
E-mail: mcollins@cepiplaw.com

Edward T. Waters
Gregory M. Cumming
FELDESMAN, TUCKER, LEIFER, FIDELL,
1129 20th Street, N.W. Fourth Floor
Washington, D.C. 20036
Telephone: (202) 466-8690
Facsimilie: (202) 293-8103
E-mail: ewaters@ftlf.com
E-mail: gcumming@ftlf.com

Ileana M. Blanco
Frank E. Sheeder III
DLA PIPER LLP (US)
1000 Louisiana, Suite 2800
Houston, Texas 77002
Telephone: 713.425.8400
Facsimilie: 713.425.8401
ileana.blanco@dlapiper.com