**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **LEGACY COMMUNITY HEALTH** | § | |
| **SERVICES, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:15-CV-25** |
| | § | |
| **DR. KYLE L. JANEK,** | § | |
| | § | |
| **Defendant.** | § | |

## <u>MEMORANDUM & ORDER</u>

Plaintiff Legacy Community Health Services, a community health center serving low-income patients in the Houston area, filed this lawsuit to assert its rights under the federal Medicaid statute. Defendant Kyle L. Janek is sued in his official capacity as executive commissioner of Texas's Health and Human Services Commission (HHSC). Plaintiff alleges that HHSC has violated federal law with respect to how it reimburses Legacy for services provided to Medicaid patients. Pending before the Court is Defendant's Motion to Dismiss for Failure to State a Claim. (Doc. No. 57.) Having considered the submissions of the parties and the applicable law, Defendant's motion is **DENIED**.

## I.   BACKGROUND

### A. Federally Qualified Health Centers, Medicaid, and Managed Care Organizations[1]

This case concerns the intersection of two federal health programs. The Public Health Services Act provides for grant funding for health care providers that serve all comers, regardless

---

[1] For the purposes of a motion to dismiss, the Court takes the factual allegations pleaded in the Second Amended Complaint (Doc. No. 51) as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

1

of ability to pay. Medicaid reimburses health care providers for the cost of providing care to Medicaid recipients. The regulations required to harmonize these two programs are complex.

Federal law provides for the designation of certain "community health centers" to serve needy populations. These are § 501(c)(3) organizations eligible to receive federal grant funds to provide care to medically underserved populations in their communities. 42 U.S.C. §§ 254b(a), (e), (k). These Federally Qualified Health Centers (FQHCs) must provide health care services to Medicaid recipients, 42 U.S.C. § 254b(k)(3)(E), and serve all residents of their communities, regardless of any patient's ability to pay, 42 U.S.C. §§ 254b(a)(1) and 254b(k)(3)(G)(iii).

A "community health center" is deemed an FQHC if it is the recipient of federal grant funds under § 254b and includes an outpatient health program. 42 U.S.C. § 1396d(l)(2)(B). FQHC status is significant for two reasons. First, FQHC services must be covered by state Medicaid plans. 42 U.S.C. § 1396a(a)(10)(A). Second, the Medicaid statute provides unique payment provisions for FQHCs, meant to ensure that FQHCs are reimbursed for the full costs of treating Medicaid patients. The purpose of this requirement is to "ensure that [FQHCs] would not have to divert Public Health Services Act funds to cover the cost of serving Medicaid patients." *Three Lower Counties Community Health Services, Inc. v. Maryland*, 498 F.3d 294, 297-98 (4th Cir. 2007) (citing H.R. Rep. No. 101-247, at 392-93, reprinted in U.S.C.C.A.N. 2118-19). Currently, the statute requires states to reimburse FQHCs on a per-visit basis, which for Legacy is approximately $270 per visit (the "PPS rate").[2]

Many states now choose to administer their Medicaid programs by contracting with private-sector managed care organizations (MCOs) that are analogous to private-sector HMOs.

---

[2] That is, instead of reimbursing FQHCs on a per-service basis, the state reimburses FQHCs for each "encounter" that it has with a patient. The per-encounter rate is based on an average of the FQHCs reasonable costs for covered services in FY 1999 and 2000, adjusted for inflation.

42 U.S.C. § 1396u-2(a)(1). In exchange for its services, an MCO receives a per-member, per-month payment, called a "capitation" payment, from the state based on its number of enrollees. 42 C.F.R. § 438.2. The MCO in turn contracts with health care providers, including FQHCs, to provide services to its enrollees. If the MCO's costs are less than the capitation payments received from the state, the MCO makes a profit; if costs exceed capitation payments, the MCO incurs a loss.

Because federal law requires states to pay FQHCs a designated amount per visit, the FQHC system sits uneasily with the MCO model, which requires MCOs to have the flexibility to negotiate with health care providers. To resolve this tension, Congress has allowed MCOs to negotiate rates with FQHCs in the same manner that they would with other health care providers. MCOs are only required to pay FQHCs "not less" than they would pay non-FQHC providers for the same services. 42 U.S.C. § 1396b(m)(2)(A)(ix). Congress then required states to pay a supplemental "wraparound payment" to bring the FQHC's total compensation to the PPS rate. 42 U.S.C. § 1396a(bb)(5)(A). The wraparound payments are to be made at least every four months. 42 U.S.C. § 1396a(bb)(5)(B).

### B. The Texas Medicaid Regime and Legacy Community Health Services

Texas has chosen to implement Medicaid through a managed care system. Tex. Gov. Code § 533.002. The Texas Children's Health Plan — one of the original defendants in this case — is one of the MCOs that contracts with the Health and Human Services Commission (HHSC) to provide care to Texas Medicaid recipients.

The Plaintiff is Legacy Community Health Services (hereinafter "Legacy"), a 501(c)(3) organization and a certified FQHC. 2d Am. Compl., ¶ 15 (Doc. No. 51). Legacy contracted with TCHP from 2009 to 2015 to provide medical care to Medicaid patients enrolled in TCHP.

Beginning in 2011, Texas's method of reimbursing FQHCs, including Legacy, for services provided to Medicaid patients differed from what is contemplated in federal law. *Id.* at ¶ 17. Instead of allowing TCHP to pay Legacy a negotiated rate and making up the difference directly from state funds, HHSC has attempted to incorporate the FQHC's full PPS rate into the monthly capitation payments it makes to TCHP. *Id.* It then requires TCHP to pay Legacy the full PPS rate rather than at a lower negotiated rate. *Id.* After 2011, TCHP reimbursed Legacy approximately $270 per visit (the PPS rate); before 2011, TCHP had reimbursed Legacy just $67 per visit. *Id.* at ¶¶ 15, 18.

Problems arose when Medicaid patients' use of Legacy services increased faster than the capitation payments provided by HHSC. *Id.* at ¶ 19. Because of the "not sustainable" difference between the payments from HHSC and the costs of Legacy's services, TCHP asked Legacy to accept lower rates than it was entitled to under federal law. *Id.* at ¶ 20-21. Legacy refused to do so.

In November 2014, when no compromise was reached with HHSC or Legacy, TCHP informed Legacy that it was terminating its contract effective February 1, 2015. *Id.* at ¶ 22. According to TCHP, the reason for termination was a "utilization trend that far exceeds the trend in the Medicaid premium." *Id.* TCHP also told Legacy that, once it was out of the TCHP network, it would only be reimbursed for out-of-network services that were pre-authorized by TCHP. *Id.* at ¶ 26.

In January 2015, before the contract with TCHP was terminated, Plaintiff filed this lawsuit against Dr. Kyle Janek, in his capacity as the head of HHSC, and TCHP. Compl., Doc. No. 1. Plaintiff sought an injunction barring HHSC from using its existing reimbursement policy, enjoining TCHP from terminating its contract with Legacy, and directing HHSC to ensure that

Legacy receives full PPS reimbursement for services provided to out-of-network patients. Plaintiff's motion for a preliminary injunction was denied at a hearing in January 2015.

After that, Plaintiff filed a Second Amended Complaint dropping TCHP as a defendant and stating claims only against Janek/HHSC. Defendant has now moved to dismiss that complaint, contending that this Court lacks subject-matter jurisdiction and that Plaintiff has failed to state a claim.

## II.    SUBJECT-MATTER JURISDICTION

### A.  Legal Standard

Federal Rule of Civil Procedure 12(b)(1) governs challenges to a court's subject-matter jurisdiction. "Under Rule 12(b)(1), a claim is properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the claim." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.,* 668 F.3d 281, 286 (5th Cir. 2012) (internal quotation marks omitted). Lack of subject matter jurisdiction may be found using (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Barrera–Montenegro v. United States,* 74 F.3d 657, 659 (5th Cir. 1996); *Clark v. Tarrant County,* 798 F.2d 736, 741 (5th Cir. 1986). The plaintiff bears the burden of demonstrating that subject-matter jurisdiction exists. *Paterson v. Weinberger,* 644 F.2d 521, 523 (5th Cir. 1981); *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507, 511 (5th Cir. 1980); *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir. 2001).

### B.  Standing

Article III of the Constitution limits the jurisdiction of federal courts to "cases" and "controversies." U.S. Const., Art. III, § 2. The legal requirement of "standing" is used to identify

cases and controversies that are "justiciable" — that is, "those disputes which are appropriately resolved through the judicial process." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation omitted). "To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'like[lihood]' that the injury 'will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2341 (2014).

HHSC first contends Legacy has not alleged an "injury-in-fact." The injury-in-fact requirement "helps to ensure that the plaintiff has a personal stake in the outcome of the controversy." *Susan B. Anthony List*, 134 S.Ct. at 2341 (internal quotation omitted). The injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* Legacy's Complaint alleges that it will lose $14,000,000 in annual revenue from the loss of its contract with Texas Children's Health Plan. *See* 2d Am. Compl. at ¶ 29. Legacy also argues that it expects to suffer further losses in the future due to unreimbursed claims for services that Legacy is required by federal law to provide. *Id.* at ¶ 35. The cost of providing unreimbursed medical services "has been recognized as a sufficient basis for standing to challenge laws regulating payments for medical care." *Pharmacy Buying Assoc., Inc. v. Sebelius*, 906 F.Supp.2d 604, 616 (W.D. Tex. 2012) (collecting cases); *see, e.g.*, *Singleton v. Wulff*, 428 U.S. 106, 112-113 (1976) (physicians performing abortions for which payment under Medicaid was refused suffered concrete injury). The Court concludes that Legacy has suffered an injury-in-fact sufficient for standing.

Next, HHSC argues that Legacy has not alleged that there is a causal connection between actions by HHSC on the one hand and Legacy's financial losses on the other. The causation requirement is satisfied if a plaintiff shows that its injury is "fairly … trace[able] to the

challenged action of the defendant and not … th[e] result [of] the independent action of some third party not before the court." *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976).

HHSC argues that the termination of the TCHP contract reflects a "business judgment" by TCHP that was independent of any action by HHSC. Def.'s Br. at 8. But if a state's action changes market conditions and, as a result, a plaintiff suffers actual or probable economic injury, that injury is sufficient for standing. *See Clinton v. City of New York*, 524 U.S. 417, 432-33 (1998). Legacy's complaint does allege facts that, if proven, would show a causal connection between HHSC's actions and the termination of the TCHP contract. Legacy alleges that it first entered into a provider relationship with TCHP in 2009, at which time the Legacy-TCHP contract provided that TCHP would pay Legacy $67 per visit. 2d Am. Compl. at ¶ 18. HHSC changed its policy on wraparound payments and required TCHP to pay Legacy the full PPS rate beginning in 2011. *Id.* After this change was implemented, TCHP told Legacy that the payment model was "not sustainable" due to the high per-visit payment required by HHSC policies. *Id.* at ¶ 20. Negotiating against the background of HHSC policy requiring TCHP to make PPS payments, the parties were unable to reach an agreement and the contract was terminated. *Id.* at ¶¶ 22-27. While the Court cannot be certain that, had HHSC policy been different, TCHP would have maintained its provider relationship with Legacy, it is clear that if Legacy secures the relief it seeks, "that barrier [to negotiation] will be removed." *Village of Arlington Heights v. Metropolitan Housing Development Corporation et al.*, 429 U.S. 252, 261 (1977). That is sufficient for constitutional standing.[3]

---

[3] HHSC makes an additional argument that it describes as going to "standing." The agency contends that Legacy, as an FQHC, had no "right" to provide services to Medicaid recipients. Def.'s Br. at 8. But this goes to whether Legacy can maintain a cause of action against HHSC,

Finally, Defendant contends that Plaintiff lacks standing to challenge HHSC's reimbursement policy because it has suffered only "self-inflicted injuries." *See Clapper v. Amnesty International USA*, 133 S.Ct. 1138, 1152 (2013). In *Clapper*, plaintiffs were journalists, attorneys and other organizations who objected to alleged unlawful surveillance by the federal government. The Supreme Court held, *inter alia*, that the funds plaintiffs spent to avoid electronic surveillance were not sufficient to establish standing when they did not face a threat of "certainly impending interception" and were merely fearful of such surveillance in the future. *Id.* at 1152. Here, Legacy alleges that it has been told that HHSC will not guarantee that it will be paid for its services in accordance with federal law. *Id.* at ¶ 35; *see also* Decl. of Melisa Garcia, Pl.'s Ex. A at ¶ 12. Legacy's concern that it will be denied reimbursement if it continues to deliver services to TCHP patients is thus not a case of "making an expenditure based on a nonparanoid fear," *Clapper*, 133 S.Ct. at 1151, simply for the purposes of establishing standing. Requiring that Plaintiff exhaust administrative remedies in order to establish standing is also inconsistent with the Supreme Court's clear statement that, as a general rule, plaintiffs bringing suit under § 1983 need not exhaust administrative remedies. *See Patsy v. Board of Regents*, 457 U.S. 496 (1982); *Romano v. Greenstein*, 721 F.3d 373, 376 (5th Cir. 2013). The availability of administrative remedies may be relevant to the merits of Plaintiff's suit, but at this stage the Court cannot say that Legacy lacks constitutional standing to allow the suit to go forward.

### C. Ripeness

Next, HHSC asserts that Legacy's complaint is not ripe for judicial review. Ripeness "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Abbott Laboratories v. Gardner*, 387

---

not to whether Legacy has standing to sue. Accordingly, that issue is properly raised under Rule 12(b)(6), not Rule 12(b)(1).

U.S. 136, 148 (1967). To determine whether a dispute is ripe, courts consider two factors: the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998) (citing *Abbott Laboratories*, 387 U.S. at 149). HHSC argues that Legacy's claims based on out-of-network services are not yet fit for judicial review because Legacy's complaint does not allege any actual instances of in which it was not reimbursed at PPS rates for services delivered to TCHP patients.

Legacy has two responses. First, it argues that a dispute can be ripe if, were it to remain unresolved, a plaintiff would be "force[d] to modify its behavior in order to avoid future adverse consequences." *Ohio Forestry Ass'n, Inc.*, 523 U.S. at 734. Under the challenged policy, Legacy alleges that it is faced with a choice between abandoning its duty under federal law to serve all patients regardless of their ability to pay or risking that it will not be reimbursed for services provided to TCHP patients. 2d Am. Compl. at ¶¶ 6, 35. Second, Legacy points to the affidavit of Legacy Vice President Melisa Garcia, stating that, between the time the complaint was filed and the time for Legacy to respond to HHSC's motion to dismiss, the organization has had hundreds of reimbursement claims denied by TCHP. *See* Pl.'s Ex. A at ¶ 11. Delaying adjudication of the dispute will cause further harm to Legacy.

Based on the allegations in the complaint and the evidence in the record, the Court concludes that this is not a dispute over "abstract disagreements over administrative policies." *Abbott Laboratories*, 387 U.S. at 148. Particularly in light of the hardship to Plaintiff of additional delay, this dispute is ripe for judicial review.

## III.    FAILURE TO STATE A CLAIM

### A.  Legal Standard

A court may dismiss a complaint for a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief — including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, consistent with Rule 8(a), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The plausibility standard "is not akin to a 'probability requirement,'" though it does require more than simply a "sheer possibility" that a defendant has acted unlawfully. *Id.* at 678. Thus, a pleading need not contain detailed factual allegations, but must set forth more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

### B. Availability of Cause of Action under 42 U.S.C. § 1983

Legacy seeks relief pursuant to 42 U.S.C. § 1983. Section 1983 imposes civil liability on "anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). A plaintiff seeking relief under § 1983 "must assert the violation of a federal *right*, not merely a violation of federal *law*." *Id.* (emphasis in original). The Supreme Court has articulated a three-part test for determining whether a federal statute creates a right enforceable under § 1983: 1)

Congress must have intended that the provision benefit the plaintiff; 2) the plaintiff must demonstrate that the right is not so "vague and amorphous" as to be judicially unenforceable; and 3) the statute must unambiguously impose a binding obligation on the state. *Id.* at 340-41.

The Supreme Court later clarified this test in *Gonzaga University v. Doe*, 536 U.S. 273 (2002), when it made clear that "nothing 'short of an unambiguously conferred right' can support a cause of action under § 1983." *Romano v. Greenstein*, 721 F.3d 373, 378 (5th Cir. 2013) (citing *Gonzaga*, 536 U.S. at 283). A statute "unambiguously" creates a federal right when it is phrased in "explicit rights-creating terms." *Id.* "It must clearly confer an 'individual entitlement' and have 'an unmistakable focus on the benefitted class.'" *Id.* Finally, a provision does not confer an individual right when it speaks in terms of policy or has an "aggregate focus" and is "not concerned with whether the needs of any particular person have been satisfied." *Id.*

Legacy contends that the Medicaid statute gives it a right to payment for services rendered to Medicaid patients. After *Gonzaga*, the courts have taken a provision-by-provision approach to determining whether the Medicaid statute gives rise to a private right of action. *Compare Equal Access of El Paso v. Hawkins*, 509 F.3d 697, 702 (5th Cir. 2007) (Medicaid beneficiaries cannot enforce the Equal Access provisions of the Medicaid Act under § 1983) *with Romano*, 721 F.3d at 378-79 (provision requiring Medicaid benefits be furnished "with reasonable promptness" is enforceable by beneficiaries under § 1983).

Accordingly, the Court focuses its analysis on 42 U.S.C. § 1396a(bb)(5)(A), which is the provision requiring the state to make wraparound payments to FQHCs when FQHCs provide services to Medicaid patients enrolled in an MCO:

> In the case of services furnished by a Federally-qualified health center or rural health clinic pursuant to a contract between the center or clinic and a managed care entity…, the State plan *shall provide for payment to the center or clinic by the State of a supplemental payment* equal to the amount (if any) by which the

> amount determined under paragraphs (2), (3), and (4) of this subsection exceeds the amount of the payments provided under the contract.

42 U.S.C. § 1396a(bb)(5)(A) (emphasis added). Whether this provision creates a private right of action is a novel question in the Fifth Circuit. But at least five courts of appeals have found, after *Gonzaga*, that this provision gives rise to a private cause of action for the FQHCs to enforce their right to supplemental payments. *See Community Health Care Ass'n of New York v. Shah*, 770 F.3d 129 (2d Cir. 2014); *California Ass'n of Rural Health Clinics v. Douglas*, 738 F.3d 1007, 1013 (9th Cir. 2013); *New Jersey Primary Primary Care Ass'n v. New Jersey Dep't of Human Res.*, 722 F.3d 527, 541 (3d Cir. 2013); *Concilio de Salud Integral de Loiza, Inc. v. Perez–Perdomo*, 551 F.3d 10, 17–18 (1st Cir. 2008); *Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 212 (4th Cir. 2007); *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 74 (1st Cir. 2005). The Fourth Circuit went further and held that the *entirety* of § 1396a(bb), read as a whole, contains rights-creating language and is enforceable by FQHCs. *Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d at 211-12.

While the out-of-circuit precedent is not binding on this Court, the courts' analysis is persuasive. Section 1396a(bb)(5)(A) mentions a specific, discrete group of beneficiaries — the FQHCs. *Rio Grande Cmty. Health Ctr., Inc.*, 397 F.3d at 74. In *Gonzaga*'s terms, it is "phrased in terms of the persons benefited." *Gonzaga*, 536 U.S. at 284. The statutory language — requiring that the state Medicaid plan "shall provide for payment … of a supplemental payment" — is rights-creating language because it "is mandatory and has a clear focus on the benefitted FQHCs." *Rio Grande Cmty. Health Ctr., Inc.*, 397 F.3d at 74. Finally, the wraparound scheme described in § 1396a(bb) is highly specific: it tells the state exactly how to calculate the wraparound and gives a maximum duration between wraparound payments. *Id.* This is not a provision that is too vague or amorphous for courts to enforce.

Accordingly, the Court concludes that Legacy has a cause of action under 42 U.S.C. § 1983 to enforce its right to payment for services to Medicaid beneficiaries enrolled in an MCO.

## C. 42 U.S.C. § 1396a(bb)

Legacy claims that HHSC violated the provisions of 42 U.S.C. § 1396a(bb) by delegating its FQHC payment obligation to MCOs. Legacy offers two theories for why this is unlawful: First, Legacy contends that, under this system, it has not been and will not be paid by the state *or* the MCOs for services it provides to out-of-network patients. Second, Legacy contends that requiring MCOs to pay the full PPS rate rather than a negotiated rate violates federal law.

### a. Reimbursement for out-of-network claims

The Court first considers Legacy's claim for payment for out-of-network services provided to Medicaid patients. Legacy is required by law to provide emergency medically necessary services to Medicaid patients, even if those patients are enrolled in an MCO that does not contract with Legacy. The Medicaid statute requires that, when a state uses MCOs to administer Medicaid, the state *or* the MCO must be responsible for reimbursing out-of-network providers for medically necessary services provided on an emergency basis. 42 U.S.C. § 1396b(m)(2)(A)(vii).[4] The contract between the state and the MCO must designate whether the state or the MCO is responsible for the out-of-network costs. *Id.* When the out-of-network provider is an FQHC, the FQHC must be reimbursed at PPS rates. 42 U.S.C. § 1396a(bb)(1); *Community Health Care Ass'n of New York*, 770 F.3d at 157.

---

[4] HHSC urges the Court to dismiss the claim for out-of-network services because 42 U.S.C. § 1396b(m) lacks the rights-creating language required by *Gonzaga*. *See AlohaCare v. Hawaii, Dept. of Human Services*, 572 F.3d 740 (9th Cir. 2009) (§ 1396b(m) does not confer an enforceable right on FQHCs to be awarded a Medicaid contract). This misunderstands Legacy's claim, which is based on § 1396a(bb)'s guarantee that FQHCs will be paid at the PPS rate for services provided to Medicaid patients. As discussed above, § 1396a(bb) does create an enforceable right. § 1396b(m) simply addresses whether Legacy should turn first to the MCO or to the state for payment.

According to Legacy's Second Amended Complaint, the state's contract with the Texas Children's Health Plan does not require TCHP to pay for emergency out-of-network services. 2d Am. Compl. at ¶ 35. Based on that contract, TCHP has represented to Legacy that it will not pay for emergency out-of-network services rendered to Medicaid patients. *Id.* Since the filing of this complaint, TCHP has declined to pay Legacy for approximately 650 claims for emergency services. Decl. of Melisa Garcia, Pl.'s Ex. A at 11. At the same time, HHSC has also told Legacy that it will not pay for services provided to TCHP patients if those services were not authorized by TCHP. *Id.* at ¶ 12.

These allegations are very similar to those made by the plaintiff in *Community Health Care Ass'n of New York*. In that case, an FQHC alleged that New York was forcing it to bear the costs of providing emergency out-of-network services to MCO enrollees. *Id.* at 156-57. The Second Circuit held that even where a state had delegated the obligation to pay to an MCO, the state nonetheless had a duty to ensure that FQHCs are actually reimbursed for services they provide. This obligation flows directly from 42 U.S.C. § 1396a(bb). States have a general obligation to ensure that FQHCs receive "100 percent … of the costs … which are reasonable and related to the cost of furnishing services." 42 U.S.C. § 1396a(bb)(2). When a state chooses to contract with MCOs, the states are still responsible for paying FQHCs the difference between the rate paid by MCOs and the PPS rate. 42 U.S.C. § 1396a(bb)(5)(A). States may require MCOs to pay the costs of out-of-network emergency services as part of their contract with the state, "[b]ut if this arrangement stops short of ensuring full repayment for these services … then it does not comport with the statute." *Community Health Care Ass'n of New York v. Shah*, 770 F.3d at 157; *see Three Lower Counties Community Health Services, Inc. v. Maryland*, 498 F.3d at 303-04; *see also New Jersey Primary Care Ass'n Inc. v. New Jersey Dept. of Human Services*, 722 F.3d at

540 ("Where there is a *valid* Medicaid encounter for which an MCO has failed to make a payment, the supplemental payment equals the entire PPS rate.") (emphasis in original). Here, Legacy has alleged that MCOs are paying nothing for emergency out-of-network services provided to Medicaid enrollees. Accordingly, taking Legacy's allegations as true, the state is responsible for paying the full PPS rate for all out-of-network services provided by Legacy to TCHP patients.

HHSC objects that § 1396a(bb)(5)(A) only requires the state to supplement "payments provided under [a] contract" between the MCO and the FQHC. The agency argues that because there is no contract between TCHP and Legacy, the state has no obligation to ensure that Legacy is paid at the PPS rate for emergency services provided to Medicaid patients. Even if that were the case — and this Court agrees with the Second and Fourth Circuits that it is not — § 1396a(bb)(1) uses equally rights-creating language to ensure that "the State plan *shall* provide for payment for [Medicaid services] furnished by a Federally-qualified health center … in accordance with [the PPS methodology]." 42 U.S.C. § 1396a(bb)(1) (emphasis added). This language also satisfies the *Gonzaga* requirements, and the Court finds that it is likely also sufficient to create a private right of action for FQHCs to demand reimbursement for emergency services rendered to Medicaid patients when the MCO does not pay. *See Pee Dee Health Care, P.A. v. Sanford* 509 F.3d at 212; *see also New Jersey Primary Care Ass'n Inc.*, 722 F.3d at 539 ("Under the Medicaid statute, the State is, indeed, responsible for reimbursement of the entire PPS rate for *all* Medicaid-eligible encounters.") (emphasis in original).

Finally, HHSC suggests that Legacy may have administrative remedy available to it that would allow it to obtain reimbursement for these out-of-network services. This is a factual

question to be resolved at a later stage in this case. The Court concludes that Legacy has stated a claim for relief under 42 U.S.C. § 1396a(bb)(5)(A) as to unpaid out-of-network claims.

### b. Wraparound payments

Next, the Court turns to Legacy's claim that Texas law requiring MCOs to pay FQHCs at the full PPS rate violates federal law. While there is no explicit statutory provision prohibiting such a requirement, Legacy argues that the relevant provisions, read together, imply that MCOs are to negotiate a rate with FQHCs, subject only to the floor imposed by federal law.

Federal law guarantees that FQHCs will be paid, at a minimum, the PPS rate for services rendered to Medicaid patients. 42 U.S.C. § 1396a(bb)(1)-(4). However, MCOs are not required to pay the full PPS rate to FQHCs with which they contract. Instead, Congress has provided that an MCO must pay an FQHC "*not less* than the level and amount of payment which the [MCO] would make for the services [if provided by a non-FQHC]." 42 U.S.C. § 1396b(m)(2)(A)(ix) (emphasis added). Presumably, Congress intended for MCOs to negotiate a rate with FQHCs, subject to that limitation. The state is then required to make up any difference between the negotiated rate paid by the MCOs and the PPS rate required by federal law in what are called "wraparound payments." *See* 42 U.S.C. § 1396a(bb)(5)(A) ("the State plan shall provide for payment to the center or the clinic *by the State* of a supplemental payment equal to the amount (if any) by which the [PPS rate] exceeds the amount of the payments provided under the contract" with the MCO"). The wraparound payments must be made within four months. *See* 42 U.S.C. § 1396a(bb)(5)(B).

Against this backdrop of federal law, Legacy alleges that Texas has unlawfully imposed an additional requirement on MCOs in the state. Since 2011, Texas has required MCOs to pay FQHCs the full PPS rate, rather than allowing MCOs to negotiate a rate directly with FQHCs.

According to Legacy, Texas thus considers itself absolved of the requirement to pay wraparound payments because there is no difference between the MCO payments and the PPS rate.

Legacy argues that this subverts Congress's intent in integrating the FQHC and Medicaid programs. In particular, Legacy points to the legislative history of § 1396a(bb)(5) and § 1396b(m)(2)(A)(ix). Prior to 1997, when these provisions were added, MCOs were required to reimburse FQHCs the full, federally-mandated rate due to FQHCs under § 1396a(bb)(1). The Balanced Budget Act of 1997 eliminated requirements that MCOs pay FQHCs the federally-mandated, cost-based rate, and instead created the wraparound payment system described above. *See* Pub. L. 105-33, at 258-59 (Jan. 7, 1997).[5] According to Legacy, this change was intended to incentivize MCOs to contract with FQHCs by ensuring that FQHCs need not be significantly more costly to the plans than other health care providers.

The Center for Medicare and Medicaid Services (CMS), the federal agency charged with administering Medicaid, supports Legacy's interpretation of the statute. In a 1998 letter to state Medicaid directors, CMS found that a reimbursement approach that required MCOs like TCHP to pay higher rates to FQHCs was not permitted by the statute. *See* Letter from Sally K. Richardson to State Medicaid Directors (April 20, 1998), Doc. No. 61-2. The guidance was confirmed in a second 1998 guidance letter, which observed that a reimbursement approach like the one followed by Texas could create unintended barriers or disincentives to contract with FQHCs. *See* Letter from Sally K. Richardson to State Medicaid Directors (October 23, 1998), Doc. No. 61-3. That is, because MCOs would perceive FQHCs as more costly than other health care providers, they would be incentivized to drop them from their plans. This would be contrary

---

[5] Prior to 2000, FQHCs were paid on the basis of their actual costs each year. In 2000, to relieve health centers from having to supply new cost data every year, Congress created a new prospective payment system based on historical costs plus a cost-of-living factor. *Three Lower Cnties.*, 498 F.3d at 298. That is the PPS system currently in place.

to Congress's intent in creating the wraparound scheme, which was to protect FQHCs' role in providing Medicaid services. In CMS's view, a compliant reimbursement methodology would involve: 1) a capitation payment to an MCO that does not include any enhancement for FQHC's federally-mandated higher rates, and 2) reimbursement by the state directly to the FQHC for any difference between the MCO payment to the FQHC and the federally-mandated rate. *Id.* CMS directed the states to come into compliance with its interpretation of the law by amending existing MCO contracts by no later than December 31, 1998. *Id.*

The parties disagree on whether the CMS guidance is entitled to deference from the court. Interpretations of federal law contained in opinion letters and other forms of sub-regulatory guidance are not subject to *Chevron*-style deference. *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). Nonetheless, such guidance is "entitled to respect … to the extent that those interpretations have the 'power to persuade.'" *Id.* at 587 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). In the case of CMS, even relatively informal guidance "warrants respectful consideration" due to the complexity of the statute and the considerable expertise of the agency. *Wisconsin Dept. of Health and Family Services v. Blumer*, 534 U.S. 473, 497 (2002).

HHSC argues that this guidance is not persuasive for two reasons. First, it contends that it the letters were issued before the prospective payment system was implemented. However, the PPS changes affected only the way states were to calculate the amount due to FQHCs — not the rules on who is to make the wraparound payments, and when. HHSC also suggests that the guidance is out-of-date. The Supreme Court has suggested that, to the contrary, courts should accord particular deference to an agency interpretation of long-standing duration. *Barnhart v. Walton*, 535 U.S. 212, 220 (2002). And CMS has continued to refer to the 1998 guidance in later letters. *See* Letter from Dennis Smith, Director of the Center for Medicaid and State Operations

(Aug. 20, 2001), Doc. No. 8-17. The 2001 letter also came after the switch to the PPS method of calculating payments to FQHCs, suggesting that the PPS system did not change the FQHCs' entitlement to negotiate its rates with MCOs and to receive supplemental payments from the states.

Ultimately, the Court finds CMS's guidance persuasive, and consistent with the statutory purpose. The statute appears to draw a careful balance between various statutory objectives. First, it ensures that FQHCs are paid at a rate sufficient to cover their costs. Second, it gives MCOs flexibility to negotiate rates with health care providers, including FQHCs. Third, it protects the role of FQHCs in providing services to Medicaid patients. The Court does not believe that Congress intended to allow states to undermine this carefully-drawn balance by making it more expensive for MCOs to contract with FQHCs — thus encouraging MCOs to drop FQHCs from their provider networks, and undermining Congress's intent to retain the role of FQHCs in providing Medicaid services.

The Court is mindful that the Fourth Circuit reached a different conclusion in a similar case. *See Three Lower Counties*, 498 F.3d at 305. Looking only at the statutory language in 1396b(m)(2)(A)(ix), which requires MCOs to pay FQHCs "not less than" the market rate, the Fourth Circuit concluded that the statute did not restrict states from requiring MCOs to pay *more* than the market rate. Considering the entire statutory scheme, however, and with the benefit of the CMS guidance, this Court concludes that Congress did intend to constrain states' ability to require MCOs to make higher payments to FQHCs.

Accordingly, the Court concludes that, taking the facts pleaded in the complaint as true, Legacy has stated a claim for relief as to Texas's requirement that MCOs pay FQHCs at their full PPS rates.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss is **DENIED.**

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on the 2nd of July, 2015.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE