IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| LEGACY COMMUNITY HEALTH SERVICES, INC., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No.: 4:15-CV-00025 ) |
| DR. KYLE L. JANEK, in his Official Capacity as Executive Commissioner of the Texas Health and Human Services Commission, | ) ) ) ) |
| Defendant. | ) ) |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REPLY TO DEFENDANT'S RESPONSE**

Pretending as if Plaintiff Legacy Community Health Services, Inc. ("Legacy") has only itself to blame, Defendant (hereinafter referred so solely as the Texas Health and Human Services Commission ("HHSC")) glosses over the undisputed fact that its implementation of 42 U.S.C. § 1396a(bb) almost exactly replicates a payment methodology that Congress prohibited with the passage of the Balanced Budget Act ("BBA") of 1997 and produces the very harms Congress sought to eliminate.

**I.  Statement of Facts**

The material facts are few and undisputed.  As to HHSC's payment policy, there is no dispute that it delegated to Medicaid managed care organizations ("MCO") its full responsibility for reimbursing federally-qualified health centers ("FQHC"), such as Legacy, at their respective prospective payment system ("PPS") rates.  *See* ECF Nos. 84-18, at 31:16-25; 89, at 20 & n.10. That policy is effectuated through HHSC's model MCO contract, which requires MCOs to pay

FQHCs at their PPS rates. ECF No. 84-9, at 17. HHSC implemented this policy in an effort to eliminate its statutory obligation to pay FQHCs the difference between the amount FQHCs receive from MCOs and the total amount they are owed under the PPS methodology. *See* ECF No. 84-18, at 31:16-25.

Prior to implementation of HHSC's policy, Legacy's provider contract with one MCO, Texas Children's Health Plan ("TCHP"), required TCHP to reimburse Legacy at a rate of $59 per-visit – well below its reasonable cost per-visit. ECF No. 84-8, at 10. Following HHSC's policy, TCHP was required to reimburse Legacy at its PPS rate, which is approximately $270 per-visit. *Id.* at 14.

HHSC's delegation of its payment obligation created a disincentive for MCOs to contract with Legacy. Payment at Legacy's PPS rate made Legacy appear too expensive to TCHP, TCHP complained about the cost of Legacy's services, asked Legacy to accept a lower payment rate, and asked HHSC to modify its payment policy. ECF Nos. 84-1, at 17-19; 84-13, at 5, 8-9; 84-25, at 3-4. When Legacy explained that it would be unlawful for it to accept a lower rate and HHSC refused to modify its policy, TCHP terminated its provider agreement. *Id.;* ECF No. 84-10.

As to payment for out-of-network services, there is no dispute that HHSC's out-of-network payment policy, as expressed through its administrative code and model MCO contract, only requires payment for "emergency services." *See* 1 Tex. Admin. Code § 353.4; ECF Nos. 84-24, at 3; No. 89, at 25. Further, Legacy has failed to receive payment for over 6,000 claims for out-of-network services. ECF No. 84-20, at 22:17-22. Finally, HHSC's own agent admitted that about 2,700 claims were denied due to a "lack of prior authorization for out-of-network

services" and that it denies claims for a variety of reasons unrelated to whether the claim constitutes a valid FQHC visit. ECF No. 84-23, at ¶ 63-70.

## II. Legacy's Arguments are Legally Undisputed

These undisputed facts amount to statutory violations of both HHSC's requirement to make supplemental FQHC payments as prescribed in 42 U.S.C. § 1396a(bb)(5), as well as its obligation to provide payment for out-of-network FQHC services as prescribed in 42 U.S.C. § 1396b(m)(2)(A)(iv).

As to the first violation, HHSC's full delegation of its FQHC payment obligation is facially contrary to law. As described in Legacy's opening brief, from 1989 until 1997, MCOs were required to reimburse FQHCs at their full cost-based rates. *See* ECF No. 84-1, at 9-10. In 1997, to prevent MCOs from having to pay FQHC differently (and typically more) than other non-FQHC providers, Congress repealed the provision that permitted that delegation and added two new payment provisions, currently located at 42 U.S.C. §§ 1396a(bb)(5) and 1396b(m)(2)(A)(ix). *Id.* In doing so, Congress explained that "[i]n the case of a contract between an FQHC . . . and an HMO, the HMO would have to pay the FQHC . . . at least as much as it would pay any other provider for similar services. States would be required to make supplemental payments to the FQHCs . . . . Such payments would be equal to the difference between the contracted amount and the cost-based amount." H. Rep. 105-217, at 869 (1997); *see also* Pub. L. 105-33, at 258-59 (Jan. 7, 1997).

In 1998, the Centers for Medicare and Medicaid Services ("CMS") issued two State Medicaid Director Letters ("SMDL") explaining that, through BBA 1997, "Congress intended to encourage contracting between [FQHCs] and MCOs, and to remove financial barriers to this contracting." ECF No. 84-2, at 2. Further, CMS explained that the 1997 amendments prohibited

3

payment policies such as HHSC's, because the statutory language signaled Congressional intent "to not have the MCO involved in any issues regarding supplemental payments, reconciliations or any other reimbursement issues that would *raise payment levels between the two parties above those of [non-FQHCs] that provide a similar set of services*." ECF No. 84-3, at 2 (emphasis added). HHSC's payment policy blatantly violates the statutory language and CMS's guidance.

As to out-of-network services, HHSC's system violates federal law in a number of ways. First, 1 Tex. Admin. Code § 353.4 only provides payment for "emergency services." As described more fully in Legacy's opening brief, those services, involving treatment for the most serious conditions, are not the same as services "immediately required due to an unforeseen illness, injury, or condition." ECF No. 84-1, at 29-30. Further, TCHP, the payment agent of HHSC, has interpreted its out-of-network payment responsibility to only extend to emergency services delivered in a hospital emergency room setting. *Id*. Second, even if HHSC's administrative rules provided payment for the proper scope of out-of-network services (and they do not), payment would not be at an FQHC's PPS rate, but rather at a lower fee-for-service rate, *id*; *see* 1 Tex. Admin. Code § 353.4(c)(1), which would leave an FQHC with less than its PPS rate, in violation of § 1396a(bb). Given that HHSC fails to explain how its payment policy for out-of-network FQHC services complies with federal law, the Court should treat Legacy's claim on this point as conceded.

## III.     HHSC's Arguments Have No Factual or Legal Basis

Instead of confronting the plain statutory language at issue, HHSC spends almost 33 pages re-litigating issues which either involve undisputed material facts or which this Court has already rejected. With the remaining pages, it advances the novel and meritless arguments that

CMS approved HHSC's delegation of its FQHC payment obligation despite CMS's longstanding position that such a delegation is plainly prohibited by the 1997 amendments.

A.     HHSC simply recycles arguments that this Court has already dismissed

Despite the fact that its FQHC payment policies indisputably violate federal law, HHSC makes a litany of claims regarding supposed "facts in dispute" that are either reiterations of arguments this Court has already rejected or which have no bearing on HHSC's legal violations.

First, HHSC's attempt to claim that it did not delegate its payment obligation to MCOs is pure semantics (and an implicit concession that its delegation is unlawful). HHSC would have the Court believe that it did not delegate its supplemental payment obligation to MCOs because it instead chose to write that provision out of the federal statute altogether. CMS's 1998 guidance, however, explained that 42 U.S.C. § 1396a(bb) prohibits the full delegation of a state's payment obligation to MCOs just as much as it prohibits a partial delegation, such as using MCOs to determine the amount of a state's supplemental payments. *See* ECF Nos. 84-2, at 3; 84-3, at 2.

Second, any relief ordered by the Court does not depend on the actions of TCHP, a third-party. The legal violation at issue here is HHSC's full delegation of its FQHC payment obligation to *all* Texas MCOs, not just TCHP, and the associated disincentive to contract with FQHCs that MCOs experience as a result of that delegation. The existence of the policy alone causes the harm that Congress sought to eliminate, and warrants injunctive relief. Legacy not only experienced the risk of that harm but saw the full ramifications of it in the form of contract termination. While there is no way to know whether Legacy and TCHP would resume a

contractual relationship absent HHSC's delegation,[1] that delegation is plainly a barrier to reestablishing a contractual relationship going forward.[2]

With respect to payment for of out-of-network services, HHSC's argument misconstrues where the burden lies – a state is required to set rules for reimbursement with which providers must comply; a provider is not required to guess at whether a state's rules comply with federal law and risk being left "holding the bag" if they do not. *New Jersey Primary Care Ass'n v. New Jersey Dep't of Human Res.*, 722 F.3d 527, 540 (3d. Cir. 2013).

HHSC's argument is essentially that Legacy cannot demonstrate whether the claims for which it has failed to receive reimbursement fall within the definition of claims "immediately" required due to an "unforeseen illness, injury, or condition" as prescribed by 42 U.S.C. § 1396b(m)(2)(A)(vii), even though HHSC all but admits that it has failed to implement that provision and offers no explanation for how "emergency services" are the same as the services specified by the statute at issue.

HHSC's position also fails to take into account that Legacy, as a not-for-profit health center charged with providing care to underserved communities, regardless of a patient's ability to provide payment, is at risk of receiving no reimbursement for services it is legally obligated to provide. *See* 42 U.S.C. § 254b(k)(3)(G)(ii). HHSC's position would have Legacy bear the burden of violating its responsibilities as an organization receiving grant funds under § 330 of the Public Health Service Act by turning away patients who cannot provide payment simply

---

[1] In fact, despite HHSC's payment delegation, TCHP mentioned on a number of occasions that Legacy provided high-quality services. *See* ECF No. 84-25.

[2] HHSC references Legacy's so-called "aggressive business tactics." ECF No. 89, at 21. However, in an earlier communication regarding Legacy's business practices, HHSC noted that "Legacy has not to my knowledge violated any rules or policies, so if we take this action there will likely be some difficult questions to answer ahead." ECF No. 84-25, at 5. HHSC's argument is simply a *post hoc* attempt to deflect attention from its unlawful policies.

because Legacy was unable to divine whether HHSC's out-of-network payment provisions even apply to FQHCs. The Supreme Court has recognized that hardship for the purposes of finding a party has standing includes the harm "of being forced to modify [one's] behavior in order to avoid future adverse consequences." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998). Regardless, because of the Eleventh Amendment, a precise quantification of unpaid out-of-network claims, as HHSC believes is required, is simply beside the point.[3]

> B. This Court Should Give No Deference to the CMS Regional Office's Approval of HHSC's Model MCO Contract

In an effort to invoke *Chevron* deference, HHSC claims that CMS approved HHSC's policies at issue in this litigation through either a State Plan amendment ("SPA") or review of HHSC's model MCO contract, and in doing so reversed a longstanding federal interpretation. This is plainly incorrect (and as to the SPA claim, misleading), as well as contrary to established principles of administrative law. First, no deference is owed where a statute's meaning is plain and unambiguous. Second, even if the statutory language at issue here had any ambiguity, CMS's supposed approval would be plainly arbitrary as an unreasoned and unexplained departure from a longstanding agency interpretation. Indeed, if any deference were owed in this case, it should be given to CMS's coherent, well-reasoned, and longstanding interpretation, not an unexplained and *sub rosa* contract approval bereft of any analysis whatsoever.

---

[3] For that reason, HHSC's abstention argument is equally farfetched. Whether HHSC has "comprehensive" administrative rules in place is of no instance if those rules do not provide for payment for out-of-network services as specified by federal law. *See* ECF No. 84-1, at 29-31. Further, HHSC's belief that Legacy has taken an "aggressive" position regarding the scope of § 1396b(m)(2)(A)(vii), ECF No. 89, at 22, is irrelevant to whether HHSC has in fact violated that provision. *See also Romano v. Greenstein*, 721 F.3d 373, 376 (5th Cir. 2013) (holding that "there is no general requirement that a plaintiff exhaust state administrative or judicial remedies before she can pursue a claim under § 1983").

1.  *The statute is clear and deference is unwarranted*

Because the statutory provisions at issue are clear and unambiguous, *Chevron* and its progeny are inapplicable. In deciding whether to defer to an agency action, "first, always, is the question whether Congress has spoken to the precise question at issue." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* HHSC's argument presumes that Congress's intent regarding FQHC payments is unclear, when in actuality, Congress spoke to the "precise question at issue" when it amended the FQHC payment provisions in 1997. *See, e.g. Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000) (examining statute "as a symmetrical and coherent regulatory scheme" to conclude that Congress had excluded regulation of tobacco products from FDA's jurisdiction).

Because the language and intent underlying the FQHC payment provisions is clear, there is no need to look beyond the statute. 42 U.S.C. § 1396a(bb)(5) plainly prohibits delegation of a state's FQHC payment obligation when it mandates that a state "shall provide for payment to the center or clinic by the State of a supplemental payment . . . ." Further, because that provision's conforming amendment (§ 1396b(m)(2)(A)(ix)) states that the only permissible obligation that may be imposed on the MCO is a payment floor, it makes clear that a state cannot divest itself of its payment obligation.

CMS agrees. In its April 1998 SMDL, it noted that "the language in [what is now § 1396a(bb)] specifically requires States to make these supplemental payments." ECF No. 84-2, at

2. Further, CMS later reiterated that "the statutory requirements are straightforward and self-implementing . . . ." 66 Fed. Reg. 6628, 6328 (Jan. 19, 2001).

Indeed, other courts have recognized that the FQHC payment provisions found in 42 U.S.C. § 1396a(bb) are clear and unambiguous, and those same provisions consequently also confer enforceable rights on FQHCs pursuant to 42 U.S.C. § 1983.[4] In fact, the U.S. District Court for the District of South Carolina recently refused to afford *Chevron* deference to a State Plan amendment that was contrary to the plain language of § 1396a(bb). Exhibit ("Ex") AA, at 17.

Lastly this Court has also already found as much. In its Order denying HHSC's Motion to Dismiss, the Court considered "the entire statutory scheme . . . with the benefit of the CMS guidance" to "conclude[] that Congress did intend to constrain states' ability to require MCOs to make higher payments to FQHCs." ECF No. 66, at 19.

There is no question that Congress has spoken as to the issue of FQHC supplemental payments, and no deference is required.

> 2. *Even if deference were warranted, CMS's longstanding interpretation should be entitled to deference, not approval of HHSC's model contract*

Although the statutory language at issue is unambiguous, if deference were afforded to anything it should be owed to CMS's longstanding interpretation first expressed in the 1998 SMDLs, rather than an agency action that is an unexplained departure from longstanding practice.

---

[4] *See, e.g. Cmty. Health Care Ass'n of New York v. Shah*, 770 F.3d 129, 153 (2d. Cir. 2014); *Cal. Ass'n of Rural Health Clinics v. Douglas*, 738 F.3d 1007, 1013 (9th Cir. 2013); *New Jersey Primary Care Ass'n*, 722 F.3d at 541; *Three Lower Cnties. Cmty. Health Servs., Inc. v. Maryland*, 498 F.3d 294, 298 (4th Cir. 2007); *Rio Grande Cmnty. Health Cntr., Inc. v. Rullan*, 397 F.3d 56, 74 (1st Cir. 2005); *Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132 (2d. Cir. 2002).

As an initial matter, approval of HHSC's model contract is the only action at issue here. HHSC's false premise, designed to invoke *Chevron* deference, is that CMS approved the challenged policies through an amendment to Texas's State Medicaid Plan. The provision of the State Plan which HHSC relies on was issued with an effective date of October 2, 2010, *before* the Texas legislature directed HHSC to fully delegate its FQHC payment obligation on June 17, 2011. *See* ECF Nos. 84-6, at 10; 84-7, at 4. HHSC cannot claim that it received approval for a *2011* policy change through a *2010* SPA that related to its preexisting payment methodology. Further, the provision does not purport to delegate HHSC's FQHC payment obligation, and simply enacts, with minor changes in wording, the language found § 1396a(bb)(5). ECF No. 84-6, at 10. Consequently, the numerous cases HHSC cites regarding *Chevron* deference to SPAs are irrelevant here. *See, e.g., Texas v. U.S. Dep't of Health and Human Servs.*, 61 F.3d 438 (5th Cir. 1995).[5]

Without SPA approval to rely upon, HHSC is left arguing that CMS's approval of its model MCO contract constitutes a departure from CMS's longstanding interpretation to which deference is owed. It simply is not.

The Supreme Court has explained that "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). Essentially, if an agency wishes to

---

[5] It is worth noting that approval of a model MCO contract involves a process many rungs below SPA approval. SPA approval requires public notice, as well as a formal administrative review, including a hearing in cases of amendment disapproval. *See* 42 C.F.R. Part 430. In contrast, the regulation governing MCO contract approval provides only that the "CMS Regional Office must review and approve all MCO . . . contracts." 42 C.F.R. § 438.6. As such, the contract approval contains none of the hallmarks of agency actions entitled to *Chevron* deference.

10

change its longstanding practices and procedures in a significant manner, it must give some notice and a rational basis for the proposed change. *See Shell Offshore, Inc. v. Babbitt*, 238 F.3d 622, 630 (5th Cir. 2004).

There is no question the interpretation expressed in CMS's 1998 SMDLs is longstanding. First, as this Court recognized, following enactment of the PPS payment methodology in 2000, CMS issued a letter referring to its April 1998 SMDL. ECF No. 8-17, at 3.

Second, in a 2001 rulemaking implementing provisions of BBA 1997, CMS made further reinforced the 1998 SMLDs. CMS stated that no regulations were necessary to implement the FQHC payment provisions because "the statutory requirements are straightforward and self-implementing and we have provided guidance to all States on FQHCs . . . through [SMDLs] on April 21, 1998, October 23, 1998, and September 27, 2000." 66 Fed. Reg. 6628, 6328 (Jan. 19, 2001); *see also* Ex. BB.

Third, as part of a July 22, 2003 "Financial Review Documentation for At-risk Capitated Contracts Ratesetting" checklist, CMS stated that: "The State may build in only the FFS rate schedule or an actuarially equivalent rate for services rendered by FQHCs . . . . The State may NOT include the [FQHC] encounter rate, cost-settlement, or prospective payment amounts. The entity must pay FQHCs . . . no less than it pays non-FQHC[s] . . . for similar services. In the absence of a specific 1115 waiver, the entity cannot pay the annual cost-settlement or prospective payment." ECF No. 84-5, at 12.

Fourth, in a September 2013 declaration filed in the U.S. District Court for the Northern District of California, Mary E. Cieslicki, Technical Director for the Division of Reimbursement and State Financing of the Financial Management Group at CMS, confirmed that the April 1998 SMDL has "not been rescinded or superseded." Ex. CC, at 2.

11

Fifth, in CMS's 2015 "State Guide to CMS Criteria for Managed Care Contract Review and Approval," it stated that if an MCO enters into a contract with an FQHC, the MCO shall "provide payment that is not less than the level and amount of payment which the [MCO] would make for the services if the services were furnished by a provider which is not an" FQHC. Ex. DD, at 28.

Lastly and most importantly, the SMDLs remain published on "Medicaid.gov" to this date.[6] In sum, CMS's interpretation as expressed in the 1998 SMDLs has been consistent since Congress acted in 1997, and HHSC's contention that CMS has "backed away from" its own guidance is wishful thinking.

Against this history, it cannot be said that CMS's approval of HHSC's model contract constitutes a reasoned departure from that longstanding interpretation. The Regional Office's approval of HHSC's model MCO contract states only the following:

> "CMS accepts the reports submitted by the State's contracted actuary, which certifies that the SFY 2014 rates were developed in accordance with CMS regulations at 42 Code of Federal Regulations (CFR) 438.6(c), for the Medicaid population enrolled and the services covered during the approved rating period from October 1, 2013 to August 31, 2014 and the contract period of October 1, 2013 to August 31, 2015."

ECF No. 30-4, at 2-3. That statement does not even make mention of the 1998 SMDLs, much less acknowledge a disagreement with their conclusions. *See Texas Office of Public Util. Counsel v. F.C.C.*, 265 F.3d 313, 322 (5th Cir. 2001) (noting that while agency "is entitled to change its views on the acceptability of [a prior policy], it is obligated to explain its reasons for doing so"). Simply put, the MCO contract warrants no deference.

---

[6] *Available at* http://www.medicaid.gov/federal-policy-guidance/federal-policy-guidance.html.

In contrast, CMS's 1998 SMDLs (and their subsequent reaffirmations) are well-reasoned, detailed, and derived from the plain statutory language. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ("The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control"). CMS's interpretation is based on, and flows directly from, the language enacted by Congress in 1997, and it is therefore no surprise that it has remained unchanged, as any contrary interpretation would not "reasonably effectuate Congress's intent." "We should be especially reluctant to reject the agency's current view which, as we see it, so closely fits 'the design of the statute as a whole and . . . its object and policy.'" *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417-18 (1993) (citing references omitted); *see also I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) ("an agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view").

As such, if any deference is warranted, it is owed only to CMC's 1998 interpretation. The reason this interpretation has stood the test of time is that it is rooted in plain statutory language.

## IV. Conclusion

For the reasons discussed above, this Court should grant Legacy's Motion for Summary Judgment and deny HHSC's Motion for Summary Judgment.

13

Respectfully submitted,

                LEGACY COMMUNITY HEALTH SERVICES, INC.

                By: /s/ Michael J. Collins
                Michael J. Collins – Attorney-in-Charge
                Texas Bar No. 04614510
                Southern District of Texas I.D. No. 15643
                COLLINS EDMONDS
                SCHLATHER & TOWER, PLLC
                1616 South Voss Rd., Suite 125
                Houston, Texas 77057
                Telephone: (713) 501-3425
                Facsimile: (832) 415-2535
                mcollins@ip-lit.com

Of Counsel:

Edward T. Waters
Gregory M. Cumming
FELDESMAN TUCKER LEIFER FIDELL LLP
1129 20th Street, N.W., Fourth Floor
Washington, D.C. 20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)
ewaters@ftlf.com
gcumming@ftlf.com

## **CERTIFICATE OF SERVICE**

      I hereby certify that all counsel of record who registered as filing users of the Court's CM/ECF system are being served with this filing per LR5.1.

December 18, 2015                                        */s/ Michael J. Collins*
                                                    Michael J. Collins