United States District Court
Southern District of Texas
**ENTERED**
May 03, 2016
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| LEGACY COMMUNITY HEALTH SERVICES, INC., | § § § | |
| Plaintiff, | § | |
| VS. | § § | CIVIL ACTION NO. 4:15-CV-25 |
| DR. KYLE L. JANEK, *et al*, | § § | |
| Defendants. | § | |

## MEMORANDUM & ORDER

## I.    INTRODUCTION

This case concerns a challenge to certain aspects of how Texas administers its responsibilities under the federal Medicaid Act, 42 U.S.C. § 1396a *et seq*. ("the Medicaid Act" or "the statute"). Plaintiff Legacy Community Health Services ("Plaintiff"), a community health center serving low-income patients in the Houston area, filed this lawsuit to assert its rights under the Medicaid Act. Defendant Dr. Kyle L. Janek[1] is sued in his official capacity as Executive Commissioner of Texas's Health and Human Services Commission ("HHSC" or "the State"). Legacy claims that HHSC has violated the Medicaid Act with respect to how it reimburses Legacy for services Legacy provides to Medicaid patients. In the Court's Memorandum & Order of July 2, 2015 (Doc. No. 66), the Court held that Plaintiff had stated a claim for relief on two separate theories: first, that the State's process for providing reimbursement for services rendered to out-of-network patients allegedly violates the Medicaid Act, 42 U.S.C. § 1396b(m)(2)(A)(vii), and, second, that the State's delegation of its

---

[1] Although Dr. Janek was Commissioner at the time the complaint was filed, Chris Traylor was appointed as his successor effective July 1, 2015. As Dr. Janek's successor, Mr. Traylor is "automatically substituted as a party." FED. R. CIV. PRO. 25(d).

reimbursement responsibility to third-party Managed Care Organizations allegedly violates the Act, *id.* § 1396a(bb)(5)(A). Plaintiff seeks injunctive relief under 42 U.S.C. § 1983 to remedy the alleged shortcomings in Texas's method for providing payments to Legacy for its Medicaid services.[2]

The parties cross-moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. On April 18, 2016, the Court held a hearing on the cross-motions for summary judgment and took the motions under advisement. The Court now issues its decision as to the claim that the State has unlawfully allocated its payment obligation to Managed Care Organizations. The Court does not here decide Plaintiff's claim with respect to out-of-network services, but finds that there is no just reason to delay the summary judgment decision as to the other, independent claim for relief. After considering the parties' arguments, the applicable law, and the record in this case, the Court finds that Plaintiff's Motion for Summary Judgment (Doc. No. 84) should be granted as to the claim that the State has unlawfully delegated its payment obligation. Likewise, the Court finds that Defendant's cross-Motion for Summary Judgment (Doc. No. 89) should be denied as to this claim.

## II.    BACKGROUND

### A.    Federal Statutory Framework

The Medicaid Act is a cooperative federal-state program through which the federal government provides financial assistance to states so that they can furnish medical care to low-

---

[2] In the July 2015 Memorandum & Order, the Court held that 42 U.S.C. § 1396a(bb)(5)(A) gives rise to a private cause of action under § 1983 for Federally Qualified Health Centers ("FQHCs"), such as Legacy, to enforce their right to receive the reimbursement payments required under § 1396a(bb)(5)(A). *See* Mem. & Order, July 2, 2015, at 10-13. In Defendant's Motion for Summary Judgment, Defendant continues to make the argument that no such right of action exists. Nothing in the parties' briefing or the summary judgment record changes the Court's ruling that a private action can be brought by an FQHC under § 1983 to enforce § 1396a(bb)(5)(A).

income individuals. *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990), *superseded on other grounds by statute*. Medicaid is jointly financed by federal and state governments and is administered by the states. States are not required to participate in Medicaid but, "once a state chooses to join, it must follow the requirements set forth in the Medicaid Act and its implementing regulations." *S.D. v. Hood*, 391 F.3d 581, 586 (5th Cir. 2004) (quoting *Evergreen Presbyterian Ministries, Inc. v. Hood*, 235 F.3d 908, 915 (5th Cir. 2000)). The Centers for Medicare and Medicaid Services ("CMS"), a subsidiary of the Department of Health and Human Services, is the federal agency responsible for overseeing state compliance with federal Medicaid requirements. *Perry Cty. Nursing Ctr. v. U.S. Dep't of Health & Human Servs.*, 603 F. App'x 265, 267 (5th Cir. 2015). States electing to participate in Medicaid must submit to CMS a "state plan" detailing how the state will expend its funds.[3] *See* 42 U.S.C. §§ 1396, 1396a (2000). Each state plan must be approved by CMS. *Id.*; 42 C.F.R. § 430.0. Defendant HHSC is the Texas state agency responsible for establishing and complying with the Texas State Plan and must submit any state plan amendments ("SPAs") to CMS for review and approval. 42 U.S.C. § 1396a(a)(5); 42 C.F.R. §§ 430.10, 430.12, 430.14, 431.10.

Among the Medicaid Act's many requirements is that states must provide payment for Medicaid-covered services rendered by Federally Qualified Health Centers ("FQHCs"), health centers that provide medical care to an under-served population. 42 U.S.C. § 1396d(a)(2)(B)-(C); *id.* § 1396a(bb)(1). Plaintiff is designated as an FQHC. In addition to receiving Medicaid funding from the state, FQHCs are also eligible to receive federal grants under Section 330 of the Public

---

[3] "A 'state plan' is a comprehensive description of the nature and scope of the state's intended Medicaid program, and this document provides CMS with assurances that the state will administer the Medicaid program in conformity with CMS regulations and federal law. Filing of the state plan is a pre-requisite to receiving federal funding." *Women's Hosp. Found. v. Townsend*, No. CIV A 07-711-JJB-DLD, 2008 WL 2743284, at *1 (M.D. La. July 10, 2008).

Health Services Act. 42 U.S.C. § 254b. "The constituencies served by Medicaid funding and by Section 330 grants are not identical, however." *Cmty. Health Care Ass'n of New York v. Shah*, 770 F.3d 129, 136 (2d Cir. 2014). The dual sources of FQHC funding—direct federal grants and indirect federal Medicaid dollars filtered through the states—"allows the FQHC to allocate most of its direct grant dollars towards treating those who lack even Medicare or Medicaid coverage." *Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 134 n.2 (2d Cir. 2002). To ensure that Section 330 grants are not used to cover the cost of treating Medicaid patients, the Medicaid Act requires that states reimburse FQHCs for services provided to Medicaid beneficiaries. 42 U.S.C. § 254b(k)(3)(F).

The Medicaid Act, specifically § 1396a(bb), also governs precisely *how* a state must reimburse FQHCs for Medicaid services. Since 2001, reimbursement payments are assessed through what is known as the Prospective Payment System ("PPS"). *Id.* § 1396a(bb)(1)-(3). Stated simply, an FQHC's reimbursement from the state is calculated by multiplying the number of Medicaid patient encounters by the average reasonable costs of serving Medicaid patients in 1999 and 2000, adjusted yearly for inflation. *Id. See generally New Jersey Primary Care Ass'n Inc. v. New Jersey Dep't of Human Servs.*, 722 F.3d 527, 529 (3d Cir. 2013). The total amount owed by the state to reimburse an FQHC for a Medicaid patient encounter is referred to as the "PPS rate" or the "PPS amount."[4]

The "system of states reimbursing FQHCs for their Medicaid costs is complicated considerably by the fact that many states . . . use a managed care approach to running their Medicaid system." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 62 (1st Cir. 2005). Under a managed care approach, the state administers its Medicaid program by contracting with

---

[4] Instead of reimbursing FQHCs on a per-service basis, the statute requires the state to reimburse FQHCs for each visit or "encounter" that they have with a Medicaid patient.

private-sector managed care organizations ("MCOs"), analogous to private-sector HMOs, that arrange for the delivery of healthcare services to individuals who enroll with them. 42 U.S.C. § 1396u-2(a)(1). In exchange for its services, an MCO receives from the state a prospective per-patient, per-month payment, called a "capitation" payment, based on the number of patients enrolled in the MCO.[5] The MCO, in turn, contracts with healthcare providers, including FQHCs, to provide services to its enrollees. Under the MCO model, the state does not directly reimburse FQHCs for their services to Medicaid recipients; rather, the MCOs reimburse FQHCs out of their capitation funds. *See Shah*, 770 F.3d at 137; *New Jersey Primary Care Ass'n*, 722 F.3d at 530. If an MCO's costs are less than the capitation payments received from the state, the MCO makes a profit; if costs exceed capitation payments, the MCO incurs a loss.

The tripartite relationship between the state, MCOs, and FQHCs—and the provisions of the Medicaid Act that govern this relationship—forms the crux of this case. As this Court has previously recognized, "[b]ecause federal law requires states to pay FQHCs a designated amount per visit, the FQHC system sits uneasily with the MCO model, which requires MCOs to have the flexibility to negotiate with health care providers." Mem. & Order, July 2, 2015, at 3. To resolve this tension, Congress enacted a pair of statutory provisions—42 U.S.C. § 1396a(bb)(5)(A) and § 1396b(m)(2)(A)(ix) (hereinafter, "the payment provisions")—that together achieve a careful balance between two competing objectives. The payment provisions ensure that FQHCs will be paid the PPS rate to cover the costs of providing Medicaid services while also ensuring that MCOs are able to negotiate with FQHCs just as they would with any other healthcare provider.

---

[5] *See* 42 C.F.R. § 438.2 (2014) ("Capitation payment means a payment the State agency makes periodically to a contractor on behalf of each beneficiary enrolled under a contract for the provision of medical services under the State plan. The State agency makes the payment regardless of whether the particular beneficiary receives services during the period covered by the payment.").

The precise framework established by the payment provisions is as follows: Section 1396b(m)(2)(A)(ix) provides that MCOs are required to pay FQHCs "not less than" they would pay non-FQHC providers for the same services.[6] Section 1396a(bb)(5)(A) then requires states to pay FQHCs a supplemental payment to bring the FQHC's total compensation to the PPS rate, referred to as a "wraparound payment." Specifically, §1396a(bb)(5)(A) places on the states the following reimbursement obligation: "In the case of services furnished by a[n] [FQHC] . . . pursuant to a contract between the [FQHC] . . . and a[n] [MCO] . . . the State plan shall provide for payment to the center or clinic by the State of a supplemental payment equal to the amount (if any) by which the [PPS] amount . . . exceeds the amount of the payments provided under the contract." 42 U.S.C. § 1396a(bb)(5)(A). Plaintiff's suit contends that Texas's system for reimbursing FQHCs violates this provision of the Medicaid Act.

### B.     Texas's Medicaid Reimbursement Regime

Texas has chosen to implement Medicaid through a managed care system. Tex. Gov. Code § 533.002. Beginning in October 2010, when State Plan Amendment ("SPA") 10-61 went into effect, the Texas State Plan mandated that the State make wraparound payments to FQHCs, as contemplated under §1396a(bb)(5)(A). Specifically, SPA 10-61 provided that "[i]n the event that the total amount paid to an FQHC by a managed care organization is less than the amount the FQHC would receive under PPS . . ., the state will reimburse the difference on a state quarterly basis." *See* Pl.'s Mot. Summ. J. Ex. E at 10 (hereinafter, "SPA 10-61"); *see also* Def.'s Reply 4 n.5 (Doc. No. 96) (explaining that SPA 10-61 tracked the language of

---

[6] *See* 42 U.S.C. § 1396b(m)(2)(A)(ix) ("such contract [between the state and the MCO] provides, in the case of an [MCO] that has entered into a contract for the provision of services with a Federally-qualified health center or a rural health clinic, that the [MCO] shall provide payment that is not less than the level and amount of payment which the entity would make for the services if the services were furnished by a provider which is not a Federally-qualified health center or a rural health clinic.").

6

§1396a(bb)(5)(A)). In 2011, however, Texas changed its method of reimbursing FQHCs for Medicaid services. The State began requiring—and today continues to require—that MCOs reimburse FQHCs at the full PPS rate, thereby obviating the need for the State to make a wraparound payment.[7] *See* Def.'s Mot. Summ. J. 28 ("[T]here is no need for wraparound payment because the contracted MCO is required to pay the full PPS to the provider."). Despite the language of SPA 10-61, which provided for state wraparound payments, HHSC's contracts with MCOs have, since 2011, stated that:

> The MCO must pay full encounter [i.e., PPS] rates to FQHCs . . . for Medically Necessary Covered Services provided to Medicaid and CHIP Members using the prospective payment methodology described in Sections 1902(bb) and 2107(e)(1) of the Social Security Act. *Because the MCO is responsible for the full payment amount in effect on the date of service, HHSC cost settlements (or "wrap payments") will not apply.*[8]

Pl.'s Mot. Summ. J. Ex. H at H-16 [hereinafter HHSC/MCO Contract] (emphasis added); *see also* Def.'s Mot. Summ. J. at 44-45 ("Section 8.1.22 of the [HHSC/MCO contract] . . . expressly indicates that there is no need for a wraparound payment because the contracted MCO is required to pay the full PPS to the provider."); *id.* Ex. A, Affidavit of Gary Jessee ¶ 2 [hereinafter Jessee Aff.] (discussing HHSC's Uniform Managed Care Contract). HHSC's contractual requirement that MCOs pay FQHCs the full PPS amount was also authorized by the Texas

---

[7] In 2011 the National Association of Community Health Centers reported that five other states used a similar system. *See* National Association of Community Health Centers, *Update on the Status of the FQHC Medicaid Prospective Payment System in the States, State Policy Report #40*, November 2011, *available at* http://www.nachc.com/client/2O11%2OPPS%2OReport%2OSPR%2O40.pdf, at p. 5) ("5 states (CO, CT, MA, MS, DE) actually pay the managed care organizations the wrap-around who in turn pay the health centers. Texas just made this change, which is effective September 1st. NJ, NC, and TN are considering this change.").

[8] This is the language that HHSC currently uses in its contracts with MCOs. The predecessor version of the contract used nearly identical language: "MCOs are required to pay full encounter rates (as determined by HHSC) directly to FQHCs and RHCs for Medically Necessary Covered Services. HHSC cost settlements (or 'wrap payments') no longer apply." Def.'s Mot. Summ. J. Ex. A, Affidavit of Gary Jessee ¶ 18 n.2.

legislature. *See* House Bill No. 1 (General Appropriations Bill) ("[t]o the extent allowable by law, in developing the premium rates for Medicaid and CHIP Managed Care Organizations . . ., the Health and Human Services Commission shall include provisions for payment of the FQHC Prospective Payment System (PPS) rate and establish contractual requirements that require MCOs to reimburse FQHCs at the PPS rate.").

As the Court has previously observed, by requiring MCOs to pay 100 percent of the PPS amount, "Texas's method of reimbursing FQHCs . . . for services provided to Medicaid patients differ[s] from what is contemplated in federal law." Mem. & Order, July 2, 2015, at 4. Instead of allowing MCOs to pay an FQHC a rate that the MCO has negotiated with that individual FQHC, and then making up the difference directly from state funds, HHSC has attempted to incorporate the FQHC's PPS rate into the monthly capitation payments it makes to MCOs. Jessee Aff. Ex. A, attachment 3 at pp. 2, 8, 14; *see also* Def.'s Mot. Summ. J. 50. The State then requires MCOs to pay FQHCs at the full PPS rate rather than at the lower negotiated rate. Def.'s Mot. Summ. J. Ex. B, Affidavit of Christopher Born ¶ 17 [hereinafter Born Aff].

### C.      Legacy, HHSC, and the Texas Children's Health Plan

Plaintiff Legacy Community Health Services is a 501(c)(3) nonprofit corporation that operates eight school-based clinics, two education or outreach locations, and twelve outpatient clinics, all of which provide care to medically under-served populations. Legacy is designated as an FQHC for purposes of Medicaid reimbursement and is also a recipient of Section 330 grants.

One of the MCOs that contracts with HHSC to provide care to Texas Medicaid recipients is the Texas Children's Health Plan ("TCHP").[9] Legacy contracted with TCHP from 2009 to 2015 to provide medical care to Medicaid patients enrolled in TCHP. TCHP implemented the

---

[9] TCHP was originally named as a defendant in this action. Plaintiff's Second Amended Complaint dropped TCHP as a defendant and stated claims only against HHSC.

State's 2011 requirement that it pay Legacy the PPS rate rather than the negotiated rate.[10] During

that same period, Legacy significantly expanded the number of its clinic locations and the

services it offered. Born Aff. ¶ 32-34. As Legacy expanded, Medicaid patients' use of Legacy

services increased faster than the capitation payments TCHP received from the State, causing

TCHP eventually to determine that Legacy's PPS rate had made Legacy prohibitively expensive

for TCHP. Born Aff. ¶ 45. TCHP's required payment to Legacy had increased by over 350%,

from a rate of $59 per visit to a PPS rate of approximately $270 per visit. *Id.*; Pl.'s Reply 2 (Doc.

No. 94). In February 2014, TCHP complained to Legacy about the cost of its services and also

asked HHSC to modify its PPS payment requirement, but HHSC refused to modify its policy.

*See* Pl.'s Mot. Summ. J. Ex. X at X-3. HHSC rejected TCHP's proposal that HHSC "transition

the payment of the full FQHC encounter rate back to the State, so that it is no longer the

Managed Care Organization's responsibility." *Id.* This proposal, the State concluded, "was not a

feasible option." *Id.* On November 1, 2014, TCHP notified Legacy that it would be terminating

its contract with Legacy effective February 1, 2015. *Id.* Ex. I at I-1.

### D.   Recent Developments

Each state plan must include, among its numerous details, a provision for payment to

FQHCs. 42 U.S.C. § 1396a(bb) (2000). At the time the parties filed their cross motions for

summary judgment, Texas's reimbursement scheme—in which MCOs are required to pay

FQHCs the full PPS rate and the State's wraparound payments therefore "will not apply"—was

imposed only as a term of the State's contract with MCOs. It was not codified in the Texas State

Plan. In fact, the contractual language stating that wraparound payments "will not apply" stood

---

[10] HHSC's contract with TCHP contains the provision from the standard HHSC/MCO Contract,
quoted above, requiring the MCO to pay the FQHC the full PPS rate.

in clear tension with the State Plan, specifically SPA 10-61, which ensured FQHCs that the State would make wraparound payments. *See* HHSC/MCO Contract at H-16.

In January 2016, however, the State submitted a new SPA to CMS for review and approval. SPA 16-02, which supersedes SPA 10-61, amends the State Plan in two significant ways as relevant here. First, SPA 16-02 incorporates into the State Plan the requirement that MCOs pay the full PPS amount. *See* Def.'s Advisory Ex. A, at 7 [hereinafter SPA 16-02] (Doc. No. 97-1). Specifically, the SPA states that FQHCs must be "paid their full per-visit [i.e., PPS] rate by state-contracted managed care organizations when the service is rendered." *Id.* Second, SPA 16-02 does away with the guarantee that "the state will reimburse [FQHCs for] the difference," if any, between the MCO payment and the PPS amount. *Compare id.*, *with* SPA 10-61.

On February 25, 2016, CMS approved of SPA 16-02 for incorporation into the Texas State Plan, with a retroactive effective date of January 1, 2016. *See* Def.'s Advisory Ex. A, at 2 [hereinafter CMS Approval Letter]. The Court ordered the parties to brief the effect of CMS's approval on the pending motions for summary judgment and to address the level of deference, if any, that the Court owes to CMS's approval of the SPA.

## III.   DISCUSSION

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(a). Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* The movant has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has met its burden,

the burden shifts to the nonmovant to show that summary judgment is not appropriate. *Id.* at 325. The nonmovant "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1071 (5th Cir. 1994) (en banc) (citing *Celotex*, 477 U.S. at 325). "This burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (internal quotation omitted). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

The parties agree, and the Court finds, that there are no genuine issues of material fact in dispute. *See* Pl.'s Reply 1 ("The material facts are few and undisputed."); Def.'s Mot. Summ. J. 27 ("Because there is no genuine triable issue as to any material fact before this Court concerning CMS's approval of HHSC's State Plan and MCO contracts, HHSC is entitled to judgment as a matter of law."). Plaintiff's challenge to the State's reimbursement scheme presents only legal issues for resolution by the Court and should be resolved on the parties' cross motions for summary judgment.

### A.   *Chevron* Deference

Legacy claims that the payment provisions of the Medicaid Act do not permit a state to dispense with the obligation to reimburse FQHCs at the PPS rate by requiring that MCOs pay the full PPS amount, as Texas has done in SPA 16-02. As discussed above, CMS has approved of SPA 16-02 and the change that it effects "for the reimbursement methodology for Federally Qualified Health Centers." *See* CMS Approval Letter. Because the Court is reviewing an agency's interpretation of a statute that it administers, the Court's analysis is governed by

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), which sets forth a two-step test.[11] A reviewing court must first ask "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. "If Congress has done so, the inquiry is at an end; the court 'must give effect to the unambiguously expressed intent of Congress.'" *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (U.S. 2000) (quoting *Chevron*, 467 U.S. at 843). "But if Congress has not specifically addressed the question, a reviewing court must respect the agency's construction of the statute so long as it is permissible." *Id.* In other words, the Court is required to abide by the agency's implementation of a statute it administers if (1) Congress has not "directly spoken to the precise question at issue," and (2) the agency's decision is "permissible" under the statute. *Chevron*, 467 U.S. at 842-43.

Defendant suggests, citing *State of Texas v. U.S. Dep't of Health & Human Services*, that CMS decisions approving or denying SPAs are necessarily entitled to *Chevron* deference. *See* Def.'s Mot. Summ. J. 46-47. In *State of Texas*, the state appealed the denial of an SPA by the Health Care Financing Administration (the predecessor agency to CMS), and the Fifth Circuit accorded the agency's denial *Chevron* deference. 61 F.3d 438, 442 (5th Cir. 1995). The portion of the Medicaid Act at issue there was 42 U.S.C. § 1396d(a)(13), "which provides federal matching funds for the provision of rehabilitative services." *Id.* at 440. Other circuit courts, considering other provisions of the Medicaid Act, have also granted *Chevron* deference to CMS approvals of SPAs. *See Managed Pharmacy Care v. Sebelius*, 716 F.3d 1235, 1240 (9th Cir. 2013); *Christ the King Manor, Inc. v. Sec'y of U.S. Dep't of Health and Human Servs.*, 730 F.3d

---

[11] When CMS approves an SPA, CMS "implicitly approve[s] [the state's] interpretation of the Medicaid Act," and, as such, a court reviewing CMS's approval of an SPA must apply the *Chevron* doctrine. *California Ass'n of Rural Health Clinics v. Douglas*, 738 F.3d 1007, 1014 (9th Cir. 2013); *see also State of Texas v. U.S. Dep't of Health & Human Services*, 61 F.3d 438, 440 (5th Cir. 1995); *Shah*, 770 F.3d at 144-48.

291, 307 (3rd Cir. 2013); *Harris v. Olszewski*, 442 F.3d 456, 467 (6th Cir. 2006); *Pharm. Research and Mfrs. of America v. Thompson*, 362 F.3d 817, 822 (D.C. Cir. 2004). *State of Texas* and the other cases cited here do not, however, establish a rule that CMS approvals of SPAs are categorically entitled to *Chevron* deference. The decision whether to apply *Chevron* deference requires an inquiry that is focused not on the agency's decision, but on Congress's intent as expressed in the relevant statute. Hence the threshold determination in *Chevron* analysis is "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842; *see also State of Texas*, 61 F.3d at 440 (asking whether a "certain portion of the Medicaid statute unambiguously indicates that Congress intended the statute to be interpreted" in a particular way). Whether an agency's decision should be accorded *Chevron* deference is a question that depends on the particular statutory provision at issue and the "precise question at issue." As a result, it is entirely possible that a CMS approval of an SPA should be accorded *Chevron* deference in the context of a challenge to one aspect of a state's Medicaid scheme but not in the context of a challenge to an entirely different aspect of the scheme. The Ninth Circuit, for example, has recently found that *Chevron* deference should be applied to CMS's approval of an SPA where one provision of the Medicaid Act was at issue, but found that *Chevron* deference did not apply when considering a different provision of the Act. *Compare Managed Pharmacy Care*, 716 F.3d at 1240 ("[T]he Secretary's approval of California's requested reimbursement rates . . . is entitled to deference under *Chevron*."), *with California Ass'n of Rural Health Clinics v. Douglas*, 738 F.3d 1007, 1014 (9th Cir. 2013) ("[T]he statutory text provides a clear answer, and, thus, we do not defer to CMS's approval of the SPA.").[12] Similarly, the Fifth Circuit's

---

[12] *See also Douglas*, 738 F.3d at 1014 (explaining why the decision to accord *Chevron* deference in *Managed Pharmacy Care* does not dictate the same result in *Douglas* because the statutory language in question is clear and unambiguous).

decision to apply *Chevron* deference in *State of Texas*, where Texas challenged the agency's implementation of § 1396d(a)(13), has no bearing on the Court's decision whether to apply *Chevron* deference in the instant case, as there are entirely different statutory provisions and questions at issue. *See Thompson v. Goetzmann*, 337 F.3d 489, 501-02 (5th Cir. 2003) ("We reject this effort by the government to clothe itself in the deference given to agencies' reasonable interpretations of ambiguous statutory provisions.").

Because step one of the *Chevron* analysis requires the Court to "ascertain whether the statute is silent or ambiguous in addressing the precise question at issue," *Texas Savings & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd.*, 201 F.3d 551, 554 (5th Cir. 2000), the Court must begin by identifying the "precise question at issue." *Chevron*, 467 U.S. at 842; *see also Douglas*, 738 F.3d at 1014. Here, Legacy's claim that the Medicaid Act prohibits the state from passing onto MCOs the duty to make PPS payments actually involves two distinct questions. One question is whether a state may require that MCOs pay the full PPS rate rather than a negotiated rate. A separate issue is, even assuming that a state is allowed to require that MCOs pay the full PPS rate, whether a state is allowed to remove its guarantee that the state will pay FQHCs at the PPS rate in the event that an MCO fails to do so.[13]  The Court will perform the *Chevron* analysis separately for each question, beginning with the latter, as it is the easier to resolve.

**B.      Must a state guarantee that FQHCs receive the full PPS rate?**

The Court cannot defer to CMS on any issue about which "Congress has directly spoken," such that "the intent of Congress is clear." *Chevron*, 467 U.S. at 842. Here, the question

---

[13] Defendant also recognizes that Plaintiff's claim implicates these two discrete questions. *See* Def.'s Reply 4 ("Legacy contends [1] that the law requires HHSC to guarantee Legacy receives 100 percent of its PPS and [2] that at least some portion of that 100 percent must come in the form of a payment from the state, even where—as here—Legacy otherwise received 100 percent of its PPS for services rendered.").

is whether Congress has "directly spoken" to the issue of whether a state may do away with its guarantee of making wraparound payments to FQHCs when such payment is necessary to reimburse the FQHC at the PPS rate. As was discussed above, the Texas State Plan formerly provided, pursuant to SPA 10-61, that "[i]n the event that the total amount paid to an FQHC by a managed care organization is less than the amount the FQHC would receive under PPS . . ., the state will reimburse the difference on a state quarterly basis." The new SPA approved by CMS eliminates this backstop provision, makes no mention of any obligation on the part of the State to make supplemental payments, and instead simply states: "FQHCs are paid their full per-visit [i.e., PPS] rate by state-contracted managed care organizations when the service is rendered." SPA 16-02. The State's contract with MCOs expressly provides that "[b]ecause the MCO is responsible for the full [PPS] payment . . ., HHSC cost settlements (or 'wrap payments') will not apply." HHSC/MCO Contract. HHSC concedes that its policy is that "no Wrap Payments will ever be owed by HHSC to Legacy." Jessee Aff. ¶ 16.

While the payment provisions of the Medicaid Act are perhaps not quite as straightforward as one would wish, the Act does speak clearly and unambiguously to the question at hand: whether a state may do away with a mechanism by which it will provide wraparound payments where necessary to reimburse FQHCs at the PPS rate. For the reasons set out below,[14] the statute clearly prohibits a state from refusing *ex ante* to make wraparound payments, and, thus, as to this issue, the Court will not defer to CMS's approval of the SPA. As the Third Circuit has concluded, in declining to apply *Chevron* deference, "the meaning of the

---

[14] Because the Court must "use traditional tools of statutory construction to determine whether Congress has spoken to the precise point at issue," *Nat'l Pork Producers Council v. E.P.A.*, 635 F.3d 738, 749 (5th Cir. 2011), the below discussion of the correct construction of the statute also provides the analysis to support the conclusion that the statute is clear and unambiguous as to the question at issue.

sections of the Medicaid Act at issue here [§ 1396a(bb)(5)] are clear" with respect to "a State's obligations under the federal Medicaid program when paying [FQHCs] for services they render to Medicaid patients." *Three Lower Counties Cmty. Health Servs., Inc. v. Maryland*, 498 F.3d 294, 296, 302 n.2. (4th Cir. 2007). *See also Genesis Health Care, Inc. v. Soura*, No. 3:14-CV-03449-CMC, 2015 WL 10550133, at *9 (D.S.C. Dec. 9, 2015) (holding that CMS's approval of the challenged SPA cannot be afforded *Chevron* deference because § 1396a(bb) is clear and unambiguous).

Because the Court does not defer to CMS's approval of the State's decision not to guarantee payment at the PPS rate, the Court must determine for itself whether this aspect of the State's reimbursement scheme conflicts with the Medicaid Act. *Chevron*, 467 U.S. at 843. The provision of the Medicaid Act relevant here, § 1396a(bb)(5)(A), states as follows:

> In the case of services furnished by a[n] [FQHC] . . . pursuant to a contract between the [FQHC] . . . and a[n] [MCO] . . . the State plan shall provide for payment to the center or clinic by the State of a supplemental payment equal to the amount (if any) by which the [PPS] amount . . . exceeds the amount of the payments provided under the [MCO-FQHC] contract.

42 U.S.C. § 1396a(bb)(5)(A). This Court is the first to consider whether § 1396a(bb)(5)(A) permits a state to stop making the wraparound payments and to instead delegate to MCOs the responsibility, in its entirety, of paying FQHCs at the PPS rate. However, a number of courts have interpreted this provision of the Medicaid Act in cases challenging a state's *method* of providing wraparound payments. The courts in these cases have been unanimous in concluding that, "[u]nder the Medicaid statute, the State is, indeed, responsible for reimbursement of the *entire* PPS rate for *all* Medicaid-eligible encounters." *New Jersey Primary Care*, 722 F.3d at 539 (emphasis added). As the Second Circuit has stated, the Medicaid Act "imposes an absolute burden on the state to reimburse FQHCs for the entirety of their reasonable costs." *Shah*, 770

F.3d at 154. *See also id.* at 153 ("[T]he State has a clear responsibility to make a supplemental payment in the case of services furnished by a[n] FQHC."); *Douglas*, 738 F.3d at 1013 ("[T]he statute plainly requires state plans to pay for services furnished by FQHCs . . . . [T]he statute imposes a mandatory obligation, stating that the state plan "*shall* provide for payment for services."); *Three Lower Counties*, 498 F.3d at 303 ("By opting into a managed care system, the State cannot avoid its responsibility to reimburse FQHCs at the full PPS amount."); *Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 62 (1st Cir. 2005) ("[S]tates must pay FQHCs a supplemental or wraparound payment to make up the difference between what the MCO is paying the FQHC and what the FQHC is entitled to via the detailed PPS methodology.").

The Court agrees with the conclusion reached by these courts. While § 1396a(bb)(5)(A) allows a state to require that MCOs offset the cost of reimbursing FQHCs at the PPS rate, the statutory provision states in no uncertain terms that "the State plan *shall* provide for payment to the center or clinic *by the State*." 42 U.S.C. § 1396a(bb)(5)(A) (emphasis added). The statute thus makes clear that the obligation to ensure that FQHCs are paid the PPS rate ultimately rests with the state and the state alone. "Whether or not the MCO makes a payment, the State is responsible for the supplemental payment (which may in fact be the entire PPS rate, if the MCO fails to make a payment)." *Cmty. Healthcare Assoc. of New York v. New York State Dep't of Health*, 921 F. Supp. 2d 130, 145 (S.D.N.Y. 2013), *aff'd in part, vacated in part on other grounds, remanded sub nom. Shah*, 770 F.3d at 129.

Two of the cases cited above are particularly illuminating on the question of whether a state may refuse to ensure that it will make a payment in the event that the MCO payment falls short of the PPS rate. *Shah* and *New Jersey Primary Care* both considered whether § 1396a(bb)(5)(A) permits a state reimbursement system in which the state would make

wraparound payments only on Medicaid claims "for which an MCO has paid an FQHC." *Shah*, 770 F.3d at 153; *see also New Jersey Primary Care*, 722 F.3d at 539-542 (discussing "[New Jersey's] refusal to make wraparound payments on claims for which the MCO has not paid a FQHC"). In neither case did the state go so far as to shift the PPS payment obligation entirely onto the MCOs, as Texas has done. But the states' policies did reduce the states' reimbursement responsibility, namely by making the MCO "the final arbiter of whether a claim is Medicaid eligible" and thus of whether a wraparound payment is necessary. *Id.* at 155. Both the Second and Third Circuits held that such a delegation of the state's PPS payment obligation violates § 1396a(bb)(5)(A). *Shah*, 770 F.3d at 156; *New Jersey Primary Care*, 722 F.3d at 542-43. These reimbursement policies ran afoul of the Medicaid Act because "[t]he state . . . cannot simply shift its reimbursement obligations to MCOs. " *New Jersey Primary Care*, 722 F.3d at 540-41; *see also Shah*, 770 F.3d at 156. The same principle applies here, but with even more force. The state plans at issue in *Shah* and *New Jersey Primary Care* at least maintained the general wraparound framework established in § 1396a(bb)(5)(A). Texas, by contrast, has abandoned the state's wraparound obligation altogether.

Even assuming that a state may require MCOs to reimburse FQHCs at a rate higher than the individual negotiated rate, the state plan must, at a minimum, maintain a mechanism by which the state will pay an FQHC the PPS amount in the event that an MCO fails to pay, or pays below, the PPS rate. In replacing SPA 10-61 with SPA 16-02, Texas eliminated from its state plan precisely this mechanism. The "fact that there is no mechanism by which FQHCs are reimbursed for services actually furnished under MCO contract and not paid by the MCO is . . . in clear contravention of the plain language of [§] 1396a(bb)(5)." *Cmty. Healthcare Assoc. of New York*, 921 F. Supp. 2d at 145; *see also Shah*, 770 F.3d at 129 (finding that New York's

reimbursement policy violates § 1396a(bb)(5)(A) "because the risk of non-payment by an MCO now has no remedy"). The fact that MCOs are "the primary avenue for payment . . . cannot relieve the state of its specific burden to ensure payment to FQHCs" at the PPS rate. *Shah*, 770 F.3d at 157.

The State contends that the fact that Legacy "received 100 percent of its PPS rate from TCHP while Legacy contracted with TCHP" supports the conclusion that the State "did not unlawfully delegate its obligations under the Medicaid Act." Def.'s Reply 4; *see also* Def.'s Mot. Summ. J. 38-41 ("Section 1396a(bb) does not require states to create policies or programs leading to supplemental payments where no deficiency or discrepancy [in PPS payment] exists."). But the fact that a particular FQHC received full PPS payments from a certain MCO during a particular period is irrelevant to the question of whether the State's reimbursement policy violates § 1396a(bb).[15] This is because the statute specifically requires state plans to provide for the potential situation in which an FQHC does *not* receive a full PPS payment from an MCO. A state plan that even "raise[s] the *possibility* that FQHCs will 'be left holding the bag,' [is] a clearly impermissible result given that . . . the State has a clear responsibility to make a supplemental payment in the case of services furnished by an FQHC." *Shah*, 770 F.3d at 153 (quoting *New Jersey Primary Care*, 722 F.3d at 541) (emphasis added). It is the "*risk* that FQHCs will bear the cost of non-payment by MCOs" that is "impermissible" under the statute.

---

[15] While not relevant to the merits question of § 1396a(bb) liability, the issue of whether Legacy received full PPS payments certainly might be relevant to the question of remedies as well as to the question of standing, specifically, whether Plaintiff has suffered an injury-in-fact. On the issue of standing, the Court ruled in its July Memorandum & Order that Legacy had suffered an injury-in-fact sufficient for standing not based on underpayment for particular claims, but rather based on TCHP's termination of its contract with Legacy, which, the Court found, bore a sufficient causal nexus to the State's requirement that TCHP pay the full PPS amount. Mem. & Order, July 2, 2015, at 6-8. Although Defendant reasserts arguments on the issue of standing in its Motion for Summary Judgment, nothing in the parties' briefing or the summary judgment record changes the Court's ruling that Plaintiff does have standing.

*Id.* (emphasis added); *see also id.* at 155 (finding that § 1396a(bb)(5)(A) prohibits a state plan that creates "the potential for FQHCs to be reimbursed neither by MCOs, nor New York for services they provide."); *New Jersey Primary Care*, 722 F.3d at 542 ("MCOs often deny payments for reasons unrelated to Medicaid . . . e.g., MCO delays, multiple visits in different locations in the same day, and visits with non-primary care physicians" such that MCOs "inevitably exclude valid, Medicaid-eligible encounters and result in underpayment."). Under § 1396a(bb)(5)(A), the state plan must provide for an administrative process by which FQHCs can recover payment of the PPS rate *from the state* for any valid Medicaid claim for which an MCO has failed to pay or for which the MCO's payment is less than the PPS rate. A state plan lacking such a process cannot "be squared with the clear intent of Congress to ensure that Section 330 [grants] do not end up subsidizing state Medicaid programs." *Shah*, 770 F.3d at 155. Accordingly, to the extent that Defendant's reimbursement policy lacks such a process, it must be enjoined. *See Shah*, 770 F.3d at 157 (affirming district court injunction ordering the state to create "the necessary procedural mechanism to ensure that FQHCs would have the opportunity to seek redress in the event of non-payment.").

    **C.**    **May a state require that MCOs pay the full PPS rate rather than a negotiated rate?**

Distinct from the question of whether a state must guarantee reimbursement at the PPS rate is the question of whether a state may in the first instance require that MCOs pay FQHCs the full PPS amount. Thus the Court must return to the first step of the *Chevron* analysis. The Court finds that, as to this second question, the text of the Medicaid Act is "silent or ambiguous." *Chevron*, 467 U.S. at 843.

The question of whether a state may mandate full PPS payment by MCOs implicates both § 1396a(bb)(5)(A) and its companion provision, § 1396b(m)(2)(A)(ix), which states:

> such contract [between the state and the MCO] provides, in the case of an [MCO] that has entered into a contract for the provision of services with a Federally-qualified health center or a rural health clinic, that the [MCO] shall provide payment that is not less than the level and amount of payment which the [MCO] would make for the services if the services were furnished by a provider which is not a Federally-qualified health center or a rural health clinic.

42 U.S.C. § 1396b(m)(2)(A)(ix). Nowhere in this provision, nor elsewhere in the Medicaid Act, is there language that explicitly prohibits a state from demanding that MCOs pay FQHCs 100 percent of the PPS amount. Section 1396b(m)(2)(A)(ix) provides that a state must require MCOs to pay FQHCs "not less than" what the MCO would pay a non-FQHC for the same services. It is clear that this language "imposes a floor" on the rates that MCOs must pay FQHCs and that this floor is pegged at the market rate. *Three Lower Counties*, 498 F.3d at 305. It is also clear that the Medicaid Act contemplates the possibility that MCOs might reimburse FQHCs at a rate above this minimum requirement. The statute provides that the state's wraparound payment shall equal "the amount *(if any)* by which the [PPS rate] exceeds" the MCO's payment to the FQHC, 42 U.S.C. § 1396a(bb)(5)(A) (emphasis added), thereby recognizing that an MCO's payment might, in some instances, equal the PPS amount. What the Medicaid Act does not expressly address, however, is *who* may raise the MCOs' payment above the statutory market-rate floor: may the states do so or only the MCOs themselves? Defendant contends that the states are permitted to require that MCOs pay an amount above the market rate. Plaintiff, in contrast, contends that "[a]n MCO may, in its own discretion pay more, but it cannot be forced by the state to do so." Pl.'s Supp. Br. 4. The statute simply does not say.

Because the Medicaid Act is "silent or ambiguous with respect to [this] specific issue," the Court must defer to the agency's decision so long as it is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. Under this deferential standard, "a court reviewing an agency action may not substitute its own judgment for that of the agency."

21

*Louisiana Environmental Action Network v. E.P.A.*, 382 F.3d 575, 581-82 (5th Cir. 2004). Rather, the court's inquiry is limited to determining "whether the agency action 'bears a rational relationship to the statutory purposes' and [whether there is] 'substantial evidence in the record to support it.'" *Id.* (quoting *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir. 1998)). "Consistent with § 706 of the Administrative Procedure Act ("APA"), [the court will] reverse only where the agency's construction of the statute is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)). Here, in approving SPA 16-02, CMS implicitly adopted the view that the payment provisions of the Medicaid Act allow states to mandate, as Texas has, that MCOs pay FQHCs 100 percent of the PPS amount. For the reasons set forth below, the Court finds that this is not a permissible interpretation of the Medicaid Act. The only reasonable interpretation of the statute, when reading the payment provisions as a whole and in light of the legislative history,[16] is as follows: the *only* FQHC reimbursement obligation that a state may impose on MCOs is the requirement that MCOs pay "not less than" the market rate; the state must then pay FQHCs whatever wraparound payment is necessary to equal the PPS rate. Because the State cannot raise MCOs' payment obligation above the statutory floor, the State cannot require that MCOs pay the full PPS rate if the PPS rate would be more than the market rate.

    As with all issues of statutory interpretation, the appropriate place to begin is with the text itself. *Hamilton v. United Healthcare of Louisiana, Inc.*, 310 F.3d 385, 391 (5th Cir. 2002).

---

[16] It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989). "A court must therefore interpret the statute 'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into an harmonious whole.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995) and *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 389 (1959)).

Defendant argues that the words "if any" in § 1396a(bb)(5)(A) must authorize states to require full PPS payment by an MCO, "[o]therwise, the '*if any*' language would be superfluous because there would *always* be a supplemental payment." Def.'s Reply 5; *see also* Def.'s Mot. Summ. J. at 39. This interpretation is erroneous. To be sure, the purpose of the words "if any" is to account for the possibility that an MCO's payment to an FQHC might equal the PPS rate. Contrary to Defendant's interpretation, however, what the statute contemplates as giving rise to a situation where the MCO payment equals the PPS rate is not that the state would mandate such an equivalence, but rather that the rate negotiated between the MCO and the FQHC might equal the PPS rate. As the Second Circuit has explained: "if an FQHC contracts with an MCO, and *under this contractual arrangement an MCO pays the FQHC for services at a rate that is less than the PPS rate*, the FQHC must still be made whole by the state." *Shah*, 770 F.3d at 137. Every reading of § 1396a(bb)(5)(A) in the caselaw confirms that the purpose of the phrase "if any" is not to allow states to require that MCOs pay the full PPS amount, but rather simply to make clear that states are relieved of the duty to make wraparound payments in the event that an MCO, in its discretion, agrees to pay an amount equal to the PPS rate. *See, e.g.*, *Rullan*, 397 F.3d at 62 ("A problem arises when the MCO contract with the FQHC gives the FQHC less than the amount of compensation it is supposed to get according to the detailed per visit PPS reimbursement method outlined above. Congress has dealt with this problem by providing that states must pay FQHCs a supplemental or wraparound payment to make up the difference between what the MCO is paying the FQHC and what the FQHC is entitled to via the detailed PPS methodology."); *New Jersey Primary Care*, 722 F.3d at 530 ("A frequent problem . . . occurs in a managed care system: the contracted-for payment from the MCO to the FQHC for a Medicaid-covered patient encounter is often less than the amount the FQHC is entitled to receive under the PPS. In this

situation, the Medicaid statute requires the state to make a supplemental payment—the wraparound payment—at least once every four months, to make up the difference between the PPS rate and the MCO payment.").

The meaning of the last word of § 1396a(bb)(5)(A)—"contract"—makes plain why Defendant's proposed construction of the words "if any" is untenable. The payment provisions of the Medicaid Act govern two distinct contractual relationships: the contract between the state and MCOs and the contract that MCOs in turn enter into with FQHCs. If the State's interpretation of the statute were correct, the "contract" in § 1396a(bb)(5)(A) would, logically, have to refer to the contract between the state and MCOs: the words "if any" would, then, absolve the state of its duty to make wraparound payments in the event that the PPS rate equals the amount that the MCO is obligated, by the terms of its contract with the state, to pay FQHCs. But it is indisputable that the contract to which § 1396a(bb)(5)(A) refers is that between the MCO *and the FQHC*. *See* 42 U.S.C. § 1396a(bb)(5)(A) ("a contract between the center or clinic and a managed care entity"); *see also Cmty. Health Care Assocs.*, 921 F. Supp. 2d at 145 (holding that "the phrase 'payments provided under the contract' permits" a state to deduct from its payment obligation only the amounts "actually paid by the MCO" pursuant to its contract with the FQHC) (emphasis removed); *Concilio de Salud Integral de Loiza, Inc. v. Perez-Perdomo*, 551 F.3d 10, 14 (1st Cir. 2008). Because the contract referred to is that between the MCO and the FQHC, it is clear that the only purpose of "if any" is to release states of the obligation to make wraparound payments in the unlikely event (hence the parentheses around "if any") that the MCO and FQHC decide to contract at a price equal to the PPS rate.

Congress's use of the precise words "payment . . . *by the State*" in § 1396a(bb)(5)(A) further demonstrates that the payment provisions prohibit a state from requiring that MCOs pay

the full PPS amount. The State contends that the payment provisions only entitle FQHCs to receive reimbursement at the PPS rate, but do not entitle FQHCs to receive reimbursement from two different entities, MCOs and the state. However, the statutory language makes quite clear that this is exactly what the statute requires. In several provisions of § 1396a(bb), the statute states that "the State plan shall provide for payment" to FQHCs at the PPS rate. *See, e.g.*, 42 U.S.C. § 1396a(bb)(1); § 1396a(bb)(2). This language arguably does not require the state itself to make any payments to FQHCs, but rather permits a state to arrange, in its state plan, for a third party to make PPS payments on its behalf. But in § 1396a(bb)(5)(A), Congress was clear: "the State plan shall provide for payment to the [FQHC] *by the State* of a supplemental payment." *Id.* § 1396a(bb)(5)(A) (emphasis added). As the First Circuit, interpreting § 1396a(bb)(5)(A), has held, "[s]ince [the state] uses a managed care system, FQHCs will get Medicaid payments *from two sources*: first, the MCO, and second, a wraparound payment from the Commonwealth." *Rullan*, 397 F.3d at 62 (affirming preliminary injunction requiring the state to make wraparound payments to FQHCs where the state had failed to set up a PPS and make wraparound payments) (emphasis added); *see also New Jersey Primary Care*, 722 F.3d at 540 (3d Cir. 2013) (interpreting "supplemental payment" to mean that the state must make a payment that is "'in addition to' the MCO contractual payment").

This is not a case where the Court must speculate as to whether Congress even considered the issue of whether a state may require that MCOs reimburse FQHCs at the PPS rate.[17] Congress was well aware that one possible framework for the reimbursement structure would be to give states the option to delegate the payment responsibility to MCOs, for this is

---

[17] *Cf. Tafflin v. Levitt*, 493 U.S. 455, 462 (1990) ("[E]ven if we could reliably discern what Congress' intent might have been had it considered the question, we are not at liberty to so speculate; the fact that Congress did not even consider the issue readily disposes of any argument [as to] Congress['] unmistakabl[e] inten[t].").

precisely the option that Congress gave the states in § 1396b(m)(2)(A)(vii), just two paragraphs above the ambiguous provision in question, § 1396b(m)(2)(A)(ix). Section 1396b(m)(2)(A)(vii) governs how states must reimburse health care providers for certain services rendered to out-of-network patients—i.e., Medicaid patients enrolled in an MCO with which the provider does not have a contract. The provision requires that providers be reimbursed for out-of-network services when such services are "immediately required due to an unforeseen illness, injury or condition." 42 U.S.C. § 1396b(m)(2)(A)(vii). The provision further specifies that states are permitted to designate "*either the [MCO] or the State* [to] provide[] for reimbursement with respect to those services." *Id.* (emphasis added). As the Second Circuit put it, "Section 1396b(m)(2)(A)(vii) allows the state to contractually allocate to the MCO the obligation to pay for services provided by out-of-network FQHCs." *Shah*, 770 F.3d at 143; *see also Three Lower Counties*, 498 F.3d at 304 ("In plain language, this section requires States to include in their contracts with managed care organizations a provision that requires either the managed care organization or the State to reimburse out-of-network health centers . . . ."). A critical distinction between § 1396b(m)(2)(A)(vii) and §§ 1396b(m)(2)(A)(ix) and 1396a(bb)(5)(A) is that the former applies to all Medicaid providers whereas the latter two provisions impose special requirements that pertain only to FQHCs.[18] Because Congress expressly authorized states to require that MCOs make full reimbursement payments in a provision governing all providers, and did not use any such language in the provisions governing payment to FQHCs, "[t]he proper inference . . . is that Congress considered the issue of" granting states the authority to pass the reimbursement obligation onto MCOs, "and, in the end, limited [the grant of such authority] to the one[] set forth" in § 1396b(m)(2)(A)(vii). *United States v. Johnson*, 529 U.S. 53, 58 (2000). *See also*

---

[18] In addition to FQHCs, §§ 1396b(m)(2)(A)(ix) and 1396a(bb)(5)(A) also apply to Rural Health Clinics (RHCs), but RHCs are of no relevance here.

*NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522-23 (1984) ("Obviously, Congress knew how to draft an exclusion for collective-bargaining agreements when it wanted to; its failure to do so in this instance indicates that Congress intended that § 365(a) apply to all collective-bargaining agreements covered by the NLRA."); *In re Mirant Corp.*, 378 F.3d 511, 522 (5th Cir. 2004). Had Congress wanted to allow states the ability to shift the PPS payment entirely onto the MCOs, Congress would have said so, just as it did in § 1396b(m)(2)(A)(vii).

The Court's conclusion is bolstered by the legislative history of the payment provisions, which reveals a clear congressional intent to constrain states' ability to require that MCOs make payments higher than the market rate. Prior to 1997, when § 1396a(bb)(5) and § 1396b(m)(2)(A)(ix) were added, MCOs were required by the Medicaid Act to reimburse FQHCs "the full amount of the 100 percent reasonable cost" of providing services. *See generally New Jersey Primary Care*, 722 F.3d at 540-41; *Shah*, 770 F.3d 129 at 137. With the passage of the 1997 Balanced Budget Amendment ("BBA"),[19] Congress eliminated the requirement that MCOs pay FQHCs at the full, cost-based rate, and instead created the wraparound payment system in which MCOs need only pay FQHCs "not less than" they would pay to non-FQHCs, 42 U.S.C. § 1396b(m)(2)(A)(ix), while the state must make up the difference, *id.* § 1396a(bb)(5). By mandating that MCOs pay the full PPS amount, Texas has, in effect, attempted to return to the very system that Congress decided to repeal when it passed the BBA. Congress's intent in replacing the former system with the wraparound regime was to ensure that FQHCs would not be disadvantaged, relative to non-FQHCs, in their ability to secure contracts with MCOs. *See Shah*, 770 F.3d 129, 137 ("[The BBA] was designed to encourage MCOs to contract with FQHCs for provision of Medicaid services to MCO enrollees."). CMS's own guidance on the

---

[19] Pub. L. No. 105–33, 111 Stat. 251, formerly codified at 42 U.S.C. § 1396a(13)(c)(1999).

implementation of the payment provisions, in its October 1998 State Medicaid Director Letter ("SMDL"), instructed that the purpose of the wraparound requirement was "to assure that MCOs do not perceive or incur any undue burdens when contracting with FQHCs/RHCs versus other providers of care thus creating unintended barriers or disincentives to contract." Health Care Financing Administration, State Medicaid Director Letter (October 23, 1998), *available at* https://www.medicaid.gov/Federal-Policy-Guidance/downloads/SMD102398.pdf      [hereinafter October 1998 SMDL]. *See also* Health Care Financing Administration, State Medicaid Director Letter (April 20, 1998), *available at* http:// www.medicaid.gov/Federal-Policy-guidance/federal-policy-guidance.html ("Congress intended to encourage contracting between FQHCs/RHCs and MCOs and to remove financial barriers to this contracting.") [hereinafter April 1998 SMDL].[20]

Because Congress's aim was to level the playing field between FQHCs and non-FQCHs in the competition for MCO contracts, the key innovation of the wraparound requirement is that it "allows MCOs to negotiate their own rate for FQHC care of MCO enrollees," just so long as that rate is "not less than" the amount offered to a non-FQHC. *Shah*, 770 F.3d at 150; *see also New Jersey Primary Care*, 722 F.3d at 540 ("[T]he BBA removed the responsibility of MCOs to reimburse FQHCs at their cost-based rates as required under the predecessor statute. Rather, MCOs could agree on a contractual reimbursement rate as long as that rate was no less than the

---

[20] The agency's SMDLs—"like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). However, such interpretations are "entitled to respect" under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), "to the extent that those interpretations have the power to persuade." *Christensen*, 529 U.S. at 587 (internal quotation marks and citation omitted). The courts that have interpreted § 1396a(bb)(5) and enforced its wraparound provision against a state have found persuasive the 1998 SMDLs and have construed § 1396a(bb)(5) to conform with the guidance offered in those SMDLs. *See New Jersey Primary Care*, 722 F.3d at 541; *Shah*, 770 F.3d 129; *id.* at 151-52. This Court agrees with that conclusion. *See* Mem. & Order, July 2, 2015, at 19 ("Ultimately, the Court finds CMS's guidance persuasive, and consistent with the statutory purpose.").

amount offered to a non-FQHC."). By departing from the wraparound system and requiring that MCOs pay the full PPS rate, Texas has instituted a system that encourages MCOs to drop FQHCs from their provider networks—as TCHP did of Legacy—thus undermining Congress's intent to safeguard the role of FQHCs providing Medicaid services in managed care systems. *See Rullan*, 397 F.3d at 61 ("The special provisions on FQHC reimbursement reflect the important public health role that these centers play.").

Beyond these many reasons why CMS's approval of SPA 16-02 rests on an impermissible construction of the Medicaid Act, the approval itself bears the traits of an agency decision that is arbitrary and capricious, which further supports the Court's decision not to defer to the agency's approval. *Louisiana Environmental Action Network*, 382 F.3d at 582. The CMS approval contains no explanation or statement of reasons in support of its decision. The failure to explain its decision is of particular concern because the CMS approval contradicts the agency's consistently-stated policy on the question of whether a state may do away with wraparound payments and instead mandate that MCOs reimburse FQHCs at the PPS rate. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 56 (1983) ("While the agency is entitled to change its views on the acceptability of [a prior policy], it is obligated to explain its reasons for doing so."). CMS's position, as far back as April 1998, has been that the wraparound payment "requirement cannot and should not be delegated to an MCO, and that each State must determine any differences in payment and make up these amounts." *See* April 1998 SMDL. In the agency's October 1998 SMDL, CMS expressly rejected the exact sort of reimbursement scheme that Texas has adopted. CMS wrote that a reimbursement approach in which the state pays MCOs "a capitation payment that includes the State's best estimate of 100 percent of the FQHCs['] reasonable costs" and, "[i]n turn, the MCOs are required to make payments to FQHCs

. . . equal to their reasonable costs" is "not consistent with" and "contradictory to" the payment provisions of the Medicaid Act. *See* October 1998 SMDL. In its approval of SPA 16-02, CMS does not even acknowledge, much less explain, its departure from its longstanding position that a state may not shift its wraparound payment obligation onto the MCOs. The Court "cannot uphold [an agency's] decision . . . if it represents an unexplained reversal of past [agency] policy." *Texas Office of Pub. Util. Counsel v. F.C.C.*, 265 F.3d 313, 322 (5th Cir. 2001).

Perhaps the most revealing indication that CMS's approval of the Texas State Plan constitutes an arbitrary and capricious agency decision is that the approval of SPA 16-02 is not only inconsistent with CMS's prior position on the issue of MCO delegation, but is also inconsistent with the position that the agency has articulated *subsequent* to its approval of SPA 16-02. Just two months after CMS approved the SPA, CMS issued another guidance letter that expressly affirms the validity of the 1998 SMDLs and instructs that states may not "requir[e] that managed care contracts provide FQHCs and RHCs the full PPS reimbursement rate" in the manner that Texas has adopted. *See* Centers for Medicare and Medicaid Services, State Health Official Letter 1-2 (April 26, 2016), *available at* https://www.medicaid.gov/federal-policy-guidance/downloads/smd16006.pdf [hereinafter April 2016 SHO Letter]. Rather, the letter states, a requirement that MCOs pay the full PPS amount is valid only if the state seeking "[t]o accomplish this goal" has satisfied certain "conditions." *Id.* at 2. First, the requirement "that managed care contracts provide FQHCs and RHCs the full PPS reimbursement rate" must be incorporated into the state plan as an "alternative payment methodology (APM)," meaning that it must be "an *optional* alternative to the PPS requirements, including the supplemental payment requirement[]." *Id.* (emphasis added); *see also* 42 U.S.C. § 1396a(bb)(6) (defining "alternative payment methodologies"). Second, the state must "demonstrate that each affected FQHC and

RHC has agreed to the APM." *Id.* at 3. And third, the state must "remain responsible for ensuring that FQHCs and RHCs receive at least the full PPS reimbursement rate" and must maintain "reconciliation and oversight processes to ensure that the managed care payments comply with the statutory requirements of the APM." *Id.*

Texas's delegation of the PPS payment responsibility to MCOs does not comply with these conditions for instituting such a delegation. The State's requirement that MCOs reimburse FQHCs at the full PPS rate was not implemented as an "alternative payment methodology" in which FQHCs may elect to participate; rather, it was, and continues to be, mandatory for all FQHCs. Because the requirement was implemented as a rule applicable to all FQHCs, individual FQHCs never had the opportunity to consent to the requirement. And, as was discussed at length above, Texas has eliminated its guarantee that it will make supplemental payments where necessary, and has thereby failed to "remain responsible for ensuring that FQHCs and RHCs receive at least the full PPS reimbursement rate." *Id.*

The Court cannot explain why CMS would have approved of a state plan that CMS had declared inconsistent with the Medicaid Act in its 1998 guidance letters, and that CMS would again declare impermissible just two months after rendering its approval. But it is precisely because CMS's decision lacks rational explanation that the Court cannot defer to it. *See Diaz-Resendez v. I.N.S.*, 960 F.2d 493, 495 (5th Cir. 1992) ("[T]he [agency's] decision may be reversed as an abuse of discretion when it is made without rational explanation, or inexplicably departs from established policies."); *Navarro-Aispura v. I.N.S.*, 53 F.3d 233, 235 (9th Cir. 1995) ("[W]hatever deference is owed to the agency is overcome by the lack of a rational explanation for the agency's decision."). Because the Court does not defer to CMS's approval of the State's requirement that MCOs pay the full PPS amount, and because the Court further finds that such a

requirement violates § 1396a(bb)(5)(A) and § 1396b(m)(2)(A)(ix), this aspect of the State's reimbursement policy must be enjoined.

## IV.     CONCLUSION

For the reasons set forth above, the Court finds that Plaintiff's Motion for Summary Judgment (Doc. No. 84) should be, and hereby is, **GRANTED IN PART**. Likewise, Defendant's cross-Motion for Summary Judgment (Doc. No. 89) is **DENIED IN PART**. The State's reimbursement policy is hereby enjoined until modified in a manner consistent with this Opinion. The parties are asked to resolve consensually their remaining disputes.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 3rd day of May, 2016.

HON. KEITH P. ELLISON
U.S. DISTRICT JUDGE